*JC FUNDING GROUP*
*1123 WILSHIRE BLVD., #1012*
*SANTA MONICA, CA 90403*

Mr. Richard Eaton
Golden Sun Energy Company, LLC
and Panorama Energy Financial, LLC
4900 California Avenue
Tower B, 2nd Floor
Bakersfield, CA 93309

January 13, 2014

## LOAN TERM SHEET

PROVIDED IN RESPONSE TO A REQUEST FOR FUNDING RECEIVED BY OUR ASSOCIATION AND BY APPROVAL OF OUR OPERATING PARTNERS.

THIS DOCUMENT IS NOT A SOLICITATION OF ANY TYPE. THIS NOTICE IS INTENDED TO BE AN INFORMATIONAL DOCUMENT TO SUPPORT A LOAN THAT IS SUBJECT TO THE TERMS AS THEY ARE PROVIDED HEREIN.

---

Dear Mr. Eaton,

This letter shall confirm an expression of interest of **JC Funding Group**, working in connection with **Toval International**, to provide financing in the form of a Series-1 Development Loan for use in development of approximately four oil wells located in the Maya Sands lease tract in Bakersfield, CA, upon the conditions set forth below. Lender will require the satisfactory completion of due diligence in connection with the project and the completion of final legal documents supporting the terms set forth below. As such, this Letter of Intent is deemed to be an expression of interest only and should not be relied upon by any party as the basis for a commitment to finance the Project.

**Borrowers/Corporate:**
**Golden Sun Energy, LLC and Panorama Energy Financial, LLC** (the "**Borrower**"), intends to borrow funds for the purpose of the development of approximately four oil wells for the extraction of oil for commercial resale, (the "**Project**").

**Lender/Serviceman:**
Lender will be a newly formed special purpose vehicle established by JC Funding Group (the "**Lender**").

**Loan Program Amount:**
$2,000,000 USD (the "**Loan Amount**"). Lender will provide Project capital in monthly fundings pursuant to a mutually agreed upon draw schedule, subject to, among other conditions, an Interest Reserve Account established at the time of the first Loan Funding that will contain sufficient funds to pay interest only payments due during the first 12 months of the loan; inclusive of Lender and Servicing Fees.

Term Sheet 1

**Use of Loan Funds (for 4 Oil Wells):**

| | |
|---|---|
| Development Costs | $ 2,000,000 |
| Accrued Interest Cost | $    115,320 |
| Loan Fees | $      42,340 |
| Advisor Fees | $      31,755 |
| Loan Servicing | $      10,585 |
| | $ 2,200,000 |
| Less Equity Contribution | $    200,000 |
| Net Loan Proceeds | $ 2,000,000 |

**Interest Reserve Account:**
The parties hereto have agreed that to aid the Loan Program in its ramp-up and stabilization that an interest reserve account will be established on day of closing and funded from the Loan proceeds. The account shall contain sufficient funds (estimated to be $115,320) to make the required interest only payments for the first twelve (12) months of this loan. This account will be held and disbursed by a loan service agent.

**Loan Rate:**
The Lender has agreed to a fixed loan rate of 6.5%. During the first twenty four (24) months there shall be interest only payments and thereafter Principal and Interest payments based on a eight (8) year repayment schedule as set forth below.

**Term of the Loan:**
The term of the Loan shall be ten (10) years. The Lender has agreed to provide the Loan in the form of twenty four (24) months of interest only payments during the construction loan period and eight (8) years of principal and interest payments during the permanent loan period. Any remaining unpaid principal or interest will be due at the end of year ten.

**Repayment Schedule:** The Lender has agreed to provide the Loan in the form of monthly Interest only payments for two (2) years and then after year 2, monthly Interest payments and one time per year Principal Payments, with the Principal Payments as follows:

One Time Payment at -
End of Year 3 -  $    200,000
End of Year 4-   $    250,000
End of Year 5 -  $    250,000
End of Year 6 -  $    250,000
End of Year 7-   $    250,000
End of Year 8-   $    250,000
End of Year 9-   $    250,000
End of Year 10- $    300,000 (Balance Due)

Term Sheet 2

**Project Collateral, Provided in Support of the Loan:**
This Loan will be secured by a valid, perfected and continuing pledge and assignment of the first priority security interests in all of the rights, title, and interest in and to and upon all of Borrower's assets associated with the Project, now owned or hereafter acquired, including, but not limited to, a first mortgage on the Project real estate, other Project hard assets, intellectual property, trade secrets, and any and all contracts, plans, permits and other items required to secure a first mortgage and UCC-1 on all Project related holdings of the Borrower.

