ELECTRONICALLY FILED
Superior Court of California,
County of Orange

**03/30/2015** at 04:51:55 PM
Clerk of the Superior Court
By Veronica Acosta, Deputy Clerk

1  John S. Clifford, State Bar No. 172263
2  Vince Wilson, State Bar No. 283442
   SMITH LC
3  3161 Michelson Drive, Suite 925
   Irvine, CA 92612
   Telephone:     (949) 416-5000
4  Facsimile:     (949) 416-5555
   Email:         jclifford@smith-lc.com
5  Email:         vwilson@smith-lc.com

6  Attorneys for Plaintiff,
   MEMPHIS WINSET, LLC
7

8                **SUPERIOR COURT OF CALIFORNIA**

9          **COUNTY OF ORANGE – CENTRAL JUSTICE CENTER**

10

MEMPHIS WINSET, LLC, A California        CASE NO: 30-2015-00779918-CU-BC-CJC
11  limited liability company,

12                    Plaintiff,          JUDGE:  Judge David Chaffee
                                          DEPT.:

13          vs.

14  JC FUNDING, LLC; a Missouri limited   **COMPLAINT FOR:**
    liability company; JC FUNDING-18, LLC, a
15  Missouri limited liability company; JEFF  1)  **BREACH OF CONTRACT**
    CROSSLAND, an individual; RAY        2)  **BREACH OF COVENANT OF GOOD**
16  ROBINSON, an individual; and DOES 1      **FAITH AND FAIR DEALING**
    through 25, inclusive,               3)  **CONVERSION**
17                                        4)  **FRAUD**
                      Defendants.         5)  **NEGLIGENT MISREPRESENTATION**
18                                        6)  **MONEY HAD AND RECEIVED**
                                          7)  **ACCOUNTING**
19                                        8)  **CONSTRUCTIVE TRUST**
20

21

22

23          Plaintiff MEMPHIS WINSET, LLC ("Plaintiff" or "Memphis") complains against

24  Defendants as follows:

25                        **THE PARTIES**

26          1.      At all times herein, Plaintiff MEMPHIS WINSET, LLC ("Memphis") was and is a

27  California limited liability company, licensed to do business in California with its principal place

28  of business in Orange County.

SMITH LC

1
COMPLAINT

SMITH LC

2.      Defendant JC FUNDING, LLC, a Missouri limited liability company, is and, at all times relevant herein, was a company conducting and doing business in the State of California, County of Orange and with its principal place of business in Los Angeles County.

3.      Defendant JC FUNDING-18, LLC (JC FUNDING, LLC and JC FUNDING 18, LLC are referred to herein collectively as "JC Funding"), a Missouri limited liability company, is, and at all times relevant herein was, a special purpose entity set up by JC FUNDING, LLC for the express purpose of entering into the loan agreement and perpetrating the frauds as set forth in more detail below.

4.      Plaintiff is informed and believes, and thereon alleges, that Defendant JEFF CROSSLAND, an individual ("Mr. Crossland"), is, and at all times herein was, an individual residing in the State of California and working as an agent, member, owner, operator, manager, alter ego, and employee of JC Funding.

5.      Defendant RAY ROBINSON, an individual ("Mr. Robinson"), is, and at all times herein was, working as a member, owner, operator, manager, and/or employee of JC Funding.

6.      The true names, involvement and/or capacities, whether individual, corporate, governmental or associate, of Does 1 through 25, inclusive, are unknown to Plaintiff at the time of filing this Complaint.  Plaintiff will amend the Complaint by inserting the true names of those defendants named herein as Does 1 through 25 when the true names of said defendants have been ascertained.  (JC Funding, Mr. Crossland, Mr. Robinson, and Does 1-25 are collectively referred to herein as "Defendants".)

7.      Plaintiff is informed and believes, and thereon alleges, that each Defendant is legally responsible, whether negligently, intentionally, or otherwise, for the events and happenings herein set forth and are thus the proximate and legal cause of the damages and losses claimed by Plaintiff in this action as set forth herein.

8.      Plaintiff is informed and believes, and based thereon alleges, that at all times herein mentioned in this Complaint, in committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct and acted in concert with and conspired with one another in furtherance of their common plan or scheme.

SMITH LC

9.     Plaintiff is informed and believes, and based thereon alleges, that at all times herein mentioned in this Complaint, in addition to the wrongful conduct alleged herein as giving rise to primary liability, Defendants have also aided and abetted each other in committing the wrongful acts alleged herein.

### JURISDICTION AND VENUE

10.    This action arises under California law and the amount in controversy exceeds $25,000.00.

11.    Jurisdiction is proper, pursuant to California Code of Civil Procedure ("CCP") section 410.10, as Defendants, and each of them, reside in or conducted the business alleged herein the state of California. Further, the facts giving rise to the instant dispute arise from the parties' transactions and occurrences within the County of Orange.

12.    Venue is proper in this judicial district pursuant to CCP sections 395.5 and 410.10 as the contract to be performed was entered into in the County of Orange.

### GENERAL ALLEGATIONS

13.    On or about September 11, 2014, Memphis and JC Funding entered into a written contract entitled "Project Funding Loan Agreement" (the "Loan Agreement"), whereby JC Funding agreed to loan Memphis $5,000,000 (the "Loan"). A true and correct copy of the Loan Agreement without signatures is attached to this complaint as **Exhibit A** and incorporated herein as though set forth in full. All parties executed and signed Exhibit A at or about the date set forth herein. Contemporaneous with the Parties execution of Exhibit A, Plaintiff Memphis executed a Promissory Note for $5,000,000 and a Deed of Trust in favor of JC Funding. Mr. Crossland signed all of the documents for JC Funding.

14.    Plaintiff entered into the Loan Agreement in order to obtain financing for construction costs associated with the redevelopment of a housing project. As set forth in Exhibit A, time is and was of the essence for funding the Loan as the Loan was vital to Memphis' ability to continue the housing project and, as the Parties expressly acknowledged and agreed, any delay by Defendants in the performance of their obligations under the Loan Agreement would result in massive and ongoing consequential damages to Plaintiff.

15.     As a condition precedent to funding the Loan, Memphis was required to make a $500,000 deposit (the "Deposit") which was to stand as security for the Loan and from which JC Funding could take draws only in the event of a default by Memphis. JC Funding and Mr. Crossland all represented that the Loan would not and could not be funded unless Memphis made the Deposit.  These same Defendants represented that, consistent with Exhibit A, the Deposit would be transferred to and kept in a sequestered escrow and that no portion of the Deposit would be withdrawn unless and until all of the following occurred: the Loan was funded, Memphis incurred obligations for repayment of the Loan, and either a $500,000 balance on the Loan remained or Memphis defaulted on the Loan.

16.     After signing the Loan Agreement, JC Funding and Mr. Crossland made further reassurances that, should there be any difficulty obtaining the money required for funding the loan, that the Deposit would be returned in full and that Defendants had no right to, plan to, or intentions to, use or even touch, the Deposit unless and until the conditions set forth and described in paragraph 15 occurred.

17.     In preparation for the funding, as part of the Loan Agreement, and in reliance on the representations made by JC Funding, Mr. Crossland, and Mr. Robinson, Memphis made the Deposit to a bank account as dictated by Defendants.  The Deposit was wired in two separate installments, one of $275,000 and one of $225,000 with both occurring on September 12, 2014. Making the Deposit was the only condition precedent and the only obligation of Memphis prior to funding the Loan outlined in the Loan Agreement.  Once the Loan was funded, Memphis would be obligated to repay the Loan on a schedule set forth in the Loan Agreement.  Accordingly, Plaintiff has met all conditions and obligations imposed by the Loan Agreement, save those obligations excused as a result of Defendants' breaches as set forth herein.

18.     The representations made by JC Funding, Mr. Crossland and Mr. Robinson were false.  Defendants withdrew the entirety of the $500,000 from the account held by the Barton Law Firm at some point after September 12, 2014, distributed the Deposit, and, Plaintiff alleges on information and belief, Defendants have used the Deposit to pay for personal and/or professional expenses which are neither authorized under the Loan Agreement nor for the benefit of Plaintiff.

SMITH LC

SMITH LC

19.     JC Funding, Mr. Crossland, and Mr. Robinson made the specific representations regarding the Deposit as set forth above under circumstances such that they either knew or should have known that the representations were false. Further, the representations were made with the express intent to induce Memphis to make the $500,000 deposit so that they could then use the Deposit for personal and/or professional obligations in breach of the express terms of the Loan Agreement. Memphis and its principals did in fact rely on the representations regarding the safety and sanctity of the Deposit in deciding to enter into the Loan Agreement as well as in deciding to entrust Defendants with the Deposit.

20.     Plaintiff alleges, on information and belief, that a conspiracy was formed amongst the Defendants to commit a fraud against Memphis whereby Defendants agreed and intended to cooperate in the fraud as alleged herein in that they agreed to access and divide the Deposit amongst themselves despite each Defendant having knowledge that Memphis had been promised, both orally and in writing, that the Deposit was to be held in escrow under the terms of the Loan Agreement and was not to be distributed or accessed unless and until the Loan was funded and Memphis either defaulted on the Loan or the outstanding Loan balance reached $500,000.

21.     On or about December 22, 2014, the Memphis and JC Funding executed a First Amendment to the Loan Agreement whereby the Parties agreed to alter the schedule of distributions under the Loan Agreement and JC Funding agreed to begin distributions on December 31, 2014, with further distributions to occur on February 1, 2015 and March 1, 2015. To date no distributions have been made. A true and correct copy of the unsigned Amendment to the Loan Agreement, which Amendment was in fact executed by all of the Parties, is attached to this complaint as **Exhibit B** and incorporated herein as though set forth in full.

22.     Defendants never made or arranged for others to make the promised Loan; as of the date of this complaint, no monies have ever been advanced to Plaintiff by Defendants. The Loan Agreement provides that, in the event of a default by JC Funding, Memphis will provide notice of default and JC Funding will have five days cure such default. If JC Funding is unable to cure within five days of receipt of the notice of default, Memphis is entitled to a refund of the entirety of the Deposit along with attendant costs.

23.     When Plaintiff began making inquiries to Defendants when funding would take place or when the Deposit would be returned, Defendants stated that various options had been or were being explored and that there was still a "very good chance" that the entirety of the Loan would become available soon.  This was false.

24.     On February 13, 2015, Plaintiff gave Defendants notice of default for failure to timely fund the Loan, demanding repayment of the Deposit or cure.  Defendants failed to cure the default. To date, Defendants have failed to return the deposit. Subsequent to the expiration of the cure period, Defendants for the first time admitted to Plaintiff that the Deposit had not been kept in Escrow as promised, but rather had already been spent.

25.     Section 5.14 provides that Defendant JC Funding is entitled to attorney fees in the event of litigation with Memphis. Pursuant to California Civil Code section 1717, any contractual right to attorney fees is reciprocal, and therefore Plaintiff has a right to attorney fees pursuant to the Loan Agreement

26.     Plaintiff is informed and believes, and based thereon alleges, that Mr. Crossland and Mr. Robinson are the alter egos of JC Funding.  JC Funding is, and at all times mentioned herein was, a mere shell without capital, assets, or stock and were conceived, intended, and used by their owners and operators, and for the purpose of substituting a financially insolvent company in the place of the principals.  JC Funding is, and at all times mentioned herein was, so inadequately capitalized that, compared to the business to be done by it and the risk of loss, its capitalization was trivial.

27.     Plaintiff alleges, again on information and belief, that there is, and at all times mentioned herein was, such a unity of interest and ownership between Mr. Crossland, Mr. Robinson and JC Funding that any separateness has ceased to exist in that Mr. Crossland and/or Mr. Robinson used assets of JC Funding for personal use, caused assets to be transferred to and from JC Funding without adequate consideration, and withdrew funds from JC Funding for his personal use.  Plaintiff is informed and believes, and based thereon alleges, that money deposited into the JC Funding bank account was accessed and used by Mr. Crossland and/or Mr. Robinson for personal expenses and excessive distributions.  JC Funding was established by Mr. Crossland

SMITH LC

1   and/or Mr. Robinson as a front for fraudulent activities as detailed above, whereby Mr. Crossland

2   and/or Mr. Robinson would be able to take deposits from unsuspecting potential borrower's like

3   Memphis, and impermissibly use those deposits for personal or professional obligations not

4   associated with the borrower.

5         28.     Adherence to the fiction that JC Funding and Mr. Crossland or Mr. Robinson are

6   separate entities would permit abuse of the corporate privilege and produce an inequitable result in

7   that: Mr. Crossland and Mr. Robinson represented and promised to Plaintiff that JC Funding and

8   Mr. Crossland or Mr. Robinson would either fund the loan or else return the entirety of the deposit

9   along with attendant costs; JC Funding was so undercapitalized and Mr. Crossland and Mr.

10   Robinson personally benefitted from such undercapitalization; Mr. Crossland and Mr. Robinson

11   used company assets including the deposit and other funds for personal debts, obligations, and

12   expenses; Mr. Crossland and Mr. Robinson used the Deposit  for personal and/or professional

13   obligations and he thereby personally profited in the form of increased revenues, increased

14   improper distributions from JC Funding, and/or increased proceeds from other loans funded or

15   brokered by JC Funding.

16               **FIRST CAUSE OF ACTION**

17                 **Breach of Contract**

18             **(As Against All Defendants)**

19        29.     Plaintiff incorporates by reference paragraphs 1-28 of this Complaint as though

20   fully set forth herein.

21        30.     All conditions required by the contract for JC Funding's obligation to return the

22   Deposit have been performed by Plaintiff or were otherwise excused.

23        31.     As a direct and proximate result of Defendants' breach of contract as set forth

24   herein, Plaintiff has suffered direct and consequential damages including, but not limited to the

25   Deposit, interest, property loss, delay and loss of the housing development property and

26   workforce, and other lender fees and penalties, all in an amount to be proven at trial, but in no

27   event less than $1,500,000.