**Calculation of Principal and Interest Payments:**
The P&I payments on this Loan will be based on an eight (8) year repayment schedule in years 3-10.

**Loan Prepayment:**
The Loan can be prepaid in whole or in part at any time after twenty four (24) months, with a minimum of 30 days written notice to a duly authorized representative of Lender. If prepaid in less than 24 months, any amount remaining in the Interest Reserve Account shall be unrecoverable, forfeited as a prepayment penalty.

**Estimated Closing Date and Funding Dates:**
Subject to the timely establishment of the escrow loan account and the release of the Deposit to Lender in order to allow Lender to use it to generate the Loan Proceeds, the first funds in the amount of $1,000,000 will be available in a Loan Production Account no later than March 21, 2014. Additional funds in the amount of $1,000,000 shall be made available 30 days thereafter. Draw downs from the Loan Production Account shall be subject to a mutually agreeable Draw Schedule.

**Corporate Guarantee Based on the Limited Recourse Escrow:** The Borrower will establish an escrow holding account as identified in the body of this term sheet that shall provide the equity investment amount in the Project. There is no personal guarantee associated with this Loan.

**Project Equity Contribution:** Borrower shall make available Two Hundred Thousand Dollars ($200,000) as its Equity Contribution in the Project.

**Escrow and Custodial Account Procedures:**
The following procedures shall take place relating to the Escrow Account:

- The Borrower shall, pursuant to an Escrow Agreement to be provided by Lender, open an escrow account at a mutually agreeable location. Borrower shall DEPOSIT into that escrow account not less than $200,000 USD (the "Deposit").

- Upon receipt by Escrow Agent of Borrower notification to release the Deposit, Escrow Agent shall wire funds to bank coordinates provided by Lender for use in funding the Project.

**Loan Payments:**
Loan payments shall be due and payable on the fifteenth day of each month.

**Payment Priorities:**
Prior to deploying any Loan Proceeds into the Project, the following shall be paid from Loan Proceeds:
  i. All closing and start-up fees including closing points or loan origination charges, unless designated to be paid ratably from each Loan Funding; and

Term Sheet 3

ii. The Interest Reserve funded.

**Conditions Precedent:**
The following are some, but not all, of the conditions precedent to any funding by the Lender:

i. The Borrower shall be duly organized and in good standing in the jurisdiction of its organization and qualified to do business in any other jurisdiction where it has Loans or underlying collateral;

ii. The execution and delivery of the Loan documents executed and delivered by the Borrower on or prior to the Closing Date;

iii. No material pending claim, investigation or litigation with respect to the Borrower by any state or Federal governmental entity except as disclosed prior to closing and acceptable to Lender;

iv. The Lender shall have received and reviewed such financial and other information as it may reasonably request, including monthly financial projections of the Borrower, the results of which shall be satisfactory to Lender;

v. Lender shall be satisfied with the background of key members of the Borrower's management team;

vi. Lender shall be satisfied with the required Project management and audit control arrangements and all other aspects of Project cash management system;

vii. No material adverse change in the business, operations, or in the condition of Borrower shall have occurred;

viii. Payment in full of all outstanding Loan fees and other amounts due from the Borrower prior to or as a part of the funding;

ix. Customary legal opinions at closing, if necessary; and

x. All of the listed herein items shall be completed and be in-place, prior to or during the transaction processing period.

**Project Insurance:**
Project Insurance coverage must be acceptable to the Loan Servicer as determined by the Lender prior to the closing. The key Insurance Policies include, but are not limited to, well, liability insurance and fire insurance.

**Reporting Requirements:**
Borrower and Project, as applicable, shall be subject to the following reporting requirements:

i. Every 90 days Borrower shall provide updates and progress reports on the Project. As a part of this requirement, Lender has the option of ordering a book audit conducted by an Agent of Record on all Project expenditures paid out of Loan proceeds. These audits shall not exceed two

   (2) times a year unless an accounting irregularity has been found and identified in writing to Borrower by Agent of Record.
ii. Monthly financial statements during construction and quarterly consolidated financial statements thereafter.
iii. Project insurance renewals if required.
iv. Notices of material events and/or potential events of defaults, litigation or licensing issues.
v. Other reports as reasonably requested by the Agent of Record.