28   / / /

SMITH LC

SMITH LC

## SECOND CAUSE OF ACTION

### Breach of Covenant of Good Faith and Fair Dealing

### (As Against All Defendants)

32.     Plaintiff incorporates by reference paragraphs 1-28 and 31 of this Complaint as though fully set forth herein.

33.     JC Funding unfairly interfered with Plaintiff's right to the return of the Deposit as outlined in the Loan Agreement in that JC Funding accessed and used the Deposit for personal and/or professional obligations not associated with Plaintiff.

34.     As a result of JC Funding's breach of the covenant of good faith and fair dealing by accessing, distributing, and otherwise using the Deposit, Plaintiff has been injured in an amount to be determined at trial, but in no event less than $1,500,000, together with interest and costs, including reasonable attorney fees as allowed by the Loan Agreement.

## THIRD CAUSE OF ACTION

### Conversion

### (As Against All Defendants)

35.     Plaintiff incorporates by reference paragraphs 1-28 and 31 of this Complaint as though fully set forth herein.

36.     Plaintiff owned, possessed, and had the right to possess the $500,000 Deposit

37.     Plaintiff alleges, on information and belief, that JC Funding, Mr. Crossland, and Mr. Robinson intentionally and substantially interfered with Plaintiff's rights in the Deposit by improperly withdrawing the Deposit, distributing it amongst the Defendants where Defendants used the funds to pay for personal and/or professional obligations.

38.     Plaintiff did not consent to the withdrawal, distribution, or spending of the Deposit by JC Funding, Mr. Crossland, and Mr. Robinson.  Plaintiff has requested the return of the Deposit in its entirety, but JC Funding, Mr. Crossland, and Mr. Robinson have refused and continue to refuse to do so.

39.     As a direct and proximate result of the withdrawal, distribution, and spending of the Deposit by JC Funding, Mr. Crossland, and Mr. Robinson, Plaintiff has been injured through the

1  inability to access the funds contained in the Deposit and attendant foreseeable, natural, and

2  reasonable damages in an amount to be determined at trial, but in no event less than $1,500,000,

3  together with interest and costs, including reasonable attorney fees as allowed by the Loan

4  Agreement.

5        40.     Defendants' actions were and are presently malicious, oppressive, and/or

6  fraudulent, entitling Plaintiff to punitive and exemplary damages in an amount to punish

7  Defendants and to deter Defendants from engaging in similar conduct in the future.

8  ## FOURTH CAUSE OF ACTION

9  ### Fraud

10 ### (As Against All Defendants)

11       41.     Plaintiff incorporates by reference paragraphs 1-28, 31, and 37-39 of this

12 Complaint as though fully set forth herein.

13       42.     A conspiracy was formed amongst JC Funding (including Mr. Crossland and Mr.

14 Robinson) for the commission of a fraud against Memphis whereby Defendants agreed and

15 intended to cooperate in the fraud as alleged herein in that they agreed to access and divide the

16 Deposit amongst themselves despite each Defendant having knowledge that the Deposit was to be

17 held in escrow under the terms of the Loan Agreement and was not to be distributed or accessed

18 unless and until the Loan was funded and Memphis either defaulted on the Loan or the

19 outstanding Loan balance reached $500,000.  Each of the Defendants were aware that the

20 distributions from the Deposit were wrongful and in contravention of the terms of the Loan

21 Agreement and representations regarding the Deposit made by JC Funding, Mr. Crossland, and

22 Mr. Robinson as alleged previously.

23       43.     As a condition precedent to funding the Loan as set forth by the Loan Agreement,

24 Memphis was required to make a $500,000 deposit (the "Deposit"). JC Funding, Mr. Crossland,

25 and Mr. Robinson all represented that the Loan would not and could not be funded unless

26 Memphis made the deposit, but that the Deposit would stand as security for the Loan and from

27 which JC Funding could take draws in the event of a default by Memphis.  These same defendants

28 represented that the Deposit would be transferred to and kept in an escrow account and that no

SMITH LC

SMITH LC

1  portion of the Deposit would be withdrawn unless and until all of the following occurred: the Loan

2  was funded, Memphis incurred obligations for repayment of the Loan, and either a $500,000

3  balance on the Loan remained or Memphis defaulted on the Loan.  These representations were

4  false.

5      44.    After signing the Loan Agreement, JC Funding, Mr. Crossland, and Mr. Robinson,

6  made further reassurances that, should there be any difficulty obtaining the money required for

7  funding the loan, that the Deposit would be returned in full and that Defendants had no plans or

8  intentions to use any of the Deposit until after the Loan had been fully funded.  These

9  representations were false.

10     45.    In preparation for the funding, as part of the Loan Agreement, and in reasonable

11 reliance on the representations made by JC Funding, Mr. Crossland, and Mr. Robinson made the

12 Deposit to a bank account that was represented by the same individuals to belong to the Barton

13 Law Firm.  The Deposit was wired in two separate installments, one of $275,000 and one of

14 $225,000 with both occurring on September 12, 2014.

15     46.    The representations made by JC Funding, Mr. Crossland, and Mr. Robinson as

16 detailed previously were false.  Plaintiff alleges on information and belief that JC Funding, Mr.

17 Crossland, and Mr. Robinson withdrew the entirety of the $500,000 from the account held by the

18 Barton Law Firm at some point after September 12, 2014 and have disbursed the Deposit amongst

19 all Defendants who have otherwise used the Deposit to pay for personal and/or professional

20 expenses not associated with the Memphis.

21     47.    JC Funding, Mr. Crossland, and Mr. Robinson made the representations  regarding

22 the Deposit as set forth above with the intent to induce Memphis to make the $500,000 deposit so

23 that they could then use the Deposit for personal and/or professional obligations.  As intended by

24 the Defendants, Plaintiff reasonably relied on the representations and entrusted the Deposit to

25 Defendants.

26     48.    As a direct and proximate result of the misrepresentations and concealments

27 alleged previously, Plaintiff has been injured in an amount to be proven at trial, but in no event

28 less than $1,500,000, together with interest and costs, including reasonable attorney fees as

1    allowed by the Loan Agreement.

2        49.    Defendants' actions were and are presently malicious, oppressive, and/or

3    fraudulent, entitling Plaintiff to punitive and exemplary damages in an amount sufficient to punish

4    Defendants and to deter Defendants from engaging in similar conduct in the future.

5                            **FIFTH CAUSE OF ACTION**

6                          **Negligent Misrepresentation**

7                          **(As Against All Defendants)**

8        50.    Plaintiff incorporates by reference paragraphs 1-28, 31, 37-39, and 42-46 of this

9    Complaint as though fully set forth herein.

10       51.    JC Funding, Mr. Crossland, and Mr. Robinson made the representations regarding

11   the Deposit, as contained above, and those representations were unwarranted in light of

12   information available to those defendants in that they knew, or should have known, that the Barton

13   Law Firm would not hold the Deposit in escrow pursuant to the terms of the Loan Agreement and

14   the representations made by these defendants, or that the ongoing obligations of JC Funding would

15   require Mr. Crossland and Mr. Robinson to use the Deposit for personal and/or professional

16   obligations not related to Memphis or the Loan.

17       52.    All Defendants intended that Plaintiff rely on the representations regarding the

18   safety and security of the Deposit.

19       53.    Plaintiff did in fact reasonably rely on Defendants' representations by transferring

20   the Deposit on September 12, 2014 and by delaying this lawsuit due to the false promises of

21   Defendants.

22       54.    As a direct and proximate result of the misrepresentations and concealments

23   alleged previously, Plaintiff has been injured in an amount to be proven at trial, but in no event

24   less than $1,500,000, together with interest and allowable costs, including reasonable attorney fees

25   as allowed by the Loan Agreement.

26   / / /

27   / / /

28   / / /

11

COMPLAINT

SMITH LC

## SIXTH CAUSE OF ACTION

### Money Had and Received

### (As Against All Defendants)

55.     Plaintiff incorporates by reference paragraphs 1-28, 31, 37-39, and 42-46 of this Complaint as though fully set forth herein.

56.     On September 12, 2014, Plaintiff transferred the Deposit to the Barton Law Firm, which was to be held in escrow for the benefit of Plaintiff with regards to the Loan.  The Deposit was to be held in escrow pending the funding of the Loan and either a default by Memphis or a remaining outstanding balance on the Loan of $500,000.

57.     Sometime after September 12, 2014, JC Funding, Mr. Crossland, and Mr. Robinson accessed and distributed the Deposit amongst all Defendants, and all Defendants used the Deposit for uses other than for the benefit of Plaintiff.

58.     Any money received by any Defendant from the Deposit should, in equity and good conscience, be returned to Plaintiff

59.     Defendants have refused and continue to refuse to return the Deposit.

## SEVENTH CAUSE OF ACTION

### Accounting

### (As Against All Defendants)

60.     Plaintiff incorporates by reference paragraphs 1-28, 31, 37-39, and 42-46 of this Complaint as though fully set forth herein.

61.     Sometime after September 12, 2014, Defendants accessed, withdrew, distributed, and spent the Deposit in contravention to the terms of the Loan Agreement and the representations made by defendants as set forth more fully above.

62.     The amount of money distributed to each of the Defendants and therefore due and owing from each of the Defendants to Plaintiff is unknown at this time and Plaintiff cannot ascertain said amounts absent an accounting.  Plaintiff has requested an accounting from Defendants, but each has failed and refused, and continues to fail and refuse to provide an accounting or return the portion of the Deposit disbursed to each Defendant.

SMITH LC

# EIGHTH CAUSE OF ACTION

## Constructive Trust

### (As Against All Defendants)

63.     Plaintiff incorporates by reference paragraphs 1-28, 31, 37-39, and 42-46 of this Complaint as though fully set forth herein.

64.     Defendants have received proceeds from the Deposit, which Deposit was to be held in escrow unless and until the Loan was funded and either Memphis defaulted on the Loan or the outstanding balance of the Loan reached $500,000.

65.     The Deposit was to be returned to Plaintiff in the event that JC Funding defaulted on the Loan.  JC Funding has defaulted on the Loan and, Plaintiff has satisfied the contractual requirements precedent to a return of the Deposit, and accordingly, Plaintiff has a right above all others to the Deposit in its entirety.

66.     The Deposit was accessed by and distributed amongst the Defendants in contravention to the Loan Agreement and the representations made by Defendants as alleged previously.

67.     Defendants hold the proceeds from the Deposit, in constructive trust in favor of Plaintiff.  Plaintiff does not know, and cannot ascertain, the amount of money owing to it from each defendant but the aggregate amount is not less than $500,000.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff MEMPHIS WINSET, LLC prays as follows:

As to the First Cause of Action for Breach of Contract:

1.     For damages as allowed under the Loan Agreement in an amount to be determined at trial, but in no event less than $1,500,000;

2.     For interest thereon at the legal maximum from September 12, 2014;

3.     For Attorney Fees pursuant to section 5.14 of the Loan Agreement;

4.     For costs of suit; and

5.     For such other and further relief as the Court deems just and proper.

/ / /

As to the Second Cause of Action for Breach of Covenant of Good Faith and Fair Dealing:

1.     For damages as allowed under the Loan Agreement in an amount to be determined at trial, but in no event less than $1,500,000;

2.     For interest thereon at the legal maximum from September 12, 2014;

3.     For Attorney Fees pursuant to section 5.14 of the Loan Agreement;

4.     For costs of suit; and

5.     For such other and further relief as the Court deems just and proper.

As to the Third Cause of Action for Conversion:

1.     For $500,000, as the value of the property converted;

2.     For additional natural, reasonable, and proximate damages caused by the conversion in an amount to be determined at trial, but in no event less than an additional $1,000,000;

3.     For interest thereon at the legal maximum from September 12, 2014;

4.     For punitive and exemplary damages;

5.     For costs of the suit; and

6.     For such other and further relief as the Court deems just and proper.

As to the Fourth Cause of Action for Fraud:

1.     For damages as allowed under the Loan Agreement in an amount to be determined at trial, but in no event less than $1,500,000;

2.     For interest thereon at the legal maximum from September 12, 2014;

3.     For punitive and exemplary damages;

4.     For costs of the suit; and

5.     For such other and further relief as the Court deems just and proper.

As to the Fifth Cause of Action for Negligent Misrepresentation:

1.     For damages as allowed under the Loan Agreement in an amount to be determined at trial, but in no event less than $1,500,000;

2.     For interest thereon at the legal maximum from September 12, 2014;

3.     For costs of the suit; and

SMITH LC

SMITH LC

1    4.    For such other and further relief as the Court deems just and proper.

2  As to the Sixth Cause of Action for Money Had and Received:

3    1.    For damages in an amount to be determined at trial, but in no event less than

4         $500,000;

5    2.    For interest thereon at the legal maximum from September 12, 2014;

6    3.    For costs of the suit;

7    4.    For such other and further relief as the Court deems just and proper.

8  As to the Seventh Cause of Action for Accounting:

9    1.    For an accounting of the proceeds from the Deposit received by each of the

10        Defendants and payment of that amount;

11   2.    For interest thereon at the legal maximum from September 12, 2014;

12   3.    For costs of the suit;

13   4.    For such other and further relief as the Court deems just and proper.

14 As to the Eighth Cause of Action for Constructive Trust:

15   1.    For a constructive trust to be declared and found as to the value of the funds

16        converted according to proof, but in no event less than $500,000, inclusive of

17        interest and statutory penalties;

18   2.    For interest at the legal rate from September 11, 2014;

19   3.    For costs of suit herein incurred; and

20   4.    For such other and further relief as the court deems proper.

Dated: March 30, 2015                SMITH LC

                                     By: _____
                                         JOHN S. CLIFFORD
                                         VINCE WILSON
                                     Attorneys for Plaintiff MEMPHIS WINSET, LLC

**EXHIBIT A**

# MEMPHIS WINSET, LLC

# PROJECT FUNDING LOAN AGREEMENT

# Agreement No.: MW1-914

# LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is made and entered into as of September 11th, 2014, by and between **Memphis Winset, LLC** a California limited liability company (herein called "Borrower" or "Company"), having a mailing address of 2030 E. 4th Street, Santa Ana, CA 92705, and **JC Funding-18, LLC**, a Missouri limited liability company ("Lender"), whose mailing address is 1223 Wilshire Blvd., #1012, Santa Monica, CA 90403.