**Financial Covenants:**
To be determined as reasonable and customary for this type of transaction.

**Events of Borrower Default:**
Borrower shall be declared in default based upon events established by the Lender and noticed in writing to Borrower. Borrower shall be declared in default based upon the following events, which if left uncured for a term of 10 business days will represent an Event of Default.
- Breach of Representation and Warranty;
- Failure to pay interest or principal payment when due;
- Failure to pay late charge or charge when due;
- Failure to repay Lender advances when due;
- Failure to perform any obligation not involving the payment of money;
- A filing of bankruptcy if not dismissed within 60 days;
- Insolvency of Borrower;
- Borrower makes an assignment for benefit of creditors;
- The existence or the filing of or the entry of any judgment, order or decree, without Lender's prior written consent;
- Any dissolution, liquidation, transfer of stock, transfer of membership interest, admission of a new member, general partner or stockholder, merger, or other transfer of the ownership of Borrower without the prior written consent of Lender;
- The priority or security of the Collateral Agreement or any other security for the payment of the Note, in the reasonable judgment of Lender, is in jeopardy.

In the event of a filing of a bankruptcy petition by Borrower's creditors forcing an involuntary bankruptcy, Borrower shall be granted 120 days to cure this event. After that date the Lender may exercise its rights to take over the Project as a cure.

**Events of Lender Default:**

The Parties understand that the Loan Proceeds are being utilized for the development of approximately three oil wells on the Land and that time is of the essence for funding of the loan. Lender shall be in default if, after execution of all loan documents, deposit by Borrower of its Equity Contribution to the project, and subsequent release to Lender of the Deposit for use in generating the Loan Proceeds, Lender fails to fund $2,000,000.00 into the appropriate Loan Production Accounts as set forth above on or before the period of time reflected in "Estimated Closing Date and Funding Dates" above, or becomes insolvent and unable to make any contracted loan disbursements. Upon written notice of default by Borrower to Lender, <u>Lender shall have five (5) business days to cure the default. If Lender does not cure Lender waives all rights pursuant to this agreement and must refund Borrower's $200,000 Equity Contribution and all related costs, advisor fees and expenses incurred by Borrower pursuant to this agreement within thirty (30) days from date of default.</u>

Term Sheet 5

**Representations and Warranties:**
The Loan Documents will contain the following representations and warranties.

- **Capacity.** Borrower and Lender and the individuals executing Loan Documents on behalf of the Parties have the full power, authority and legal right to execute and deliver;
- **Authority and Enforceability.** The execution and delivery by the Borrower and Lender has been duly authorized and will constitute the legal, valid and binding obligations of Borrower enforceable in accordance with their respective terms;
- **Compliance with Law.** The execution and delivery do not conflict with, result in a breach or default under or create any lien or charge under any provision of any existing law, rule, regulation, order, writ, injunction or decree of any court or Governmental Authority to which it is subject;
- **Material Adverse Events.** Since the date of the financial statements delivered to Lender, no Material Adverse Change has occurred;
- **Litigation.** There are no actions, suits, investigations or proceedings pending, or to the knowledge of Borrower or Lender, threatened, after due inquiry and investigation, against or affecting Borrower or Lender at law or in equity, before or by any Person or Governmental Authority, which, if adversely determined, would have a Material Adverse Effect;
- **No Untrue Statements.**
- **Policies of Insurance.** Each of the copies of the policies of insurance relating to the Collateral delivered to Lender by Borrower (i) is a true correct and complete copy of the respective original thereof (ii) has not been terminated and is in full force and effect;
- **Financial Statements.** All historical financial statements furnished to the Lender present fairly, in all material respects, the financial condition of Borrower as of the dates stated;
- **Taxes.** Borrower has filed or caused to be filed all tax returns which are required to be filed by it.

**Confidentiality:**
Each the Borrower and the Lender agree that it will not show, circulate, or otherwise disclose this letter or its contents to any other person (other than its officers, directors, attorneys, affiliates and advisors, on a "need-to-know" basis). Additionally, prior to using either Parties' names in any public domain (filing, shareholders meetings, etc.), both Parties shall have the right to approve such document.

**Governing Law and Jurisdiction:**
The Borrower and Lender will submit to the non-exclusive jurisdiction and venue of the State of California and shall waive any right to trial by jury. California law shall govern the Facility Documents and this Term Sheet without regard to Choice of Law provisions.