## RECITALS:

A.   Borrower desires to obtain a loan for the purpose of supporting the Phase 1 redevelopment of an existing multi-building apartment complex called "Lakeview Estate" located in Memphis, TN into approximately 104 moderate grade market rate apartment units and as more fully described on Exhibit "A" attached hereto, together with all improvements of any kind now or hereafter located thereon and all rights, title, and interest now or hereafter appurtenant thereto ("Premises" or "Project").

B.   Borrower has applied to Lender for project funding in the sum of Five Million ($5,000,000) United States Dollars (the "Loan") for the purpose of (i) performance of the Development Work (as defined herein), (ii) other items provided for in the Budget (as defined herein), and (iii) paying all costs, expenses and other amounts set forth in this Agreement.

C.   Borrower has agreed to make a Deposit (as defined below) into the Lender's Production Account under procedures set forth in this Agreement.

D.   Lender has agreed to extend such Loan to Borrower only upon, and expressly subject to, all of the terms, covenants, conditions, representations and warranties set forth in this Agreement, the Deed of Trust, Assignment of Lease, Security Agreement and Fixture Filing and Promissory Note (collectively the "Loan Documents") relating to this Loan, each and all of which are important considerations to Lender and are being relied upon by Lender in its decision to extend the Loan to Borrower.

**NOW, THEREFORE,** in consideration of the terms, covenants, conditions, representations and warranties contained herein and in the other Loan Documents relating to this Loan, Lender agrees to extend the Loan to Borrower and Borrower agrees to accept the Loan and comply with and perform Borrower's obligations as follows:

1.   **DEFINITIONS.** For the purposes of this Agreement, including any Exhibits attached hereto, each of the following terms shall have the following respective meanings. For purposes of this Agreement, all accounting terms not otherwise defined herein or in the Recitals shall have the meanings assigned to them in conformity with GAAP, consistently applied.

a.   "**Jurisdiction**" means the Shelby County, State of Tennessee, as in effect from time to time during the Term of the Loan.

b.   "**Additional Collateral**" means the Deposit previously deposited by Borrower with Lender as security for the Loan.

c.   "**Advance Date**" means the variable date occurring ten (10) days after the Advance Notice and during the Term of the Loan.

2

d.  **"Advance Notice"** means the notice by Borrower to Lender of an Advance in accordance with and subject to the terms of Section 2.5 of this Agreement.

e.  **"Advances"** means any one or more disbursement(s) of Loan proceeds, together with all and any other and/or additional sums advanced by Lender under the Loan according to the Approved Schedule of Values, upon the satisfaction of conditions specified in Article 3 hereof, Section 2.5 hereof and elsewhere in this Agreement, the proceeds of which are to be utilized solely for the purposes specified in Section 2.5 of this Agreement.

f.  **"Agreement"** means this Loan Agreement, as the same may be amended and supplemented from time to time by express written consent of both Lender and Borrower as provided herein.

g.  **"Approved Schedule of Values"** means the monthly funding amount made available to the Borrower and reflective of the accrued project / development costs throughout the Funding Term as attached hereto in Exhibit "C," as may be amended from time to time by express written consent of both Lender and Borrower.

h.  **"Architect and Engineers"** means the architects and engineers employed by Borrower for any material portion of work on the Premises.

i.  **"Architect and Engineer Agreements"** means the agreements, if any, between the Borrower and the Architects and Engineers pertaining to the Premises.

j.  **"Assignment of Permits"** means the Assignment of and Security Agreement in Permits, Licenses, Plans and Approvals in a form acceptable to Lender.

k.  **"Borrower"** means **Memphis Winset, LLC,** a California limited liability company, its successors and assigns, whose address is as set forth in the introductory paragraph of this Agreement.

l.  **"Budget"** means the budget prepared by Borrower and approved by Lender in its sole discretion for the Development Work, as it may be amended or modified from time to time in accordance with Section 2.6.The initial Budget approved by Lender is attached hereto as <u>Exhibit "B"</u>.

m.  **"Business Day"** shall mean a day of the year other than Saturdays, Sundays, and those legal holidays upon which Lender's main office (the address of which is set forth in the introductory paragraph of this Agreement) is closed.

n.  **"Capital Availability Dates"** means the dates when funding shall be made available in the Project Production Account to support the Project. Subject to paragraph 8.26, the First Capital Availability Date shall be a date no later than 60 business days from the Closing Date and subsequent Capital Availability Dates shall be every 45 calendar days thereafter until the full Loan Amount has been funded. The Capital Availability Date does not mean the date Loan proceeds shall be available for drawdown, which shall occur pursuant to the Approved Schedule of Values.

o.  **"Closing Date"** means the date upon which (a) all Loan Documents are executed and (b) the Deposit placed in the Production Account and released to Lender.

p.  **"Collateral Pledge"** means all right, title and interest of Borrower now owned or hereafter acquired in and to (i) the Property under the Deed of Trust, (ii) all contracts, permits and plans relating to the construction of the Facility, (iii) assignment of all rents associated with the Property, and (iv) the cash value of on-site equipment and any other value that can be generated and received as a benefit of the

facility (e.g, contracts for storage spaces, any deposits provided in support of contracts for storage spaces), and (iv) the proceeds of the funds provided by the Lender.

q.    **"Construction Contract"** means the contracts (written or oral, now or hereafter in effect) between Borrower and Contractor, relating in any way to the construction of any portion of the Development Work, including the performing of labor or the furnishing of equipment or materials in connection therewith, together with all amendments, renewals or replacements of any of the foregoing.

r.    **"Contractor"** means the general contractor employed by Borrower to perform the Development Work on the Premises.

s.    **"Deed of Trust"** means the Deed of Trust and Fixture Filing (with Assignment of Lease and Security Agreement) in such form as is acceptable to Lender, to be executed by Borrower, to Lender, creating, among other things, a lien upon the Property, as described therein, for the purpose of securing the Note and Loan, encumbering all right, title and interest of Borrower in and to the Property, together with any and all extensions, renewals, substitutions, replacements, modifications, restatements and amendments thereof or thereto.

t.    **"Default Rate"** means Eight and one-half percent (8.5%) per annum. Such rate shall remain in force until the circumstances giving rise to the Default Rate are removed (such as a cure), wherein the Loan Rate under this Agreement will then apply.

u.    **"Deposit"** means an amount equal to $500,000 that Borrower establishes to provide investment in the Project and to act as additional security for the Loan. The Deposit shall be pledged by Borrower to the benefit of Lender during the Loan Term and who shall have use of such Deposit.

v.    **Intentionally Left Blank.**

w.    **"Development Work"** means the work of development designated on the Plans and Specifications to be performed on or with respect to the Premises which shall be completed by or on behalf of Borrower in accordance with the Plans and Specifications.

x.    **"Draw Request Certification"** means a certification of Borrower delivered to Lender in connection with a requested disbursement of the Loan to fund Qualified Expenditures, which certification shall be in the form acceptable to Lender.

y.    **"Environmental Indemnity"** shall mean that certain Environmental Indemnity as provided for in Section 8.02 hereunder. The Environmental Indemnity shall not be secured by the Deed of Trust and shall survive and continue beyond any termination or expiration of the Deed of Trust.

z.    **"Environmental Laws"** means all federal, state, and local statutes, laws, rules, regulations, and ordinances relating to the protection of human health or environmental matters, including, without limitation, those relating to fines, orders, injunctions, penalties, damages, contribution, cost recovery compensation, losses or injuries resulting from the release or threatened release of Hazardous Substances (as hereinafter defined) and the generation, use, storage, transportation, or disposal of Hazardous Substances, in any manner applicable to the Premises, each as heretofore and hereafter while the Loan or any obligation under this Agreement remains unpaid, is amended or supplemented, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.), as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. Section 11001, et seq.; the Hazardous Material Transportation Act, as amended (49 U.S.C. § 1801 et seq.); the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.);the Federal

4

Water Pollution Control Act, as amended (33 U.S.C. § 1251 et seq.); the Clean Air Act, as amended (42 U.S.C. § 9401 et seq.); the Clean Water Act, 33 U.S.C. Section 7401, et seq.; the United States Environmental Protection Agency's Rules Concerning Underground Storage Tanks; the Toxic Substances Control Act of 1976 (15 U.S.C. § 2601 et seq.); the Safe Drinking Water Act (42 U.S.C. § 300 et seq.); the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.); the Federal Hazardous Substances Act (15 U.S.C. § 1261 et seq.); the Solid Waste Disposal Act, 42 U.S.C. Section 3251, et seq., as amended by the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901, et seq.; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. Sec. 136, et seq.; State of Tennessee environmental laws, all as amended; and such environmental laws, statutes, ordinances and regulations as may be referenced in the Deed of Trust or the Environmental Indemnity, each as heretofore and hereafter while the Loan or any obligation under this Agreement remains unpaid, is amended or supplemented, and any similar future or present local, state or federal statutes, rules and regulations promulgated thereunder or pursuant thereto, and any other present or future law, ordinance, rule, regulation, permit or permit condition, order or directive addressing environmental, health or safety issues of or by the federal government, any state or any political subdivision thereof, or any agency, court or body of the federal government, any state or any political subdivision thereof, exercising executive, legislative, judicial, regulatory or administrative functions which are applicable to the Premises while the Loan remains unpaid.

aa. **"Event of Default"** means any Event of Default as defined in Section 7.0 hereof.

bb. **"Facility"** means the Phase 1 improvements to be constructed on the property located in Memphis, TN which will result in the Facility's use as market rate apartment units.

cc. **"Financing Statement"** means the Uniform Commercial Code Financing Statement required to be filed with the Office of the Secretary of State of the State of Tennessee, together with any and all extensions, renewals, substitutions, replacements, modifications, restatements and amendments thereof or thereto.

dd. **"Force Majeure Event"** means any act or event that prevents the affected Party in whole or in part from performing its obligations under this Contract, if such event is unforeseeable, beyond the affected Party's will or control and in respect of which a remedy may not be found in a timely manner (such as, for example, acts of war, even if undeclared, riot, insurrection, sabotage, natural disaster, hurricanes, tornados, closing or restriction of banking, credit, and/or financial markets, or acts or provisions of government authorities or other cause beyond the reasonable control of Borrower that will delay the Development Work.

ee. **"Initial Loan Term"** means that period of Twenty Four (24) months, known as the ramp-up period over which the Lender will provide funding to the Borrower as set forth in this Agreement.

ff. **"Term of the Loan"** means the period which the Loan shall be outstanding and shall be Ten (10) years, including the Initial Loan Term and Eight (8) years of the Permanent Loan Term.

gg. **"GAAP"** means Generally Accepted Accounting Principles.

hh. **"Governmental Authority"** means any and all courts, boards, agencies, commissions, arbitrators, other private adjudicator, offices or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

ii. **"Hazardous Substances"** means (a) any chemical, material or substance defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic pollutants," "pollutants," "toxic substances" or words of

similar import under any applicable Environmental Laws; (b) any oil, petroleum or petroleum derived substance, any drilling fluids, produced waters or other wastes associated with the exploration, development or production of crude oil, any flammable substances or explosives, any radioactive materials, any hazardous wastes or substances, any toxic wastes or substances or any other materials or pollutants which (i) pose a hazard to the Premises or to persons on or about the Premises, or (ii) cause the Premises to be in violation of any Environmental Laws; (c) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, polychlorinated biphenyls; (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated under any Environmental Law; and (e) any Hazardous Substances or Hazardous Materials referred to in the Deed of Trust or the Environmental Indemnity.

jj.    **"Legal Requirements"** means:(a) all present and future judicial decisions, statutes, regulations, permits or certificates of any governmental authority in any way applicable to Borrower or the Premises; (b) all covenants, conditions and restrictions now or hereafter contained in any instrument that is applicable to the Premises; (c) all business association agreements forming, or granting and/or limiting the powers of, Borrower; and (d) all contracts or agreements (written or oral) by which Borrower, or any portion of the Premises are bound, including, without limitation, the Principal Agreements.

kk.    **"Loan Service Agent"** means JC Funding-18, LLC, a Missouri limited liability company and its successors and assigns. Lender shall have the right to substitute a new Loan Service Agent at its sole discretion and shall notify Borrower accordingly.

ll.    **"Loan Accounting Service"** means an accounting firm to be designated by Lender and /or assigns working with the Lender, or its assigns, all acting on instructions of the Lender.

mm.    **"Loan"** means the loan to be made by Lender to Borrower pursuant to the terms of this Agreement and the Note.

nn.    **"Loan Amount"** means the principal amount of up to Five Million United States Dollars ($5,000,000) USD, which amount is available for borrowing in accordance with the terms and conditions set forth in this Agreement, the Note, and the Approved Schedule of Values as contained in Exhibit "C" of this Agreement.