**Indemnification:**
Customary and appropriate provisions relating to indemnification and related matters in a form reasonably satisfactory to the Lender as items pertaining to the loan and the Project/ Borrower shall apply.

**Expenses:**
Lender will pay for its own out-of-pocket costs in connection with making this Loan.

Term Sheet 6

**Loan Servicing Fees:**
A Loan Servicing Fee in the amount of one quarter of one half of one percent (.5%) of the Loan Amount shall be paid to the Loan Servicer ratably from each Loan draw, and renewed annually.

**Loan Fees:**
A Loan Fee equal to Two Percent (2%) of the Loan Amount shall be paid to Lender ratably from each Loan funding into the Production Account.

**Advisor Fee:** Both parties acknowledge that there are no advisors entitled to a fee pursuant to this transaction other than Toval International, who shall be paid 1.5% from the first Loan Funding Amount. Each side shall indemnify the other for any claim that might arise in connection with any other broker or advisor fees hereunder.

**Disclosures:**
The terms listed herein are understood to be subject to market. This Term Sheet is understood to be a transaction "Start Document" and a Terms and Conditions Notice and not binding on the parties with the exception of the Confidentiality section. However, all of the parties to this Term Sheet have been notified and understand that this transaction is contingent on a Two Hundred Thousand Dollar ($200,000) escrow being established and satisfactory completion of Loan documents.

**Disputes:**
In the event of any controversy or claim arising out of or relating to this Agreement, or the breach thereof, the Parties hereto shall make all efforts to settle the controversy or claim without seeking intervention. In the event that the controversy or claim has not been settled between the Parties themselves, the Parties have the option to have this controversy settled by arbitration, with any hearing to take place at a mutually agreed location. Judgment upon the award rendered by the Arbitrator(s) shall be final and binding upon the Parties. Notwithstanding anything herein to the contrary, in the event of a breach of the obligations herein, the aggrieved party may seek an injunction in a court of law for equitable relief.

**Waiver of Jury Trial:**
Each of the Parties hereby waives any right to a trial by jury in any lawsuit, proceeding or action to enforce or defend any right under this agreement or any amendment, instrument, document or agreement delivered or to be delivered in connection with this agreement and agrees that any lawsuit, proceeding or action will be tried before a court and not before a jury.

**Force Majeure:**
The Lender and the Borrower will neither be considered in breach of this Agreement nor liable under this Term Sheet for any delays, failures to perform, damages or losses, or any consequence thereof, caused by or attributable to an event of "Force Majeure" which is defined as any cause beyond the reasonable control of Lender including, without limitation, the action by a Governmental authority (such as a moratorium on any activities related to this Term Sheet or changes in government Codes, ordinances, laws, rules, regulations, or restrictions occurring after the effective/acceptance date of this Term Sheet), third-party labor dispute, flood, earthquake, fire, epidemic, war, acts of terrorism or an act of God.

Term Sheet 7

Acknowledged and Accepted as executed:

**BORROWERS**

**GOLDEN SUN ENERGY CO., LLC**
Authorized Signatory:

By: _/s/ Richard Eaton_
Title: CEO
Name: Richard Eaton
Date: 1/14/2014

**PANORAMA ENERGY FINANCIAL, LLC**
Authorized Signatory:

By: _/s/ Richard Eaton_
Title: CEO
Name: Richard Eaton
Date: 1/14/2014

Lender:
**JC FUNDING GROUP, LLC**
Authorized Signature:

By: _____
Title: Principal
Name: Jeff N. Crossland
Date: _____

EDT (Electronic or Facsimile document transmissions) shall be deemed valid and enforceable in respect of any provisions of this Agreement. As applicable, this agreement shall be:
i    Incorporate U.S. Public Law 106-229, "Electronic Signatures in Global and National Commerce Act" or such other applicable law conforming to the UNCITRAL Model Law on Electronic Signatures (2001) and
ii    ELECTRONIC COMMERCE AGREEMENT (ECE/TRADE/257, Geneva, May 2000) adopted by the United Nations Centre for Trade Facilitation and Electronic Business (UN/CEFACT).
iii    EDT documents shall be subject to European Community Directive No. 95/46/EEC, as applicable. Either Party may request a hard copy of any document that has been previously transmitted by electronic means provided however, that any such request shall in no manner delay the parties from performing their respective obligations and duties under EDT instruments.

**END OF DOCUMENT**