**oo.    Intentionally Left Blank.**

pp.    **"Loan Documents"** means, collectively, this Agreement, the Note, the Deed of Trust, the Assignment of Permits, the Financing Statement, and all other instruments and agreements required to be executed by or on behalf of Borrower in connection with the making of the Loan.

qq.    **"Loan Funding Amounts"** means the amounts Lender shall deposit into the Production Account based on each Capital Availability Date which shall be as follows: (i) Capital Availability Date 1 - $2,500,000; Capital Availability Date 2 - $750,000; Capital Availability Date 3 - $750,000; Capital Availability Date 4 - $750,000; and Capital Availability Date 5 - $250,000.

rr.    **"Material Adverse Change"** or "Material Adverse Effect" means any material and adverse change in, or a material adverse effect upon, any of:

(a)    the business, properties, operations or condition (financial or otherwise) of Borrower, taken as a whole, since either or both of (i) the date hereof, or (ii) the date of the most recent financial statements delivered to Lender in connection with the Loan; or

(b)   the legal or financial ability of Borrower to perform its obligations under the Loan or to avoid any Event of Default; or

(c)   the legality, validity, binding effect or enforceability against Borrower of this Agreement, the Note or any Other Loan Document executed by Borrower and Lender (where applicable) in connection with Lender making the Loan to Borrower, as the same may be amended or otherwise modified from time to time in accordance with this Agreement.

nn.   **"Maturity Date"** shall have the meaning set forth in the Note.

oo.   **"Note"** means the Secured Promissory Note payable by Borrower to the order of Lender in the original principal amount of up to Five Million Dollars ($5,000,000) USD evidencing the Loan, together with any and all extensions, renewals, substitutions, replacements, modifications, restatements and amendments thereof or thereto.

pp.   **"Permanent Loan Term"** shall have the meanings and terms as outlined in the accompanying Secured Promissory Note with a fully-amortizing loan over fifteen (15) years commencing at the completion of the Initial Loan Term.

qq.   **"Permitted Exceptions"** shall have the meaning given in the Deed of Trust.

rr.   **"Person"** means, any natural person, corporation, firm, limited liability company, partnership, joint venture, association, business trust, government, governmental agency, tribunal or court or any other entity other than Borrower whether acting in an individual, fiduciary, governmental or other capacity.

ss.   **"Planning Costs"** means the fees and planning costs, such as engineering and architectural fees, incurred in connection with the planning for the Development Work, to the extent reflected in the Budget.

tt.   **"Plans"** means the plans and specifications for the construction of the Development Work on the Premises as prepared by Borrower's Architects and Engineers.

uu.   **"Principal Agreements"** means all material agreements between Borrower and third parties pertaining to the Development Work, including the Plans, the Construction Contract(s) and the Architect and Engineer Agreement(s), as approved in writing by Lender.

vv.   **"Production Account"** means the bank account held at KeyBank, Wells Fargo Bank or such similar U.S. based bank (as specified by Lender at Closing) into which each Loan Funding Amount will be deposited pending Borrower Advances under Section 2.5 and Section 2.6.

ww.   **Intentionally Left Blank.**

xx.   **"Reporting Requirements"** means the following that Borrower and Project, as applicable, shall be subject to:

(1) Every 90 days Borrower shall provide written updates and reports on the Project. As a part of this requirement, during the period of construction, a book audit may be conducted by an Agent of Record (that may be designated in writing by Lender) with any expenditure paid by Lender. These audits shall not exceed two times per year unless an accounting irregularity has been found and identified in writing to Borrower by Agent of Record.

      (2) Monthly financial Statements (to be delivered no later than 2 weeks following the end of the month) during the period of construction and quarterly consolidated financial statements (to be delivered no later than 1 month following the end of the quarter) thereafter;

      (3) Evidence of Project Insurance renewals;

      (4) Notices of material events and/or potential Events of Default;

      (5) Notice of any litigation or pending litigation in connection with the Borrower or the Project; and

      (6) Other reports as reasonable requested by the Agent of Record.

zz.  **"Qualified Expenditures"** means the construction costs for the Project, and, with respect to the Development Work, those costs for which proceeds of the Loan may be disbursed, which shall include those hard costs, soft costs, financing costs and other costs listed on the approved Schedule of Values.

aaa.  **"Soft Costs"** means Borrower's loan original and closing costs, general contractor fees, architect fees, governmental fees, overhead, general and administrative expenses, legal fees, marketing fees, management fees, archeological mitigation, property taxes and other "soft costs" incurred in the development, construction and marketing to the extent reflected in the Budget.

bbb.  **"Title Insurance Policy"** means a title insurance policy covering the "Facility" in the form of an American Land Title Association Extended Coverage Loan Policy-1992 (without revision, modification or amendment, except, however, for endorsements thereto deleting the creditors rights exclusion and the arbitration provision) and all endorsements thereto required by Lender, as issued by Title Company and insuring the lien position of the Deed of Trust, all in form and substance satisfactory to Lender and which shall contain (a) full coverage against mechanic's liens (or an endorsement up to the full amount of the Note outstanding as of the current advance, (b) deletion of all standard exceptions, and (c) zoning endorsement, comprehensive endorsement, access endorsement, survey endorsement, location endorsement, tax parcel endorsement, non-imputation endorsement and pending disbursement endorsement. It is expected that the Title Insurance Policy will be will be recorded, no later than the First Capital Availability Date.

ccc.  "**Title Insurer**" means a nationally recognized title insurance company to be named mutually by the Parties prior to the First Capital Availability Date.

**2.**    AMOUNT, TERMS, AND SECURITY OF LOAN.

2.1  **Terms.**

    (a)  **Closing Costs:** Upon Closing and from the proceeds of the Loan, Borrower shall pay all due diligence costs, real and personal property taxes, credit reporting fees, assessments and special assessments for the prior years, customary charges for escrow fees, recording fees, escrow expenses, title insurance premiums and the fees and costs of all title insurance policy endorsements, all of Lender's legal counsel fees and costs, and all other escrow fees, costs and charges whatsoever, whether to the Escrow Agent, the Title Insurer, or otherwise, it being understood and agreed that neither Lender, Deed of Trust broker, nor Lender's agents, attorneys or employees shall pay any such recording taxes, fees, escrow fees, other fees, costs, premiums, charges or expenses ("Permitted Expenses"). Permitted Expenses shall not exceed $25,000, of which Borrower shall have advanced to Lender $15,000 upon the execution of this Agreement.

(b) **Interest Rate:** Borrower and Lender have agreed to a fixed loan rate of eight and percent (8.00%) throughout the term of the Loan.  Interest shall not accrue on any amount hereunder until actually advanced to Borrower.

(c) **Payments Due:** Loan payment shall be due and payable on the 1st day of each month.

(d) **Principal and Interest (P&I):** The P&I payments on this Loan will be based on a 15 year amortization and shall be calculated against the outstanding principal Loan balance using a fixed 8.0% interest rate at the end of the Initial Loan Term (24 months) and shall be payable monthly during the Permanent Loan Term.

(e) **The Term:** The term of the Loan shall be ten (10) years consisting of a 24-month Initial Loan Term and a eight (8) year Permanent Loan Term.

(f) **Interest Reserve Account:** The Parties have agreed that to aid the project in its ramp up period and stabilization, that an Interest Reserve Account will be established on the day of Closing and that an aggregate of $660,000 will be funded into the Interest Reserve Account on the First Capital Availability Date.  This account will be held in custody by the Loan Service Agent and such funds will be used to fund interest payments during this period.

2.2.   **Use of Proceeds:**  The amounts set forth below are subject to the final Project Budget.

|     |            |                                                                    |
|-----|------------|--------------------------------------------------------------------|
| a)  | $2,500,000 | Land Acquisition                                                   |
| b)  | $2,000,000 | Construction of Facility and Purchase of Equipment                 |
| c)  | $    93,200 | Loan Fee                                                           |
| d)  | $    25,000 | Legal, Due Diligence and Closing costs (estimated – not to exceed $15,000) |
| e)  | $  660,000 | To fund the Interest Reserve Account                               |
| f)  | $    23,300 | Loan Servicing Fees                                                |
| g)  | $    46,600 | Advisory Fee                                                        |
| h)  | $  151,900 | Contingency                                                         |
|     | $5,500,000 | Total Project Capitalization                                       |
|     | ($ 500,000) | Less Equity                                                        |
|     | $5,000,000 | Net Loan Amount                                                     |

2.3   **Intentionally Left Blank.**

2.4   **Intentionally Left Blank**

2.5   **Advances.** Lender agrees to make each Advance from the Loan proceeds in accordance with Section 2.6 hereunder upon satisfaction of the requirements set forth in this Section 2.5. Monies repaid to Lender may not be re-advanced. Lender's obligation to fund each Advance is conditioned upon strict compliance by Borrower with each of the following requirements:

(i) **Advance Notice.** Not later than ten (10) days prior to the applicable Advance Date, Borrower shall provide Lender with an Advance Notice, together with a Draw Request Certification setting forth, among other things, the line item from which the Advance is to be made, and, as applicable, (1) a schedule of payments, (2) a conditional progress lien release from the Contractor for amounts payable through the Advance Date, (3) an Unconditional Progress Lien Release, in statutory form from each subcontractor and supplier that has provided a preliminary 20-day lien notice for amounts

payable through the immediately prior Advance Date, (4) a certification from Lender's inspector that the amounts requested have been evidenced by work completed and materials furnished to the Premises, and (5) copies of all change orders in progress or executed since the prior Advance Notice.

(ii)   **No Event of Default.** On the date of the Advance Notice and the funding of the Advance there is not then in existence an Event of Default under any Loan Document.

(iii)  **Costs and Expenses.** Borrower has paid or will pay from such Advance all costs, fees, and expenses of Lender incurred in connection with the Advance, including reasonable third party inspection fees.

(iv)  **Title Insurance.** If required by Lender, Borrower shall cause Lender to have received a commitment from Title Insurer for an endorsement to Lender's Title Insurance Policy insuring that the lien of the Deed of Trust continues to have at least the same priority as it did on the Closing Date as to the entire amount then advanced under the Loan. There shall be no unreleased intervening or other mechanic's liens recorded against all or any portion of the Premises; provided, however, that nothing contained in this Agreement will require Borrower to pay any claims for labor, materials or services that Borrower in good faith disputes and that Borrower, at its own expense, currently and diligently contests, provided that Borrower must, for each such case where a claim of lien in excess of Five Thousand Dollars ($5,000.00) has been filed, within thirty (30) days after actual receipt by Borrower of notice of filing of any such claim of lien, (i) record or cause to be recorded in the office of the recorder in Shelby County, a surety bond sufficient to release said claim of lien, or (ii) make or cause to be made a deposit of cash in the amount of one hundred fifty percent (150%) of the claim of lien with Lender, or (iii) deliver or cause to be delivered to Lender a specific endorsement to Lender's Title Insurance Policy that insures Lender against any loss by reason of such claim of lien, or (iv) deliver or cause to be delivered to Lender such other assurance as may be acceptable to Lender.

(v)   **Conditions.** All conditions to the funding of the Loan set forth in Article 3 continue to remain satisfied.

(vi)  **Additional Items.** Borrower has provided Lender with such other instruments, documents, agreements, certifications, and affirmations as it may reasonably require, including, without limitation, evidence of Borrower's continued satisfaction of all conditions to funding set forth in Article 3 below. Borrower's request for an Advance will be deemed to be a certification that there has been no change that has not been previously approved by Lender to the Plans, the Architect and Engineer Agreements (other than change orders), or the Construction Contract (other than change orders). Borrower agrees to notify Lender of any proposed change in any of the foregoing prior to such change if it will (i) impact any of Lender's rights if Lender shall become the owner of the Collateral, or (ii) materially adversely affect the value of Lender's Collateral.

2.6    **Disbursement Procedure:** Upon satisfaction of each of the requirements contained in this Agreement, Lender agrees to make available Advances of the Loan to Borrower. Advances to Borrower may not exceed the line item costs, plus ten percent (10%), as allocated in the Budget.

2.6.1  Loan Funds Deployment - Following the date of the first funds to be made available to the Project Owners, funds will be made available each month thereafter subject to a Schedule of Values to be submitted by Project Owners. Monthly funding shall occur in accordance with the Schedule of Values until all funds have been deployed.

2.6.2  Payment Priorities – Prior to any Loan Funds Deployment, advances shall be paid from the Loan amount in the following order of priority:

10

(a) Paying all closing and start-up fees including the Loan Fee.

(b) Paying any out of pocket expenses that may be outstanding at the time of closing.

2.6.3   Lender will, subject to the terms and conditions of this Agreement make Advances to pay or reimburse Borrower for Qualified Expenditures and only to the extent that the preconditions to the Advance have been satisfied by the Advance Notice. Borrower may request an Advance from Lender once, and only once, each calendar month, except that the Advances made at the time of the funding of the Loan may precede the next Advance by a period of less than thirty (30) days. The funds of each Advance shall be utilized solely for the purpose specified in Section 2.2 above. Borrower agrees to execute such other documents as Lender may reasonably deem necessary in connection with each Advance and strict compliance with each of the foregoing conditions shall be required. No Advance made hereunder shall affect the liability or obligations of any Person for the payment of the Note or any other obligation under any of the Loan Documents, or the lien of the Deed of Trust upon the Premises for the full payment of any indebtedness then remaining unpaid or for any obligations unperformed under any of the Loan Document.

2.6.4   Lender shall have the right to determine whether any item of cost, expense, or fee for which Borrower requests a disbursement constitutes a Qualified Expenditure and to which category such cost, expense, or fee it will be applied. The maximum amount that Lender shall be obligated to disburse for any Qualified Expenditure shall not exceed the amount designated for such category or line item on the Budget plus ten percent (10%). However, Lender shall not be obligated to disburse more than the original aggregate Loan Amount.

2.6.5   In the event that all expenses for which any line item in the Budget is allocated are fully and finally paid and all work in connection therewith is fully and finally completed, the undisbursed sums in such line item shall be reallocated to the contingency line item in the Budget; provided (i) Borrower notified Lender of the amount of such undisbursed sums; (ii) Borrower provides such evidence as Lender may request that such expenses are fully and finally paid and work is fully and finally complete; and (iii) such requests shall be made no more frequently than once per month.

2.6.6   All modifications to the Budget will be evidenced by a new Budget approved by Lender or as otherwise permitted by this Agreement.

2.6.7   Provided that no Event of Default shall have occurred and is continuing, Borrower shall not be required to obtain Lender's consent to any individual change order unless (i) the individual change order would result in an increase to the Budget of Twenty-Five Thousand Dollars ($25,000.00) or more or (ii) the increase to the Budget resulting from such change order, when aggregated with the increase to the Budget resulting from all other change orders, is equal to or greater than One Hundred Thousand Dollars ($100,000.00) (the "Aggregate Limit").If a change order with the Aggregate Limit is subsequently approved in writing by Lender at the written request of Borrower, the Aggregate Limit shall be increased by the amount of such approved change.

2.6.8   The Company hereby agrees to adhere to the project's Approved Schedule of Values as set forth in Appendix "C," throughout the Funding Period. In the event the Lender reasonably determines that any material change in project costs or construction time periods, by more than thirty (30) days, has occurred, it may notify the Company in writing of such changes and demand that the Company prepare and submit to the Lender a Revised Schedule of Values for its approval. After

receipt of notification from the Lender of the Event of Default, then: **(a)** the Company shall promptly acknowledge to the Lender in writing, within five (5) business days, that it is aware of material changes in project costs, and/or construction time periods, and agrees to cover any cost overrun or shortfall; and **(b)** within twenty (20) business days thereafter, either (i) provide additional collateral reasonably acceptable to the Lender; (ii) pay for such cost overrun or shortfall directly and provide proof thereof to the Lender; or (iii) at its sole discretion the Lender reserves the right to provide additional funding as necessary to complete the project, and to add such amount to the principal amount of indebtedness to be repaid by the Borrower in accordance with the Note. If the Event of Default is not cured by the Borrower, satisfactory to the Lender, the Lender shall have the right to make a draw on the Deposit, at its maturity date, as necessary to cover such cost overruns.

2.6.9   If the Company fails to meet any of its payment obligations as set forth in this Section 2.3 and/or Appendix "C," the Lender has the right to require the Company, by notice in writing, to bring all delinquent payments current within a period of time equal to fifteen (15) days. If the Company fails for any reason whatsoever to do so within such time, then the remedies set forth in Article 7 to this Agreement shall become available to Lender. In the event the Lender elects to terminate this Contract pursuant to this paragraph 2.6.9, then this Agreement and Promissory Note shall become immediately null and void.

2.7   **Purposes.** The purpose of the Loan is and Loan proceeds shall be utilized only for the purposes set forth in Recital A above.

2.8   **Net Payments.** All payments under this Agreement and the Note shall be made without set off or counterclaim by the Borrower.

2.9   **Security for the Loan.** The Loan is secured by the Loan Documents, including without limitation, the Deed of Trust and the Deposit.

2.10   **Advertising.** Borrower acknowledges, agrees, and consents to Lender's advertising of the making of the Loan and the Loan amount in Lender's sole discretion, but Lender shall not disclose other material terms of the Loan. Borrower agrees that Lender shall have the right to issue press releases, advertisements, and other promotional material describing in general terms Lender's participation in such transaction.

2.11   **Use of City or Government Grants.** The Lender is granting Borrower the right to apply for and use any Grants and any tax bonds that may be available at any time to pay down or pay off the Loan after the first 24 months of the life of the Loan.

2.12   **Loan Prepayment.** The Loan can be prepaid in whole or in part without penalty at any time after 24 months, with a minimum of 30 days written notice. If prepaid in less than 24 months, any amount remaining in the Interest Reserve Account shall be unrecoverable and forfeited as a prepayment penalty.

2.13   **Loan Fee.** A Loan Fee equal to Two Percent (2%) of each Loan Funding Amount shall be paid to Lender from each Loan Funding Amount placed into the Production Account.

2.14   **Loan Servicing Fee.** A Loan Servicing Fee in the amount of one half of one percent (0.50%) shall be paid to Lender from each Loan Funding Amount placed into the Production Account.

## 3.0   CONDITIONS PRECEDENT TO FUNDING LOAN

In addition to the other terms and conditions set forth in this Agreement, the obligation of Lender to fund the Loan, any Advance, and any other amount under the Loan Documents is subject to Lender's having received prior to or on the Closing Date or the date of funding of any Advance, in each case, in form and substance satisfactory to Lender, each of the following:

3.01 **Execution and Delivery of Loan Documents.** All Loan Documents duly executed and delivered to the Title Insurer or Escrow Agent, as applicable, in recordable form if appropriate.

3.02 **Deposit Established.** Borrower shall have wired the Deposit into the designated Production Account.

3.03 **Authorizations**. With respect to the funding of the Loan only, original certificates of resolution and certificates of incumbency executed by the appropriate members and/or managers of Borrower and containing specimen signatures of the same, authorizing Borrower to enter into all Loan Documents and other documents and agreements to be executed by Borrower in connection with this Agreement and the Loan and further authorizing and empowering the members and/or managers who will execute such documents and agreements with the authority and power to execute such documents and agreements on behalf of the Borrower.

3.04 **Insurance.** True and correct copies of the policies (or binders), together with original certificates and loss payable endorsements in favor of Lender, of insurance required by Section 5.3 hereof, accompanied by affidavits and certificates, paid bills or other documents evidencing that all premium payments are current. 3.3.1. Property Insurance coverage must be acceptable to the Lender prior to the closing. The key insurance policies include, but are not limited to, liability insurance, fire insurance, flood insurance and business interruption insurance.

3.05 **Title Insurance Policy.** A Title company identified at the Closing, prepared to work with Lender and Borrower during the course of construction of the Facility, that will result in the irrevocable agreement of the Title Insurer to issue the Title Insurance Policy, together with the required endorsements listed in the definition of Title Insurance Policy hereunder, to Lender in accordance with the Closing Instructions, and for additional Advances, such title endorsements as Lender may request.

3.06 **Current Financial Statements.** With respect to the funding of the Loan, if requested by Lender, financial statements provided to Lender, including, but not limited to, balance sheets and income statements of Borrower in such forms as are approved by Lender and dated not later than required by Lender.

3.07 **Certain Statements.** The representations and warranties contained in Article 4 hereof and in the Loan Documents are true and correct in all material respects, and no event has occurred and is continuing which constitutes an Event of Default or would constitute an Event of Default but for the requirement that notice be given or time elapse, or both.

3.08 **Draw Request Certification.** Borrower shall have provided Lender with a Draw Request Certification for the Advance, which Draw Request Certification shall have received the prior approval of Lender.

3.09 **Required Acts and Conditions.** With the exception of the acquisition of the underlying land, which shall not need the following approvals, all acts and conditions (including, without limitation, the obtaining of any necessary regulatory or judicial approvals and the making of any required filings, recordings or registrations) required to be done and performed, and to have happened precedent to the execution, delivery and performance of this Agreement, the Deed of Trust and the Note or to constitute the same as legal, valid and binding obligations enforceable in accordance with their respective terms, shall have been done and performed.

3.10 **Additional Documents.** The execution and delivery of such additional documents, affidavits, certificates and opinions as Lender may reasonably require to insure compliance with the intent and purpose of this Agreement, including, without limitation, (i) an Assignment of and Security Agreement in Permits, Licenses, Plans, and Approvals; (ii) an Errors and Omissions Correction Agreement; and (iii) a Non-Foreign Persons Affidavit to be executed by Borrower.

3.11 **Additional Collateral.** In no event shall the Lender make a claim against the Additional Collateral unless upon a breach of a representation and warranty, an Event of Fraud or an uncured Event of Default under Section 7.

3.12 **Conditions for Sole Benefit of Lender.** All conditions precedent to the obligations of Lender to make the Loan or any advance or disbursement are imposed solely for the benefit of Lender, and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to make any disbursement or advance in the absence of strict compliance with such conditions precedent. All requirements of this Agreement may be waived by Lender, in whole or in part, at any time, and any such waiver shall not constitute a waiver of any other current, past, or future condition imposed upon Borrower hereunder. To the extent any conditions are not satisfied prior to the funding of the Loan, the parties agree to execute a separate agreement listing such items and Borrower covenants to satisfy such items within fifteen (15) days of such funding of the Loan unless otherwise stated.

3.13 **Pre-Development Bids, Valuations.** Borrower shall produce the following prior to the first Loan Advance:

     i.   All necessary State and City permits required by all municipal agencies to construct the Project; and

    ii.   A Project cash flow schedule from the Construction Builder showing all Project cash requirements on a monthly basis from the beginning through the completion of the Project.

# 4      REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the Loan hereunder, Borrower makes the following representations and warranties which shall be deemed made as of the date hereof and as of the Closing Date, the funding of the Loan, and each Advance and including the representation that no event has occurred and is continuing which constitutes an Event of Default or would constitute an Event of Default but for the requirement that notice be given or time elapse, or both.

4.02 **Capacity.** Borrower and the individuals executing Loan Documents on behalf of Borrower have the full power, authority and legal right to execute and deliver, and to perform and observe the provisions of this Agreement, the Deed of Trust, the Note, the Other Loan Documents and any other document, agreement, certificate or instrument executed in connection with the Loan and to carry out the contemplated transactions.

4.03 **Authority and Enforceability.** The execution and delivery by the Borrower of this Agreement, the Deed of Trust, the Note, the Other Loan Documents and any other document, agreement, certificate or instrument executed in connection with the Loan have been duly authorized by all necessary company action and do not and will not require any registration with, consent or approval of, notice to, or any action by any Person or Governmental Authority that has not been satisfied or obtained. Borrower has obtained or will obtain in the ordinary course of the performance of the Development Work all necessary court and other approvals necessary for Borrower to comply with the terms and provisions of this Agreement,

provided, however, if such approvals are not obtained in sufficient time to prevent the cessation of construction, it shall be a default of this Agreement. This Agreement, the Deed of Trust, the Note, the Other Loan Documents and any other document, agreement, certificate or instrument executed in connection with the Loan when executed and delivered by Borrower hereunder will constitute the legal, valid and binding obligations of Borrower enforceable in accordance with their respective terms.

4.04 **Compliance With Law.** The execution and delivery of this Agreement, the Deed of Trust, the Note and the Other Loan Documents, or any other document, agreement, certificate or instrument to which Borrower is bound in connection with the Loan do not conflict with, result in a breach or default under or create any lien or charge under any provision of any existing law, rule, regulation, order, writ, injunction or decree of any court or Governmental Authority to which it is subject. The Premises complies in all material respects with all laws, ordinances, rules, regulations, covenants, and restrictions affecting the construction, occupancy, use, and operation thereof. All permits and approvals that are required for the construction, use, and occupancy of the Premises have been duly and validly issued by the governmental authorities or persons having jurisdiction or rights with respect thereto, are in full force and effect, and are not subject to any appeal, any applicable period for appealing such actions having expired, or Borrower will obtain such permits and approvals in the ordinary course of performing the Development Work.

4.05 **Material Adverse Events**. Since the date of the financial statements delivered to Lender pursuant to Section 3.6 hereof or any financial statements thereafter provided by Borrower to Lender, no Material Adverse Change has occurred.

4.06 **Litigation.** There are no actions, suits, investigations or proceedings pending, or to the knowledge of Borrower, threatened, after due inquiry and investigation, against or affecting Borrower at law or in equity, before or by any Person or Governmental Authority, which, if adversely determined, would have a Material Adverse Effect.

4.07 **No Untrue Statements.** Section 4.10 below with regard to financial statements, all statements, representations and warranties made by Borrower in this Agreement or any Other Loan Document and any other agreement, document, certificate or instrument previously furnished or to be furnished by Borrower to Lender under this Agreement, (i) are and shall be true, correct and complete in all material respects at the time they were made and on and as of the Closing Date, (ii) do not and shall not contain any untrue statement of a material fact, and (iii) do not and shall not omit to state a material fact necessary in order to make the information contained herein or therein not misleading or incomplete in any material respect. Borrower understands that all such statements, representations and warranties shall be deemed to have been relied upon by Lender as a material inducement to make the Loan.

4.08 **Policies of Insurance.** Each of the copies of the policies of insurance relating to the Collateral delivered to Lender by Borrower (i) is a true correct and complete copy of the respective original thereof as in effect on the day hereof, and no amendments or modifications of said documents or instruments not included in such copies have been made, except as provided herein, and (ii) has not been terminated and is in full force and effect. Borrower is not in default in the observance or performance of its material obligations under said documents or instruments and Borrower has done all things required to be done as of the date of this Agreement to keep unimpaired their rights thereunder.

4.09 **Environmental Protection.** Except as disclosed in the Phase I Environmental Report (if required), (i) Borrower has not used, generated, stored, released or disposed of on, or transported from, the Premises any Hazardous Substances in violation of any Environmental Laws; (ii) to Borrower's knowledge, no other Person has used, generated, stored, released or disposes of on, or transported from, the Premises any Hazardous Substances in violation of any Environmental Laws; (iii) Borrower has not received any currently effective notice from any Governmental Authority or private agency, person or entity concerning

15

the presence of underground storage tanks or any Hazardous Substance on the Premises; (iv) to Borrower's knowledge, no underground storage tanks are, or at any time have been, located on or under the Premises; (v) no Hazardous Substances are to be used in the construction of the improvements to be located on the Premises other than in accordance with applicable Environmental Laws; (vi) only those portions of the Premises designated in writing by Borrower to Lender lie within an area which constitutes a "wetland" subject to the jurisdiction of the United States Army Corps of Engineers, the United States Environmental Protection Agency or any other federal, state or local governmental agency under the Clean Water Act, as amended, or under any similar Environmental Law; (vii) except as disclosed in writing by Borrower to Lender prior to the Closing Date, to Borrower's knowledge, no property adjoining the Premises is being used or has ever been used at any previous time for the disposal, storage, treatment, processing or other handling of Hazardous Substances nor is any such property contaminated by Hazardous Substances; and (viii) to Borrower's knowledge, no investigation, administrative order, consent order and agreement, litigation or settlement with respect to Hazardous Substances is proposed, threatened, anticipated or in existence with respect to the Premises, nor is the Premises currently, or has it ever been, on any federal or state "superfund" or "superlien" list.

4.10  **Financial Statements.** All historical financial statements furnished to the Lender present fairly, in all material respects, the financial condition of Borrower as of the dates stated subject to any typical yearend adjustments, and the results of operations and statements of cash flows of Borrower for the periods indicated, and all pro forma financial statements or projections are based on underlying assumptions which provide a reasonable basis for the projections contained herein and reflect Borrower's judgment based on present circumstances of the most likely set of conditions and course of action for the projected period.

4.10  **Taxes.** Borrower has filed or caused to be filed all tax returns which are required to be filed by it, pursuant to the laws, regulations or orders of each Person with taxing power over Borrower and Borrower has paid, or made provision for the payment of, all taxes, assessments, fees and other governmental charges which have or may have become due pursuant to said returns, or otherwise, or pursuant to any assessment received by Borrower except such taxes, if any, as are being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided.

4.11  **Title to Facility.** As of the Closing Date will be, there are no known liens, claims, changes or encumbrances that would apply to the Facility once constructed or during construction and there are no known impediments to free and clear title to the Facility once constructed or during construction, and Borrower has continued access to a public thoroughfare.


5       **AFFIRMATIVE COVENANTS OF BORROWER**

To induce Lender to enter into this Agreement and to make the Loan hereunder, Borrower agrees and covenants to Lender as follows.

5.01  **Performance of Development Work.** Borrower will diligently prosecute the construction of the Development Work upon the Premises to completion in a good and workmanlike manner and in substantial accordance with the Plans, all Legal Requirements, sound engineering and architectural principles, commonly accepted safety standards and the other terms of this Agreement, free and clear from all liens or claims for liens, other than the liens and security interests created by the Loan Documents and the Permitted Exceptions. In the event that an event of nature prevents the timely completion of the Development Work, the parties agree to discuss the possibility of an extension of the deadline.

16

5.02 **Additional Covenants Incidental to Construction.** At all times during construction Borrower will:(a) upon reasonable prior notice, and during normal business hours, permit Lender and its representatives at all reasonable times to enter and inspect the Premises, to inspect all materials to be used in the performance of the Development Work and to examine the Plans and shop drawings and use its reasonable efforts to cause Borrower's Architect and Engineers, Contractor(s), and the subcontractors and material men to cooperate with Lender during such inspections, including without limitation, respond to any reasonable inquiries of Lender (and Lender will use reasonable efforts not to interfere with the Development Work); (b) fully and timely comply with all Legal Requirements, and if required by Lender, record all notices of completion and similar notices permitted by Legal Requirements which have the effect of shortening periods within which mechanics' and material men's liens may be filed; (c) timely perform all its material obligations necessary to preserve its rights under the Principal Agreements and enforce and secure the performance of the other parties under the Principal Agreements in Borrower's reasonable business judgment; (d) from time to time and promptly after demand, deliver to Lender a current list of Contractors, subcontractors and material men performing work or services or providing equipment or materials with respect to the Development Work; (e) deliver to Lender or its representatives, promptly after demand, counterparts and/or conditional assignments of any and all Principal Agreements, bills of sale, statements, conveyances, receipted vouchers or agreements of any nature under which Borrower claims title to any materials used or to be used with respect to the Development Work; (f) after obtaining knowledge or receiving notice thereof, promptly correct any structural or material defect in the Development Work, any work or materials deviating from Legal Requirements or any material departure from the Plans not accepted by Lender; and (g) use Advances only for the purposes made and promptly pay, or cause to be paid, when due all bills, invoices and claims, whether for labor, services, materials or otherwise, which are submitted or made in connection with the completion of the Development Work.

5.03 **Insurance.** Borrower will maintain insurance, with companies or associations reasonably approved by Lender and authorized to issue the particular type of insurance in the State of Tennessee, in such amounts and covering such risks as may reasonably be required by Lender, including, without limitation, such insurance as is required under the Deed of Trust. The policies shall in no manner make Borrower or Lender a co-insurer prior to loss in excess of policy limits. All such insurance shall contain a loss payee endorsement in favor of Lender, shall provide that the insurer shall notify Lender in writing not less than ten (10) days prior to the cancellation of any such policy, shall contain endorsements that no act or negligence of the insured or any occupant and no occupancy or use of the applicable property for purposes more hazardous than permitted by the terms of the policy, will affect the validity or enforceability of such insurance as against Lender.

5.04 **Preservation of Collateral.** Borrower will preserve and maintain the Collateral in good condition, and from time to time make all needed repairs, renewals and replacements thereto, so that the Premises, and other Collateral shall be usefully preserved, and will comply with all material applicable laws and regulations of any Person or governmental authority and the terms of any indenture, contract or other instrument to which they may be a party or under which they may be bound, if non-compliance will have a Material Adverse Effect, except where contested in good faith and by proper proceedings as to which adequate reserves (determined in accordance with GAAP) have been provided.

5.05 **Advances.** At any time during the Term of the Loan, if Borrower should fail (i) to perform or observe, or (ii) to cause to be performed or observed, any covenant or obligation of Borrower under this Agreement or any of the Other Loan Documents, then Lender, upon the giving of reasonable advance notice, may (but shall be under no obligation to) take such steps as are necessary to remedy any such nonperformance or non-observance and provide for payment thereof. All amounts advanced by Lender pursuant to this Section 5.05 shall become an additional obligation of Borrower to Lender secured by the Deed of Trust and Other Loan Documents

5.06 **Financial Statements, Reports and Tax Returns.** Borrower shall provide Lender with financial statements and reports pursuant to the definition of "Reporting Requirements", and will provide tax returns upon Lender's request.

      5.06.1   BORROWER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT THE FAILURE BY BORROWER TO TIMELY DELIVER THE FINANCIAL STATEMENTS, TAX RETURNS AND SCHEDULES REQUIRED PURSUANT TO THIS SECTION 5.06 WITHIN FIFTEEN (15) DAYS AFTER WRITTEN NOTICE THEREOF FROM LENDER TO BORROWER, SHALL CONSTITUTE AN EVENT OF DEFAULT, WHICH ALLOWS LENDER TO EXERCISE ALL REMEDIES SET FORTH HEREIN AND IN THE LOAN DOCUMENTS. IN ADDITION, AND WITHOUT LIMITING ANY OF THEFOREGOING, BORROWER ACKNOWLEDGES AND AGREES THAT IN THE EVENT BORROWER DEFAULTS UNDER THE PROVISIONS OF THIS SECTION 5.6, THE INTEREST RATE UNDER THE NOTE ON ALL AMOUNTS DUE THEREUNDER SHALL AUTOMATICALLY INCREASE TO THE DEFAULT RATE WITHOUT FURTHER NOTICE OR ACTION BY LENDER UNTIL SUCH TIME AS THE REQUIRED ITEMS ARE DELIVERED TO LENDER.

5.07 **Taxes.** Throughout the Term of the Loan, Borrower shall prepare and timely file all federal, state and local tax returns required to be filed by it, and Borrower shall promptly pay and discharge all taxes, assessments and other governmental charges or levies imposed in respect of the Premises and any of the Collateral except such taxes, if any, as are being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided.

5.08 **Compliance With Other Loan Documents.** Borrower shall comply in all material respects with each and every term, condition and agreement contained in the Loan Documents.

5.09 **Suits or Actions Affecting Borrower.** Throughout the Term of the Loan, Borrower shall promptly advise Lender in writing within ten (10) days of Borrower's knowledge thereof of (i) any claims, proceedings or disputes (whether or not purportedly on behalf of Borrower) against, or threatened or affecting Borrower which, if adversely determined, would have a Material Adverse Effect, or (ii) any proposal by any Governmental Authority to acquire any of the assets or business of Borrower.

5.10 **No Additional Extensions or Advances.** Borrower covenants, acknowledges and agrees that Lender has no duty or obligation, either expressed or implied, to make any extensions of the Loan or the Maturity Date or to make any further advances of funds under the Note other than as specifically set forth herein or therein. Borrower specifically covenants and agrees that the provisions of this Agreement and the making of the Loan hereunder in no way are intended to or create an obligation to make additional advances or further loans to Borrower. The Loan shall be fully due and payable on the Maturity Date.

5.11 **Compliance With Governmental Requirements.** Borrower shall timely comply with all Governmental Authority requirements and, upon Lender's request, deliver to Lender evidence thereof, to the extent such non-compliance would have a Material Adverse Change.

5.12 **Notices by Governmental Authority, Fire and Casualty Losses Etc.** Borrower shall timely comply with and promptly furnish to Lender true and complete copies of any official notice or claim by any Governmental Authority pertaining to the Premises or performance of the Development Work. Borrower shall promptly notify Lender of any fire or other casualty or any notice or taking of eminent domain action or proceeding affecting the Premises.

5.13 **Hazardous Substances.** Borrower shall not use, generate, manufacture, produce, store, release, discharge or dispose of any Hazardous Substances on, under or about the Premises, or transport to or from the Premises any Hazardous Substances, or knowingly allow any other person to do so, in violation of any Environmental Laws, and shall take all commercially reasonable efforts to assure that no Hazardous Substances are being used, generated, manufactured, produced, stored, released, discharged or disposed of on, under or about the Premises, except in each case in full compliance with all Environmental Laws.

5.14 **Indemnity.** Borrower unconditionally shall indemnify and defend Lender against, and shall hold Lender harmless from, any and all losses, damages (whether general, punitive or otherwise), liabilities, claims, causes of action (whether legal, equitable or administrative), judgments, court costs and legal or other expenses (including attorneys' fees) which Lender may suffer or incur as a direct or indirect consequence of: (i) Borrower's failure to perform any of Borrower's obligations as and when required by this Agreement or any of the Other Loan Documents, including, without limitation, any failure of any representation or warranty of Borrower to be true and correct when made and any failure by Borrower to satisfy any condition; (ii) any act or omission by Borrower, or any contractor, subcontractor or material supplier, engineer, architect or other person or entity acting on behalf of Borrower or its Contractor, except Lender, with respect to any of the Premises; (iii) any claim or cause of action of any kind by any person or entity which would have the effect of denying Lender the full benefit or protection of any provision of this Agreement or any of the Other Loan Documents; (iv) any claim that Lender is responsible for the payment of a fee, commission or other compensation to a broker, finder or packager in connection with the Loan or the performance of the Loan Documents based on such Person's relationship to Borrower; (v) the operation or maintenance of the Development Work; (vi) any other action or inaction by, or matter which is the responsibility of, Borrower, except for any such claim, injury, damage, loss or liability caused solely by the willful misconduct or gross negligence of Lender or their agents or employees; and (vii) the release or presence of any Hazardous Substance at the Premises, whether foreseeable or unforeseeable, regardless of the source of such release or when such release occurred or such presence is discovered. The indemnity provided under this Section shall include, without limitation, all costs in law or in equity of removal, remediation of every kind, and disposal of such Hazardous Substance, all costs of determining whether the Premises is in compliance and causing the Premises to be in compliance with all applicable Environmental Laws, all costs associated with claims for damages to person, property or natural resources, and Lender's attorneys' and consultants' fees and costs related thereto. Lender's right of indemnity shall not be directly or indirectly limited, prejudiced, impaired or eliminated in any way by any finding or allegation that Lender's conduct is active, passive or subject to any theory of any kind, character or nature for any act or omission by Borrower or any other person or entity except Lender. Notwithstanding the foregoing, Borrower shall not be obligated to indemnify Lender with respect to any fraud, willful misconduct or intentional tort which Lender is personally determined by the judgment of a court of competent jurisdiction (sustained on appeal, if any) to have committed or the gross negligence or intentional acts of Lender after Lender takes possession of the Premises.

Borrower shall pay any indebtedness arising under said indemnity to Lender immediately upon demand by Lender. This indemnity shall survive the payment of all amounts payable pursuant to the Note and all Loan Documents. Payment by Lender shall not be a condition precedent to the obligations of Borrower under this indemnity.

5.13 **Lender's Action for Its Own Protection Only.** The authority herein conferred upon Lender, and any action taken by Lender, to inspect the Premises, procure waivers or sworn statements, approve contracts, subcontracts and purchase orders, and approve plans, will be exercised and taken by Lender for Lender's protection only and may not be relied upon by Borrower for any purposes whatever; and Lender shall not be deemed to have assumed any responsibility to Borrower with respect to any such action herein authorized or taken by Lender or with respect to the proper performance of the Development Work,

performance of contracts, subcontracts or purchase orders by any contractor, subcontractor or material supplier, or prevention of mechanics' liens from being claimed or asserted against any of the Premises. Any review, investigation or inspection conducted by Lender or any architectural or engineering consultants retained by Lender to verify independently Borrower's satisfaction of any conditions precedent to Loan disbursements under this Agreement, Borrower's performance of any of the covenants, agreements and obligations of Borrower under this Agreement, or the validity, of any representations and warranties made by Borrower hereunder (regardless of whether, the party conducting such review, investigation or inspection shall have discovered that any of such condition precedent were not satisfied or that any such covenants, agreements or obligations were not performed or that any such representations or warranties were not true), shall not affect (or constitute a waiver by Lender of) (i) any of Borrower's representations and warranties under this Agreement or Lender's reliance thereon, or (ii)Lender's reliance upon any certifications of Borrower or the contractor required under this Agreement or any other facts, information or reports furnished to Lender by Borrower hereunder.

5.14 **Loan Participations**. Borrower acknowledges and agrees that Lender may, from time to time, sell or offer for sale participation interests in the Loan. Borrower authorizes Lender to disseminate any information it has pertaining to the Loan, including, without limitation, complete and current credit information of Borrower, to any purchaser of a participation interest in the Loan or any party offered to purchase a participation interest in the Loan, provided that such potential participant agrees to maintain the confidentiality of such information and use it only for its internal purposes in evaluating the purchase of a participation in the Loan.

5.15 **Declaration.** Borrower shall not record any declaration of covenants, conditions and restrictions (the "Declaration") against the Premises unless the Declaration has been approved in writing by Lender. Lender shall not unreasonably withhold, condition, or delay its consent of the Declaration, so long as the Declaration does not materially adversely impact the rights of Lender thereunder.

5.16 **Negotiations.** All negotiations related to this Contract and the transactions contemplated hereby have been carried on by Borrower in such a manner as to not give rise to any valid claim against the Lender (by reason of the Borrower's actions) for a brokerage commission, finder's fee or other like payment to any person other than those otherwise indicated herein.

## 6   FORCE MAJEURE

6.01 **Performance.** If either Party is unable, wholly or in part, to perform its obligations under this Agreement because of a Force Majeure event, that Party will be excused from whatever performance is affected by the Force Majeure event to the extent so affected from the inception and during the continuance of any such Force Majeure. The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure event.

6.02 **Notice.** The Parties hereto shall give each other notice, within no more than fifteen (15) days, of the beginning of and of the end of any event of Force Majeure. If this obligation is not met, then the Party in default shall lose its right to rely upon the event of Force Majeure. The occurrence of a Force Majeure event shall not relieve a Party's obligations to pay money.

6.03 **Obligations.** Should the Parties hereto be unable to carry out their obligations in accordance with the time schedule provided hereunder for a period of six (6) months or more as a result of an event of Force Majeure, then the Parties shall meet as soon as possible in order to examine the impact of such events on the terms of this Agreement, and they shall, within sixty (60) days, work in good faith to come to an agreement in regards to the terms and conditions for the continuance of their respective obligations.

**7**     **EVENTS OF DEFAULT AND REMEDIES**.

The occurrence of any of the following events shall constitute an Event of Default hereunder:

7.1     **Representations and Warranties.** Any representation, warranty or statement of Borrower pursuant to or in connection with this Agreement, the Note, the Deed of Trust, or any Other Loan Document or in any report, certificate or other writing furnished by or on behalf of Borrower in connection herewith shall prove to be false, incorrect, or misleading in any material respect when made or furnished, or any historical financial statement did not present fairly, in all material respects, the financial condition of Borrower as of the dates stated and the results of operations and statements of cash flows of Borrower for the periods indicated (subject to yearend adjustments);

7.2     **Payment of Note.** Borrower shall have defaulted in the payment of any installment of interest and/or principal when due under the Note;

7.3     **Other Charges.** Borrower shall have defaulted in the payment of any late charge or any other charge or amount owing to Lender under any Loan Document when such payment is due;

7.4     **Advances.** Borrower shall have failed to repay to Lender any Advances made by Lender, together with interest thereon, as set forth in this Agreement, and such failure continues for a period of more than ten (10) days after written notice by Lender of such required repayment;

7.5     **Other Covenants.** Borrower shall have failed to perform any obligation not involving the payment of money, or to comply with any other term or condition applicable to Borrower under this Agreement, the Note, the Deed of Trust or under any Other Loan Document and the expiration of thirty (30) days after written notice of such failure from Lender to Borrower; provided, however, if the nature of such failure is such that Borrower is unable to cure such failure within such thirty (30) day period, as determined by Lender in its reasonable discretion, Lender may (but shall not be obligated to do so) grant Borrower an additional period of time (to be determined by Lender in its sole and absolute discretion) to cure such failure.

7.6     **Bankruptcy.** The filing by Borrower (or against Borrower to which Borrower acquiesces or which is not dismissed within ninety (90) days after the filing thereof), of any proceeding under the federal bankruptcy laws now or hereafter existing or any other similar statute now or hereafter in effect; the entry of an order for relief under such laws with respect to Borrower; or the appointment of a receiver, trustee, custodian, or conservator of all or any part of the assets of Borrower.

7.7     **Insolvency.** The insolvency of Borrower, or the execution by Borrower of a general assignment for the benefit of creditors; or the convening by Borrower of a meeting of its creditors, or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; or if Borrower is generally not paying its debts as they mature.

7.8     **Payment of Debts.** Borrower makes an assignment for the benefit of its creditors, or admits in writing its inability to pay its debts generally as they become due;

7.9     **Liens/Judgment.** The existence or the filing of any lien, attachment, levy or encumbrance against the Premises or the entry of any judgment, order or decree, without Lender's prior written consent, that is not removed and released, satisfied, bonded over, or stayed by a surety or other security acceptable to Lender or otherwise disposed of to Lender's satisfaction, within ten (10) days after the filing of such lien, attachment, levy or encumbrance or the entry of such judgment, order or decree;

7.10 **Priority.** If after fifteen (15) days prior written notice from Lender (which notice shall specify the reasons for Lender's determination), the priority or security of the Deed of Trust or any other security for the payment of the Note, in the reasonable judgment of Lender, is in jeopardy.

7.11 **Generally**. Upon the occurrence and during the continuation of an Event of Default hereunder, Lender shall have all rights and remedies available to Lender under the law or at equity, hereunder or under the Note (including, but not limited to, the right to accelerate the Note without presentation, demand, notice, or notice of protest), the Deed of Trust or any of the Other Loan Documents. Without limiting the foregoing, Lender shall have the right to appointment of a trustee or receiver to perform any acts required of Borrower under this Agreement. In order to entitle Lender to exercise any remedy available hereunder, it shall not be necessary for Lender to give any notice, other than such notice as may be required by this Loan Agreement or any of the Other Loan Documents or such notice as may otherwise be required by law.

7.12 **Right Not to Fund Loan or Advance.** In the event and during the continuation of an Event of Default by Borrower prior to the funding of the Loan or any Advance, Lender shall, in addition to any other rights and remedies provided herein or by law, or at equity, not be required to fund the Loan and shall be excused from all further obligations and performance under this Agreement. In such event, Borrower shall continue to be responsible for payment of all costs, fees, and expenses.

7.13 **Right to Draw Upon the Deposit.** In the event and during the continuation of an Event of Default by Borrower, Lender may draw upon the Deposit, in whole or in part, and apply such proceeds in the manner set forth in the Note.

7.14 **Right to Advance or Post Funds.** Borrower agrees that Lender may, but shall not be required to, make any payment or perform any act herein required of Borrower in any form and manner deemed expedient after reasonable inquiry into the validity thereof and reasonable prior notice thereof to Borrower. By way of illustration and not in limitation of the foregoing, Lender may, but shall not be required to, (i) make full or partial payments of insurance premiums which are unpaid by Borrower, and of principal or interest to persons claiming prior liens or encumbrances, if any, (ii) purchase, discharge, compromise, settle or pay any tax lien or any other lien, encumbrance, suit, proceeding, title or claim thereof, including, but not limited to, liens for real and personal property taxes, or (iii) redeem all or any part of the Collateral from any tax or assessment. All money paid for any of the purposes herein authorized and all other moneys advanced by Lender to protect the Collateral and/or the lien of the Deed of Trust or any Other Loan Document shall be additional liabilities secured and evidenced by the Loan Documents and shall become immediately due and payable without notice and shall bear interest thereon at the Default Rate until paid to Lender in full. In making any payment hereby authorized relating to taxes, assessments or prior liens or encumbrances, Lender shall be the sole judge of the legality, validity and priority thereof and of the amount necessary to be paid in satisfaction thereof.

7.15 **Remedies Are Cumulative.** All remedies of Lender provided for herein are cumulative and shall be in addition to any and all other rights and remedies provided in the Note, the Deed of Trust or any of the Other Loan Documents or by law or at equity. The exercise of any rights of Lender hereunder shall not in any way constitute a cure or waiver of a default hereunder or elsewhere, or invalidate any act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights hereunder or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Note, the Deed of Trust and the Other Loan Documents.

7.16 **Right of Contest.** Borrower shall have the right to contest in good faith any tax, claim, demand, levy, assessment or Legal Requirement by a third party, the assertion of which would constitute an Event of Default hereunder. Any such contest shall be prosecuted diligently and in a manner not prejudicial to Lender or the rights of Lender hereunder. Upon demand by Lender (which demand shall be reasonable

under the circumstances), Borrower shall deposit funds with Lender or obtain and record a statutory bond sufficient to release such claim, demand, levy, or assessment as a lien against the Premises or Collateral. Borrower shall make such deposit or obtain and record such bond, as the case may be, within ten (10) days after demand therefore and, if made by payment of funds to Lender, the amount so deposited shall be disbursed in accordance with the resolution of the contest to Borrower or the adverse claimant.

7.17 **Subrogation Rights and Other Defenses.** Borrower waives the right to require Lender to proceed against Borrower, to foreclose any lien on any real or personal property in any particular order, or to exercise any right or remedy under the Loan Documents, to pursue any other right or remedy, or to enforce any other right. Borrower further acknowledges and agrees that nothing contained in the Loan Documents shall prevent Lender from exercising any rights available to it or under any of the Loan Documents, and that the exercise of any of the rights shall not constitute a legal or equitable discharge of Borrower. Borrower understands and acknowledges that the exercise by Lender of certain rights and remedies contained in the Loan Documents may affect or eliminate one or more of the Borrower's rights of subrogation against Lender and that Borrower may, therefore, succeed to a partially or totally non-reimbursable liability hereunder. Notwithstanding the foregoing, Borrower hereby authorizes and empowers Lender to exercise, at Lender's sole discretion, any rights and remedies, or any combination thereof, which may then be available, since it is the intent and purpose of Borrower that the obligations under the Loan Documents shall be absolute, independent, and unconditional under any and all circumstances.

7.18 **Cure Period.** Upon notice, Borrower shall be given thirty (30) days to cure the event of default to the satisfaction of the Lender in its sole and absolute discretion. The Lender may choose to extend this cure period, by its satisfaction that the Borrower is actively making its best efforts to cure, in its sole and absolute discretion.

7.19 **Agreement to Pay Attorneys' Fees and Expenses.** Upon the occurrence of an Event of Default, as a result of which Lender shall require and employ attorneys or incur other expenses for the collection of payments due or to become due under the Loan Documents or the enforcement or performance or observance of any obligation or agreement on the part of Borrower contained herein or in the Loan Documents, Borrower shall, on demand, pay to Lender the reasonable fee of such attorneys and such other expenses so incurred by Lender, including, without limitation, expert witness fees, discovery costs, court costs, and other litigation-related expenses.

7.20 **Exercise of Rights Subject to Applicable Law.** All rights, remedies and powers provided by this Section 7 may be exercised only to the extent that the exercise thereof does not violate any applicable provision of the laws of the State of Tennessee and all of the provisions of this Section 7 are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they will not render this Agreement invalid or unenforceable.

7.21 **Discontinuance of Proceedings.** In case Lender shall have proceeded to enforce any right, power or remedy under this Agreement, the Note, the Deed of Trust or any Other Loan Document by foreclosure, entry, or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to Lender, then and in every such case Borrower and Lender shall be restored to their former positions and rights hereunder with respect to the Collateral, and all rights, remedies and power of Lender shall continue as if no such proceedings had been taken, subject to any binding rule by the applicable court or other tribunal in any such proceeding.

# 8   MISCELLANEOUS.

8.01 **Entire Agreement.** This Agreement with exhibits and Loan Documents embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings

23

relating to the subject matter hereof. Neither this Agreement nor any provision herein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

8.02 **Interpretation and Construction.** In this Agreement, unless the context otherwise requires:(i) Sections mentioned by number only are the respective Sections of this Agreement as so numbered; (ii) words importing a particular gender mean and include every other gender, and words importing the singular number mean and include the plural number and vice versa; (iii) any headings preceding the texts of the several Sections of this Agreement, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect; (iv) the terms "herein," "hereunder," "hereby," "hereto," "hereof" and any similar terms as used in the Agreement refer to this Agreement; the term "heretofore" means before the date of the execution of this Agreement; and the term "hereafter" means after the date of the execution of this Agreement; (v) if any clause, provision or Section of this Agreement shall be determined to be apparently contrary to or conflicting with any other clause, provision or Section of this Agreement, then the clause, provision or Section containing the more specific provisions shall control and govern with respect to such apparent conflict; and (vi) all accounting terms used herein which are not otherwise specifically defined shall be used in accordance with GAAP. The parties hereto do agree that each has contributed to the drafting of this Agreement and all Loan Documents and that the provisions herein contained shall not be construed against either Borrower or Lender as having been the person or persons responsible for the preparation thereof.

8.03 **Environmental.**With respect to the Property, Borrower shall at all times comply in all respects with all applicable laws (whether statutory, common law or otherwise), rules, regulations, orders, permits, licenses, ordinances, judgments or decrees of all governmental authorities (whether federal, state, local or otherwise), including, without limitation, all laws regarding public health or welfare, environmental protection, water or air pollution, composition of products, underground storage tanks, toxic substances or chemicals, solid and special wastes, hazardous wastes, substances, material or chemicals, waste, used, or recycled oil, asbestos, occupational health and safety, nuisances, trespass, and negligence. Borrower agrees to indemnify and hold Lender harmless from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, of any kind or nature whatsoever, including without limitation, attorneys' and experts' fees, which may be imposed on, incurred by or asserted against Lender in any way relating to or arising from the Obligations, the Deed of Trust, the other Loan Documents and/or the Property. All of Borrower's obligations under this section shall survive the foreclosure, release or other termination of any Deed of Trust and the satisfaction of the Obligations.

8.04 **Failure to Exercise Rights**. Nothing herein contained shall impose upon Lender or Borrower any obligation to enforce any terms, covenants or conditions contained herein. Failure of Lender or Borrower, in any one or more instances, to insist upon strict performance by Borrower or Lender of any terms, covenants or conditions of this Agreement or the Loan Documents, shall not be considered or taken as a waiver or relinquishment by Lender or Borrower of their right to insist upon and to enforce in the future, by injunction or other appropriate legal or equitable remedy, strict compliance by Borrower or Lender with all the terms, covenants and conditions of this Agreement and the Loan Documents. The consent of Lender or Borrower to any act or omission by Borrower or Lender shall not be construed to be a consent to any other or subsequent act or omission or to waive the requirement for Lender's or Borrower's consent to be obtained in any future or other instance.

8.05 **Notices.** All notices required or permitted to be given by law or by the terms of this Agreement shall be in writing and shall be considered given upon (i) personal service of a copy on the party to be served, (ii) the

24

next Business Day following delivery to a reputable overnight carrier service, or (iii) three (3) business days after proper deposit of a copy of such notice in the United States Mail, by certified or registered mail, postage prepaid, receipt for delivery requested, addressed to the party to be served. The addresses of the parties are as set forth on the first page of this Agreement. Any change in the address of any party shall be given by the party having such change to the other parties in the manner provided above. Thereafter, all notices shall be given in accordance with the notice of change of address. Notices given before actual receipt of the notice of change of address shall not be invalidated by the change of address.

8.06   **Termination.** This Agreement shall terminate when all indebtedness and obligations of Borrower incurred hereunder and under each of the Loan Documents shall have been discharged in full or as otherwise provided herein.

8.07   **Severability of Provisions.** In the event any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

8.08   **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of Borrower, the Lender and its respective successors and permitted assigns; provided, however, that Borrower may not transfer its rights to borrow or any of its liabilities or obligations under this Agreement or any of the Other Loan Documents directly, indirectly or by operation of law without the prior written consent of Lender, in Lender's sole discretion.

8.09   **Governing Law, Venue.** Each of the Loan Documents shall be deemed to be a contract made under and governed by the laws of the State of Tennessee without regard to the laws of conflict of any jurisdiction) as to all matters, including without limitation, matters of validity, interpretation, construction, effect, performance and remedies. Borrower hereby irrevocably consents to the personal jurisdiction of the state and federal courts located in Shelby County, State of Tennessee, or any other court having personal jurisdiction over Borrower or the Collateral in connection with any controversy related to this Loan Agreement and any other of the Loan Documents, waives any argument that venue in such forums is not convenient, and agrees that any litigation in connection herewith or therewith shall be venue in such federal or state courts.

8.10   **Modification in Writing.** This Agreement, the Note and the Other Loan Documents constitute the entire agreement between the parties and supersedes all prior agreements whether written or oral with respect to the subject matter hereof, including, but not limited to, any term sheets furnished by Lender to Borrower. Neither this Agreement nor any provision herein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

8.11   **Incorporation of Terms.** Borrower agrees that the Note shall be made subject to all the terms, covenants, conditions, obligations, stipulations and agreements contained in this Agreement to the same extent and effect as if fully set forth in and made a part of the Note and Borrower and Lender agree that this Agreement is made subject to all the terms, covenants, conditions, obligations, stipulations and agreements contained in the Note to the same extent and effect as if fully set forth herein and made a part of this Agreement. Notwithstanding any of the foregoing, if any provisions in this Agreement or the Loan Documents are inconsistent with the Note, the Note shall control. If any provisions of the Deed of Trust or any of the Other Loan Documents are inconsistent with this Agreement, this Agreement shall control.

8.12   **Cumulative Nature of Covenants.** All covenants contained herein are cumulative and not exclusive of each other covenant. Any action allowed by any covenant shall be allowed only if such action is not prohibited by any other covenant.

8.13   **Continuing Representations.** All agreements, covenants, representations, and warranties made herein shall survive the execution and delivery of this Agreement, the making of the Loan hereunder, the execution and delivery of the Note, the payment and cancellation of the Note, and the foreclosure sale of the Collateral. All covenants, agreements, representations and warranties made in or pursuant to this Agreement shall be deemed continuing and made at and as of the date of this Agreement and at and as of the time of each Advance. All statements contained in any certificate, financial statement, legal opinion or other instrument delivered by or on behalf of Borrower pursuant to or in connection with any of the Loan Documents shall constitute additional representations and warranties made under this Agreement.

8.14   **Counterparts.** This Agreement may be executed by the parties hereto in any number of separate counterparts with the same effect as if the signatures hereto and hereby were upon the same instrument. All such counterparts shall together constitute but one and the same document.

8.15   **Costs to Prevailing Party.** If any action or proceeding is brought by any party against any other party under this Agreement, the prevailing party shall be entitled to recover such attorneys' fees, expert witness fees, litigation-related expenses, and court costs as the court in such action or proceeding may adjudge reasonable.

8.16   **Time**. Time is of the essence of this Agreement.

8.17   **No Third-Party Beneficiaries.** This Agreement is made and entered into for the sole benefit of Lender, it successors and assigns and Borrower and is not for the benefit of any third party. All conditions of the obligations of Lender to make advances hereunder are imposed solely and exclusively for the benefit of Lender and may be freely modified by Lender with the concurrence of Borrower or waived by Lender in whole or in part at any time if in Lender's sole discretion it deems it advisable to do so. No person other than Borrower shall have standing to require Lender to make any loan advances or to be a beneficiary of this Agreement or of any of the advances to be made hereunder.

8.18   **Form and Substance.** All documents, certificates, insurance policies and other items required under the Loan Documents to be executed or delivered to Lender shall be in a form and substance satisfactory to Lender.

8.19   **Assignment.** Lender may assign its rights and obligations hereunder, or grant participations in its interest in the Loan, from time to time and in whole or in part, and upon any such assignment, Lender shall be released from its obligations under this Agreement and the Loan Documents to the extent of any such assignment. No participant shall be deemed a partner or agent of Lender. Borrower irrevocably agrees that no claim shall be asserted by way of direct claim or offset against any participant and Borrower hereby irrevocably waives any right it otherwise may have, now or hereafter, to assert any such claim. Borrower acknowledges that the participants shall rely on the foregoing waiver and agreement.

8.20   **Waiver of Right to Offset.** No portion of the Loan funds at any time shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross claim, whether liquidated or unliquidated, which Borrower may have or claim to have against Lender.

8.21   **Joint and Several Liability.** Should this Agreement or any Other Loan Document be executed by more than one Person as Borrower, all obligations of Borrower herein or therein contained shall be deemed to be the joint and several obligations of each Person executing this Agreement or such Other Loan Document.

8.22 **Interpretation of Conflicts.** In the event of any conflict between the terms and provisions of this Loan Agreement and the terms and provisions of any Other Loan Document, the terms and provisions of this Loan Agreement shall govern and prevail.

8.23 **WAIVER OF JURY TRIAL.** BORROWER AND LENDER WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OR ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. BORROWER AND LENDER AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION IS TO BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING THAT SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

8.24 **Broker Fee.** Both parties acknowledge that there are no brokers or advisors entitled to a fee pursuant to this transaction other than Thomas & Assoc. Consulting Group, LLC who shall be paid one percent (1.0%) of the Loan Amount from the first Loan Funding Amount. Each side shall indemnify the other for any claim that might arise in connection with any other broker or advisor fees hereunder.

8.25 **Legal Consultation; Mutual Drafting.** Each party recognizes that this is a legally binding contract and acknowledges and agrees that they have had the opportunity to consult with legal counsel of their choice. Each party has cooperated in the drafting, negotiation and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such language. Borrower agrees and acknowledges that he has read and understands this Agreement completely, is entering into it freely and voluntarily, and has been advised to seek counsel prior to entering into this Agreement and has had ample opportunity to do so.

8.26 **Regulatory.** U.S. REGULATIONS RELATING TO THE FLOW OF FUNDS INTERNATIONALLY AND, PARTICULARLY INTO U.S. JURISDICTION, HAS BEEN CONSTANTLY EVOLVING. BANKING REACTION TO COMPLIANCE WITH THESE MYRIAD REGULATORY MANDATES HAS BEEN UNEVEN AND INCREASINGLY CAUTIONARY. TIMELY LOAN PROCEEDS DEPEND TO A LARGE EXTENT ON THE COOPERATION OF UNITED STATES AND INTERNATIONAL BANKS. CHANGING VIEWS ABOUT HOW BEST TO ACHIEVE PROPER COMPLIANCE BY ANY OF THE BANKS INVOLVED IN THIS LOAN PROCESSING PROGRAM CAN HAVE THE EFFECT OF DISRUPTING THE TIMING OF EXPECTED CAPITAL FLOWS ASSOCIATED WITH THIS PROJECT DUE TO NO FAULT OF THE LENDER. BORROWER SHALL NOT ABLE TO SEEK REMEDY FROM BORROWER DUE TO THESE CIRCUMSTANCES. BORROWER SHOULD BE COGNIZANT OF THIS RISK WHEN ENTERING INTO A LOAN CONTRACT.

9.0 **LENDER'S RIGHT TO COMPLETE.**

9.1 **Lender's Right.** Upon the occurrence of any contingency (and the expiration of any applicable cure period) of the character described in Section 7 which would give Lender the right under this Agreement to

refrain from making any further Advance hereunder, Lender, at its sole option (whether or not it exercised any rights under Section 7) but without any obligation upon Lender to do so, may at any time thereafter (1) advance the proceeds of the Loan or any part thereof, or if necessary, sums in excess of the Loan proceeds, to the General Contractor, any subcontractor or any person furnishing labor or material in the construction of the Improvements for the account of Borrower, and the sums so paid or advanced shall be for the purposes of this Agreement, be deemed to have been advanced to Borrower pursuant to the provisions hereof; and (2) take possession of the Property together with all materials, equipment and improvements thereon whether affixed to the realty or not, and all Plans and Specifications, which Borrower hereby assigns to Lender, and Lender shall have the right but shall be under no obligation to perform any and all work and labor necessary to complete the Improvements substantially according to the Plans and Specifications and may employ watchmen or take any action it may deem necessary to protect them from depredation or injury.

9.2 **Lender's Implementation.** To implement the rights of the Lender under this Section 9, Lender shall have the authority and right to complete the Improvements as follows:

(a) to use the balance of the Loan including any funds of Borrower which may not have been advanced for the purpose of completing the Improvements;

(b) to make such additions and changes and corrections in the Plans and Specifications as may be necessary or desirable to complete the Improvements in substantially the manner contemplated in the Plans and Specifications;

(c) to succeed to the rights of Borrower under the General Construction Contract and all or any one or more Subcontractors, or to make new contractual arrangements to employ the present or new contractors, subcontractors, agents, architects and inspectors as shall be required;

(d) to pay, settle or compromise all existing bills and claims which may be or become liens against the Property or Improvements or as may be necessary or desirable for completion of the Improvements for the clearance of title;

(e) to execute all applications, certificates or instruments in the name of Borrower which may be required by any governmental authority or contract; and

(f) to do any and every act which Borrower might or could do in its own behalf.

Lender, in its name, or on behalf of Borrower, shall also have the power to prosecute and defend all actions and proceedings in connection with the construction of the Improvements on the Property and to take such action and require such performance as it deems necessary. Borrower hereby assigns and quitclaims to Lender all sums unadvanced hereunder conditioned upon the use of said sums in trust for the completion of the Improvements, such assignment to become effective only at the option of Lender in the event of the occurrence of any such contingency of the character described in Section 7. In addition it is agreed that Lender may, at its option, expend money in completing said construction and protecting and preserving the Property, which shall be over and above the total amount of the funds in the Loan fund to the maximum extent permitted by the law of the applicable jurisdiction, and said money when so expended, shall be added to the principal of the Loan and the same, together with interest thereon at the default rate specified in the Note, shall be secured by the lien of the Loan Documents and shall be payable by Borrower on demand.

10.0 **LIQUIDATED DAMAGES.** The Parties understand that the Loan Proceeds are being utilized for the construction of the premises on a build-to-suit basis for another user and that time is of the essence for

funding of the loan. Lender shall be in default if, after execution of all loan documents and deposit and release by Borrower of its Equity Contribution to the project, Lender fails to fund $5,000,000 into the appropriate Loan Production Accounts to Borrower as set forth above under the definition of Loan Funding Amounts. Upon written notice of default by Borrower to Lender, Lender shall have five (5) business days to cure the default(s).  If Lender does not cure Lender waives all rights pursuant to this Agreement, and must refund Borrower's $500,000 Deposit together with all related costs, advisor fees and expenses incurred by Borrower pursuant to this agreement within thirty (30) days from date of default. Upon occurrence of default by Lender, Lender will immediately cause to be released the First Deed of Trust if recorded, any liens or encumbrances, and all Loan Documents become immediately invalid and unenforceable by Lender.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, Lender and Borrower have caused this Agreement to be duly executed and delivered as of the date first above written.

**BORROWER:**

**MEMPHIS WINSET, LLC**
A California limited liability company


By:_____
Name: Juan Corona
Its: Member



**LENDER:**

**JC FUNDING-18, LLC**
a Missouri limited liability company


By:_____
Name: Jeff N. Crossland
Its: Member

**Exhibit "A"**

PREMISES LEGAL DESCRIPTION

**Exhibit "B"**

INITIAL BUDGET

**Exhibit "C"**

APPROVED SCHEDULE OF VALUES

**EXHIBIT B**

## <u>FIRST AMENDMENT TO LOAN AGREEMENT</u>

THIS FIRST AMENDMENT TO LOAN AGREEMENT (the "Amendment") is made and entered into effective as of the 22nd day of December, 2014, by and between **MEMPHIS WINSET, LLC**, a California limited liability company ("Borrower"), and **JC FUNDING-18, LLC,** a Missouri limited liability company ("Lender").

WHEREAS, Borrower and Lender entered into that certain Loan Agreement dated as of September 11, 2014 (hereinafter, as amended, revised or modified from time to time, the "Loan Agreement"; capitalized terms used herein and not otherwise defined shall have the meaning given them in the Loan Agreement); and

WHEREAS, Borrower and Lender have agreed to revise the definition of "Loan Funding Amounts";

WHEREAS, Borrower and Lender now mutually desire to amend the terms and provisions of the Loan Agreement in accordance with the terms and conditions stated herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Definitions</u>.

(a)     The definition of "Loan Funding Amounts" is hereby deleted in its entirety and replaced with the following:

**qq. "Loan Funding Amounts"** means the amounts Lender shall deposit into the Production Account based on each Capital Availability Date which shall be as follows: (i) Capital Availability Date 1 - $200,000 by December 31, 2014; Capital Availability Date 2 - $300,000 by February 1, 2015; Capital Availability Date 3 - $2,000,000 by March 1, 2015; Capital Availability Date 4 - $750,000 by April 15, 2015; Capital Availability Date 5 - $750,000 by June 1, 15, 2015; Capital Availability Date 6 - $750,000 by August, 15, 2015; and Capital Availability Date 7 - $250,000 by October 1, 2015. Further, Lender will attempt to shorten the time in between Capital Availability Dates and fund into the Production Account sooner than the above schedule, if possible.

2.      <u>Miscellaneous</u>.

(a) The Loan Agreement and all other Loan Documents are hereby amended wherever necessary to reflect the foregoing amendments.

(b) Except as expressly herein amended, all provisions of the Loan Agreement and other Loan Documents shall remain in full force and effect.

(c) This Amendment shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

(d) This Amendment shall be construed in accordance with and be governed by the laws of the State of California.

(e) Borrower agrees to execute such other and further documents, instruments and agreements as Lender may request to implement the provisions of this Amendment.

(f) Wherever possible each provision of this Amendment shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Amendment shall be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Amendment.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed and delivered by their duly authorized representatives, effective as of the date first above written.

**BORROWER: MEMPHIS WINSET, LLC**,
a California limited liability company


By:_____
    Javier Montiel Brito, Member


**LENDER: JC Funding-18, LLC,**
A Missouri limited liability company


By:_____
    Jeff N. Crossland, Member

2