

## IN THE CHANCERY COURT FOR HAMILTON COUNTY, TENNESSEE

MOUNT CANAAN MISSIONARY )
BAPTIST CHURCH, )
                            )
      Plaintiff, )
                            )      Case No. 14-0053
v. )
                            )
JC FUNDING-6, LLC, EAGLE CAPITAL )
INVESTMENT PARTNERS, INC., JEFF )
CROSSLAND, STEPHEN PARENTE, )
RAY ROBINSON, ROE MESSNER and )
JERRY BARTON )
                            )
      Defendants. )

## COMPLAINT

The Plaintiff, Mount Canaan Missionary Baptist Church, for its Complaint against the Defendants, JC Funding-6, LLC, Eagle Capital Investment Partners, Inc., Jeff Crossland, Stephen Parente, Ray Robinson, Roe Messner and Jerry Barton, states as follows:

### THE PARTIES

1.       Mount Canaan Missionary Baptist Church ("Mt. Canaan") is a non-profit organization organized under the laws of the State of Tennessee.

2.       Defendant JC Funding-6, LLC ("JC Funding") is a limited liability company organized under the laws of the State of Missouri with its principal place of business located at 1136 Washington Avenue, No. 303, St. Louis, Missouri 63101. The Registered Agent for service of process on JC Funding is Curtis Eugene Schroeder, 1136 Washington Avenue, No. 303, St. Louis, Missouri 63101.

3.       Defendant Eagle Capital Investment Partners, Inc. ("Eagle Capital") is a corporation organized under the laws of the State of Georgia with its principal place of business located at 2700 Braselton Highway, Suite #10-137, Dacula, Georgia 30019. The Registered

22523697_1

Agent for service of process on Eagle Capital is Stephen Parente, 2700 Braselton Highway, Suite #10-137, Dacula, Georgia 30019.

4.      Defendant Jeff Crossland is a citizen and resident of Santa Monica, California and may be served with process at 1223 Wilshire Blvd, #1012, Santa Monica, CA 90403.

5.      Defendant Stephen Parente is a citizen and resident of Dacula, Georgia and may be served with process at 2700 Braselton Hwy, Ste 10-137, Dacula, GA 30019.

6.      Defendant Ray Robinson is a citizen and resident of Branson, Missouri and may be served with process at 150 Bull Run Road, Branson, MO 65616.

7.      Defendant Roe Messner is a citizen and resident of Loch Lloyd, Missouri and may be served with process at 380 E Loch Lloyd Parkway, Village of Loch Lloyd, MO 64012.

8.      Defendant Jerry Barton is a citizen and resident of Maumee, Ohio and may be served with process at 1701 Woodlands Dr., Maumee, OH 43537.

## JURISDICTION AND VENUE

9.      Jurisdiction and venue are proper in this Court pursuant to Tenn. Code Ann. §§ 16-11-101 *et seq.* and 20-4-103.

10.      Additionally, the parties to this action contractually agreed that Hamilton County, Tennessee is the appropriate jurisdiction and venue for any dispute arising between them.

## FACTS

11.      In 2007, Mt. Canaan purchased land for a potential development of a new church facility.  Around that time, Roe Messner & Associates, Inc. developed plans for the potential new church facility. As a result of the downturn in the economy, Mt. Canaan elected not to move forward with the new church facility at that time.   Roe Messner & Associates, Inc. was compensated for the services it provided to Mt. Canaan in 2007.

2

12.     In 2013, Roe Messner, the principal of Roe Messner & Associates, Inc., approached Mt. Canaan and attempted to reinitiate the development of the new church facility.

13.     Mr. Messner advised Mt. Canaan that he knew certain entities and individuals that could finance the new church facility on behalf of Mt. Canaan.  Mr. Messner also falsely represented that he had worked with the entities and individuals before.

14.     Thereafter, Mr. Messner contacted Defendant Ray Robinson who directed Mr. Messner and Mt. Canaan to Defendant Stephen Parente.    Mr. Parente represented that Eagle Capital would provide financing to Mt. Canaan for the construction of the new church facility. Upon information and belief, Mr. Parente and Mr. Robinson were business partners with respect to the transaction.

15.     As the financing discussions continued, Mr. Parente introduced Mt. Canaan to Defendant Jeff Crossland, a member in JC Funding. Thereafter, Mt. Canaan had numerous discussions with Mr. Parente and Mr. Crossland regarding the project financing.

16.     On or about August 14, 2013, Mt. Canaan, as the "Borrower", and JC Funding and Eagle Capital, as the "Lender", entered into a Project Funding Loan Agreement, Agreement No. MTC 1-713 (hereinafter the "Loan Agreement").  A true and correct copy of the Loan Agreement is attached hereto as **Exhibit 1**.

17.     Under the Loan Agreement, JC Funding and Eagle Capital agreed to make project funding in the amount of Five Million Dollars ($5,000,000.00) available to Mt. Canaan.

18.     In conjunction with the execution of the Loan Agreement, Mt. Canaan also executed and delivered a Promissory Note in favor of JC Funding and Eagle Capital.  A true and correct copy of the Promissory Note is attached hereto as **Exhibit 2**.

19.     The Loan Agreement required Mt. Canaan to deposit Five Hundred and Fifty Thousand Dollars ($550,000.00) (hereinafter the "Loan Deposit") with JC Funding and Eagle

3

Capital as "investment in the Project and to act as additional security for the Loan," (Loan Agreement, ¶ 1(v)).   Mt. Canaan was instructed to wire the funds to Defendant Jerry Barton, who was alleged to be the escrow agent for the transaction.

20.    On August 23, 2013, Mt. Canaan wired an initial Four Hundred and Fifty Thousand Dollars ($450,000.00) of the Loan Deposit to Mr. Barton.

21.    On August 28, 2013, Mt. Canaan wired the remaining One Hundred Thousand Dollars ($100,000.00) of the Loan Deposit to Mr. Barton.

22.    Additionally, pursuant to Paragraph 2.1(a) of the Loan Agreement, Mt. Canaan prepaid Fifteen Thousand Dollars ($15,000.00) for closing costs related to the loan.

23.    Mt. Canaan satisfied all conditions and obligations required of it under the Loan Agreement.

24.    Although Mt. Canaan satisfied all conditions and obligations required of it under the Loan Agreement, JC Funding and Eagle Capital have wholly failed and/or refused to loan funds as required by the Loan Agreement.

25.    In fact, despite their contractual obligation to do so, JC Funding and Eagle Capital never intended to fund the loan to Mt. Canaan.

26.    After JC Funding and Eagle Capital failed to fund the loan pursuant to its contractual obligations, Mt. Canaan contacted all of the Defendants to discuss their breaches of contract, misrepresentations and/or conversion.

27.    At that time, Mr. Messner admitted that he had misrepresented his prior dealings with JC Funding or Eagle Capital.  In fact, he admitted that, despite "vouching" for the entities, he had never actually worked with them before.

28.    Mr. Parente acknowledged the Defendants' failure to fund the loan, but stated that they would make good on their obligation and/or refund the Loan Deposit.

4

29.     Mr. Barton acknowledged receipt of the Loan Deposit but failed to return the funds to Mt. Canaan.  It is unknown, as of the time of the filing of the Complaint, whether Mr. Barton has retained the escrow funds pursuant to his obligation as an escrow agent.

30.     On June 2, 2014 – following repeated failures of the Defendants to fund the loan to Mt. Canaan – Mt. Canaan demanded that the Defendants return the Loan Deposit and closing costs.  A true and correct copy of the June 2, 2014 correspondence is attached hereto as **Exhibit 3**.

31.     On June 16, 2014, the Defendants, via Mr. Crossland, acknowledged their "absolute intent to repay the Deposit."  A true and correct copy of the June 16, 2014 correspondence is attached hereto as **Exhibit 4**.

32.     To date, however, the Defendants have failed and/or refused to repay the Deposit.

33.     Mt. Canaan is entitled to recover the damages it has incurred as a result of the Defendants' wrongful actions, including consequential and compensatory damages, treble or punitive damages, prejudgment interest and attorneys' fees.

34.     Additionally, the Loan Agreement provides that Mt. Canaan is entitled to recover its reasonable and necessary attorneys' fees incurred in enforcing the Agreement. (*See* Agreement, Section 7.19).

## COUNT I – CONVERSION

35.     Mt. Canaan adopts and incorporates the allegations contained in Paragraphs 1 through 34 of the Complaint as if fully set forth herein.

36.     The Defendants misappropriated the Loan Deposit for their own use and benefit.

37.     The Defendants have intentionally exercised dominion over the Loan Deposit.

38.     The Defendants have retained or otherwise disposed of the Loan Deposit in defiance to Mt. Canaan's rights to the Loan Deposit.

39.     The Defendants are liable to Mt. Canaan for conversion and all damages arising therefrom.

### COUNT II – BREACH OF CONTRACT

40.     Mt. Canaan adopts and incorporates its allegations contained in Paragraphs 1 through 39 of the Complaint as if fully set forth herein.

41.     As set forth above, the Defendants breached numerous provisions of the Agreement.

42.     Mt. Canaan has incurred damages as a result of the Defendants' breach of the Agreement.

43.     Mt. Canaan is entitled to recover compensatory and consequential damages as a result of the Defendants' breach of the Agreement.  Additionally, Mt. Canaan is entitled to be reimbursed for the Deposit Fund paid to the Defendants as a result of the Defendants' failures to perform under the Agreement.

44.     Pursuant to Paragraph 7.19 of the Agreement, Mt. Canaan is entitled to recover its attorneys' fees incurred in enforcing the Agreement.

### COUNT III – FRAUDULENT AND/OR NEGLIGENT MISREPRESENTATION

45.     Mt. Canaan adopts and incorporates its allegations contained in Paragraphs 1 through 44 of the Complaint as if fully set forth herein.

46.     The Defendants intentionally and/or negligently made false representations with respect to the Loan Agreement and their intent to fund a loan to Mt. Canaan.

47.     Mt. Canaan relied on the representations of the Defendants to its detriment.

6

48.     Mt. Canaan has been damaged by its reliance upon the Defendants' misrepresentations and is entitled to recover therefor.  Mt. Canaan is further entitled to recover punitive damages as a result of the intentional misrepresentations of the Defendants.

## COUNT IV – CIVIL CONSPIRACY

49.     Mt. Canaan adopts and incorporates its allegations contained in Paragraphs 1 through 48 of the Complaint as if fully set forth herein

50.     The Defendants engaged in a common design between two or more persons to accomplish by concerted action an unlawful purpose and/or a lawful purpose by unlawful means

51.     The Defendants committed overt acts in furtherance of the conspiracy.

52.     Mt. Canaan was damaged as a result of the Defendants' conspiracy.

## COUNT V – VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT

53.     Mt. Canaan adopts and incorporates its allegations contained in Paragraphs 1 through 52 of the Complaint as if fully set forth herein.

54.     As set forth above, the Defendants have engaged in unfair and deceptive acts and/or practices.

55.     Specifically, the Defendants' engaged in the following unfair and deceptive acts in violation of Tenn. Code Ann. § 47-18-104(b):

   a. Representing that goods or services have characteristics or benefits that they do not have (Tenn. Code Ann. § 47-18-104(b)(5));

   b. Representing that goods or services are of a particular standard, quality or grade if they are of another (Tenn. Code Ann. § 47-18-104(b)(7));

   c. Advertising goods or services with intent not to sell them as advertised (Tenn. Code Ann. § 47-18-104(b)(9)); and

   d. Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve (Tenn. Code Ann. § 47-18-104(b)(12));

56. The Defendants' unfair and deceptive acts and/or practices actions were intentional.

57. Mt. Canaan has been damaged by the unfair and deceptive action and/or practices of the Defendants.

58. Pursuant to Tenn. Code Ann. § 47-18-101 *et seq.*, Mt. Canaan is entitled to its actual damages, treble damages, attorneys' fees and costs as a result of the Defendants' violations of the Tennessee Consumer Protection Act.

**WHEREFORE, MT. CANAAN PRAYS FOR RELIEF AS FOLLOWS:**

a) For an Order awarding damages to Mt. Canaan as a result of the Defendants' conversion of the Loan Deposit;

b) For an award of compensatory, consequential, incidental damages and attorneys' fees as a result of the Defendants' breach of the Loan Agreement;

c) For an Order awarding damages, including punitive damages, as a result of the Defendants' fraudulent and/or negligent misrepresentations;

d) For an award of damages as a result of the Defendants' participation in a civil conspiracy;

e) For an award of actual damages, treble damages, attorneys' fees and costs as a result of the Defendants' violations of the Tennessee Consumer Protection Act;

f) For interest, both pre judgment and post judgment; and

g) For such other further and general relief to which Mt. Canaan is entitled.

Respectfully submitted,

*Kevin C. Baltz*

Kevin C. Baltz, BPR # 22669
BUTLER SNOW LLP
150 Third Avenue South, Suite 1600
Nashville, TN 37201
(615) 651-6714
Kevin.baltz@butlersnow.com

8

# Mt. CANAAN BAPTIST CHURCH

# PROJECT FUNDING LOAN AGREEMENT

## Agreement No.: MTC1-713

EXHIBIT
1
tabbies

# LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is made and entered into as of August __ st, 2013, by and between Mt. Canaan Baptist Church a non-profit organization (herein called "Borrower" or "Company"), having a mailing address of 2800 Chamberlain Avenue, Chattanooga, TN 37406, and **JC Funding-6, LLC**, a Missouri limited liability company and **Eagle Capital Investment Partners LP**(herein collectively called "Lender"), whose mailing address is 1223 Wilshire Blvd., #1012, Santa Monica, CA 90403.

## RECITALS:

A.   Borrower desires to obtain a loan for the purpose of acquiring certain real estate located at 4801-4803 Hwy 58 in Chattanooga, TN (the "Hwy 58 Property") for the purpose of renovating the acquired structure into a new facility, consisting of a Multi-Purpose Family Life Center and Sanctuary to accommodate approximately 1,600 persons and more fully described on Exhibit "A" attached hereto, together with all improvements of any kind now or hereafter located thereon and all rights, title, and interest now or hereafter appurtenant thereto ("Premises" or "Project").

B.   Borrower has applied to Lender for project funding in the sum of Five Million ($5,000,000) United States Dollars (the "Loan") for the purpose of (i) acquiring real estate, (ii) performance of the Development Work (as defined herein), (iii) other items provided for in the Budget (as defined herein), and (iv) paying all costs, expenses and other amounts set forth in this Agreement.

C.   Borrower has agreed to make a Deposit (as defined below) into the Lender's Production Account under procedures set forth in this Agreement.

D.   Lender has agreed to extend such Loan to Borrower only upon, and expressly subject to, all of the terms, covenants, conditions, representations and warranties set forth in this Agreement, the First Trust Deed, Assignment of Lease, Security Agreement and Fixture Filing and Promissory Note (collectively the "Loan Documents") relating to this Loan, each and all of which are important considerations to Lender and are being relied upon by Lender in its decision to extend the Loan to Borrower.

NOW, THEREFORE, in consideration of the terms, covenants, conditions, representations and warranties contained herein and in the other Loan Documents relating to this Loan, Lender agrees to extend the Loan to Borrower and Borrower agrees to accept the Loan and comply with and perform Borrower's obligations as follows:

1.   DEFINITIONS. For the purposes of this Agreement, including any Exhibits attached hereto, each of the following terms shall have the following respective meanings. For purposes of this Agreement, all accounting terms not otherwise defined herein or in the Recitals shall have the meanings assigned to them in conformity with GAAP, consistently applied.

a.   "Jurisdiction" means the Hamilton County, State of Tennessee, as in effect from time to time during the Term of the Loan.

b.   "Additional Collateral" means the Deposit previously deposited by Borrower with Lender as security for the Loan.

c.   "Advance Date" means the variable date occurring ten (10) days after the Advance Notice and during the Term of the Loan.

d.  "Advance Notice" means the notice by Borrower to Lender of an Advance in accordance with and subject to the terms of Section 2.5 of this Agreement.

e.  "Advances" means any one or more disbursement(s) of Loan proceeds, together with all and any other and/or additional sums advanced by Lender under the Loan according to the Approved Schedule of Values, upon the satisfaction of conditions specified in Article 3 hereof, Section 2.5 hereof and elsewhere in this Agreement, the proceeds of which are to be utilized solely for the purposes specified in Section 2.5 of this Agreement.

f.  "Agreement" means this Loan Agreement, as the same may be amended and supplemented from time to time by express written consent of both Lender and Borrower as provided herein.

g.  "Approved Schedule of Values" means the monthly funding amount made available to the Borrower and reflective of the accrued project / development costs throughout the Funding Term as attached hereto in Exhibit "C," as may be amended from time to time by express written consent of both Lender and Borrower.

h.  "Architect and Engineers" means the architects and engineers employed by Borrower for any material portion of work on the Premises.

i.  "Architect and Engineer Agreements" means the agreements, if any, between the Borrower and the Architects and Engineers pertaining to the Premises.

j.  "Assignment of Permits" means the Assignment of and Security Agreement in Permits, Licenses, Plans and Approvals in a form acceptable to Lender.

k.  "Borrower" means Mt. Canaan Baptist Church, a State of Tennessee non-profit organization, its successors and assigns, whose address is as set forth in the introductory paragraph of this Agreement.

l.  "Budget" means the budget prepared by Borrower and approved by Lender in its sole discretion for the Development Work, as it may be amended or modified from time to time in accordance with Section 2.6.The initial Budget approved by Lender is attached hereto as Exhibit "B".

m.  **"Building Pledge Sinking Fund"** means the funds Borrower collects from its Parishioners, targeting a total of One Hundred Thousand Dollars USD ($100,000), dedicated to financial support of the Project, which funds shall be periodically deposited by Borrower into a designated account at Lender's Bank and used to pay down the Loan as funds are available.

n.  "Business Day" shall mean a day of the year other than Saturdays, Sundays, and those legal holidays upon which Lender's main office (the address of which is set forth in the introductory paragraph of this Agreement) is closed.

o.  **"Capital Availability Dates"** means the dates when funding shall be made available in the Project Production Account to support the Project. The First Capital Availability Date shall be a date no later than 45 business days from the Closing Date and subsequent Capital Availability Dates shall be every 30 days thereafter until the full Loan Amount has been funded. The Capital Availability Date does not mean the date Loan proceeds shall be available for drawdown, which shall occur pursuant to the Approved Schedule of Values.

p.  "Closing Date" means the date upon which (a) all Loan Documents are executed and (b) the Deposit placed in the Production Account.

3

q.   "Collateral Pledge" means all right, title and interest of Borrower now owned or hereafter acquired in and to (i) the Trust Property under the Deed of Trust, (ii) all contracts, permits and plans relating to the construction of the Facility, (iii) assignment of all rents associated with the Property, and (iv) the cash value of on-site equipment and any other value that can be generated and received as a benefit of the facility (e.g, contracts for storage spaces, any deposits provided in support of contracts for storage spaces), (iv) the proceeds of the funds provided by the Lender, (vi) the Building Pledge Sinking Fund and (vii) the Existing Building Proceeds.

r.   "Construction Contract" means the contracts (written or oral, now or hereafter in effect) between Borrower and Contractor, relating in any way to the construction of any portion of the Development Work, including the performing of labor or the furnishing of equipment or materials in connection therewith, together with all amendments, renewals or replacements of any of the foregoing.

s.   "Contractor" means the general contractor employed by Borrower to perform the Development Work on the Premises.

t.   "Deed of Trust" means the Construction Deed of Trust and Fixture Filing (with Assignment of Lease and Security Agreement) in such form as is acceptable to Lender, to be executed by Borrower, as Grantor, to, Trustee (when identified by the Parties), and naming Lender as Beneficiary, creating, among other things, a deed of trust lien upon the Trust Property, as described therein, for the purpose of securing the Note and Loan, encumbering all right, title and interest of Borrower in and to the Trust Property, together with any and all extensions, renewals, substitutions, replacements, modifications, restatements and amendments thereof or thereto.

u.   "Default Rate" means Eight and one-half percent (8.5%) per annum. Such rate shall remain in force until the circumstances giving rise to the Default Rate are removed (such as a cure), wherein the Loan Rate under this Agreement will then apply.

v.   **"Deposit"** means an amount equal to $550,000 that Borrower establishes to provide investment in the Project and to act as additional security for the Loan. The Deposit shall be pledged by Borrower to the benefit of Lender during the Loan Term; provided that the Borrower shall have the right to use the Deposit for Qualified Expenditures under Sections 2.5 and 2.6 as soon as the First Capital Availability date. After a withdrawal from the Deposit, Borrower shall not be required to replenish the balance of the Deposit.

w.   "Development Work" means the work of development designated on the Plans and Specifications to be performed on or with respect to the Premises which shall be completed by or on behalf of Borrower in accordance with the Plans and Specifications.

x.   "Draw Request Certification" means a certification of Borrower delivered to Lender in connection with a requested disbursement of the Loan to fund Qualified Expenditures, which certification shall be in the form acceptable to Lender.

y.   "Environmental Indemnity" shall mean that certain Environmental Indemnity as provided for in Section 8.02 hereunder. The Environmental Indemnity shall not be secured by the Deed of Trust and shall survive and continue beyond any termination or expiration of the Deed of Trust.

z.   "Environmental Laws" means all federal, state, and local statutes, laws, rules, regulations, and ordinances relating to the protection of human health or environmental matters, including, without limitation, those relating to fines, orders, injunctions, penalties, damages, contribution, cost recovery compensation, losses or injuries resulting from the release or threatened release of Hazardous Substances (as hereinafter defined) and the generation, use, storage, transportation, or disposal of Hazardous

4

Substances, in any manner applicable to the Premises, each as heretofore and hereafter while the Loan or any obligation under this Agreement remains unpaid, is amended or supplemented, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.), as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. Section 11001, et seq.; the Hazardous Material Transportation Act, as amended (49 U.S.C. § 1801 et seq.); the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.);the Federal Water Pollution Control Act, as amended (33 U.S.C. § 1251 et seq.); the Clean Air Act, as amended (42 U.S.C. § 9401 et seq.); the Clean Water Act, 33 U.S.C. Section 7401, et seq.; the United States Environmental Protection Agency's Rules Concerning Underground Storage Tanks; the Toxic Substances Control Act of 1976 (15 U.S.C. § 2601 et seq.); the Safe Drinking Water Act (42 U.S.C. § 300 et seq.); the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.); the Federal Hazardous Substances Act (15 U.S.C. § 1261 et seq.); the Solid Waste Disposal Act, 42 U.S.C. Section 3251, et seq., as amended by the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901, et seq.; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. Sec. 136, et seq.; State of Tennessee environmental laws, all as amended; and such environmental laws, statutes, ordinances and regulations as may be referenced in the Deed of Trust or the Environmental Indemnity, each as heretofore and hereafter while the Loan or any obligation under this Agreement remains unpaid, is amended or supplemented, and any similar future or present local, state or federal statutes, rules and regulations promulgated thereunder or pursuant thereto, and any other present or future law, ordinance, rule, regulation, permit or permit condition, order or directive addressing environmental, health or safety issues of or by the federal government, any state or any political subdivision thereof, or any agency, court or body of the federal government, any state or any political subdivision thereof, exercising executive, legislative, judicial, regulatory or administrative functions which are applicable to the Premises while the Loan remains unpaid.

aa. "Event of Default" means any Event of Default as defined in Section 7.0 hereof.

bb. **"Existing Building Proceeds"** means proceeds from sale of the location of the current church facilities located at 2800 N. Chamberlain Avenue, Chattanooga, TN, targeted to be Four Hundred Fifty Thousand ($450,000) US Dollars which are dedicated to financial support of the Project and shall be used to pay down the Loan as funds are available.

cc. **"Facility"** means the improvements to be made on the "Hwy 58 Property" which will result in the Facility's use as a multi-purpose family life center and religious sanctuary accommodating up to 1,600 persons.

dd. "Financing Statement" means the Uniform Commercial Code Financing Statement required to be filed with the Office of the Secretary of State of the State of Tennessee, together with any and all extensions, renewals, substitutions, replacements, modifications, restatements and amendments thereof or thereto.

ee. "Force Majeure Event" means any act or event that prevents the affected Party in whole or in part from performing its obligations under this Contract, if such event is unforeseeable, beyond the affected Party's will or control and in respect of which a remedy may not be found in a timely manner (such as, for example, acts of war, even if undeclared, riot, insurrection, sabotage, natural disaster, hurricanes, tornados, closing or restriction of banking, credit, and/or financial markets, or acts or provisions of government authorities or other cause beyond the reasonable control of Borrower that will delay the Development Work.

ff. "Initial Loan Term" means that period of Twenty Four (24) months, known as the ramp-up period over which the Lender will provide funding to the Borrower as set forth in this Agreement.

5

gg.   "Term of the Loan" means the period which the Loan shall be outstanding and shall be Ten (10) years, including the Initial Loan Term and Eight (8) years permanent Mortgage term.

hh.   "GAAP" means Generally Accepted Accounting Principles.

ii.   "Governmental Authority" means any and all courts, boards, agencies, commissions, arbitrators, other private adjudicator, offices or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

jj.   "Hazardous Substances" means (a) any chemical, material or substance defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic pollutants," "pollutants," "toxic substances" or words of similar import under any applicable Environmental Laws; (b) any oil, petroleum or petroleum derived substance, any drilling fluids, produced waters or other wastes associated with the exploration, development or production of crude oil, any flammable substances or explosives, any radioactive materials, any hazardous wastes or substances, any toxic wastes or substances or any other materials or pollutants which (i) pose a hazard to the Premises or to persons on or about the Premises, or (ii) cause the Premises to be in violation of any Environmental Laws; (c) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, polychlorinated biphenyls; (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated under any Environmental Law; and (e) any Hazardous Substances or Hazardous Materials referred to in the Deed of Trust or the Environmental Indemnity.

kk.   "Legal Requirements" means:(a) all present and future judicial decisions, statutes, regulations, permits or certificates of any governmental authority in any way applicable to Borrower or the Premises; (b) all covenants, conditions and restrictions now or hereafter contained in any instrument that is applicable to the Premises; (c) all business association agreements forming, or granting and/or limiting the powers of, Borrower; and (d) all contracts or agreements (written or oral) by which Borrower, or any portion of the Premises are bound, including, without limitation, the Principal Agreements.

ll.   "Loan Service Agent" means JC Funding-6, LLC, a Missouri limited liability company and its successors and assigns. Lender shall have the right to substitute a new Loan Service Agent at its sole discretion and shall notify Borrower accordingly.

mm.   "Loan Accounting Service" means Baker O' Conner of Boston, Massachusetts and /or assigns working with the Lender, or its assigns, all acting on instructions of the Lender.

nn.   "Loan" means the loan to be made by Lender to Borrower pursuant to the terms of this Agreement and the Note.

oo.   "Loan Amount" means the principal amount of up to Five Million United States Dollars ($5,000,000) USD, which amount is available for borrowing in accordance with the terms and conditions set forth in this Agreement, the Note, and the Approved Schedule of Values as contained in Exhibit "C" of this Agreement.

pp.   **Intentionally Left Blank.**

qq.   "Loan Documents" means, collectively, this Agreement, the Note, the Deed of Trust, the Assignment of Permits, the Financing Statement, and all other instruments and agreements required to be executed by or on behalf of Borrower in connection with the making of the Loan.

rr. **"Loan Funding Amounts"** means the amounts Lender shall deposit into the Production Account based on each Capital Availability Date which shall be as follows: (i) Capital Availability Date 1 - $1,250,000; (ii) Capital Availability Date 2 - $1,250,000; (iii) Capital Availability Date 3 - $1,250,000; (iv) Capital Availability Date 4 - $1,250,000; and Capital Availability Date 5 - $550,000.

ss. "Material Adverse Change" or "Material Adverse Effect" means any material and adverse change in, or a material adverse effect upon, any of:

    (a) the business, properties, operations or condition (financial or otherwise) of Borrower, taken as a whole, since either or both of (i) the date hereof, or (ii) the date of the most recent financial statements delivered to Lender in connection with the Loan; or

    (b) the legal or financial ability of Borrower to perform its obligations under the Loan or to avoid any Event of Default; or

    (c) the legality, validity, binding effect or enforceability against Borrower of this Agreement, the Note or any Other Loan Document executed by Borrower and Lender (where applicable) in connection with Lender making the Loan to Borrower, as the same may be amended or otherwise modified from time to time in accordance with this Agreement.

nn. "Maturity Date" shall have the meaning set forth in the Note.

oo. "Note" means the Secured Promissory Note payable by Borrower to the order of Lender in the original principal amount of up to Five Million Dollars ($5,000,000) USD evidencing the Loan, together with any and all extensions, renewals, substitutions, replacements, modifications, restatements and amendments thereof or thereto.

pp. "Permanent Loan Term" shall have the meanings and terms as outlined in the accompanying Secured Promissory Note with a fully-amortizing loan over twenty (20) years commencing at the completion of the Initial Loan Term.

qq. "Permitted Exceptions" shall have the meaning given in the Deed of Trust.

rr. "Person" means, any natural person, corporation, firm, limited liability company, partnership, joint venture, association, business trust, government, governmental agency, tribunal or court or any other entity other than Borrower whether acting in an individual, fiduciary, governmental or other capacity.

ss. "Planning Costs" means the fees and planning costs, such as engineering and architectural fees, incurred in connection with the planning for the Development Work, to the extent reflected in the Budget.

tt. "Plans" means the plans and specifications for the construction of the Development Work on the Premises as prepared by Borrower's Architects and Engineers.

uu. "Principal Agreements" means all material agreements between Borrower and third parties pertaining to the Development Work, including the Plans, the Construction Contract(s) and the Architect and Engineer Agreement(s), as approved in writing by Lender.

vv. **"Production Account"** means the bank account held at KeyBank, Wells Fargo Bank or such similar U.S. based bank (as specified by Lender at Closing) into which each Loan Funding Amount will be deposited pending Borrower Advances under Section 2.5 and Section 2.6.

ww. Intentionally Left Blank.

xx. "Reporting Requirements" means the following that Borrower and Project, as applicable, shall be subject to:

(1) Every 90 days Borrower shall provide written updates and reports on the Project. As a part of this requirement, during the period of construction, a book audit may be conducted by an Agent of Record (that may be designated in writing by Lender) with any expenditure paid by Lender. These audits shall not exceed two times per year unless an accounting irregularity has been found and identified in writing to Borrower by Agent of Record.

(2) Monthly financial Statements (to be delivered no later than 2 weeks following the end of the month) during the period of construction and quarterly consolidated financial statements (to be delivered no later than 1 month following the end of the quarter) thereafter;

(3) Evidence of Project Insurance renewals;

(4) Notices of material events and/or potential Events of Default;

(5) Notice of any litigation or pending litigation in connection with the Borrower or the Project; and

(6) Other reports as reasonable requested by the Agent of Record.

zz. "Qualified Expenditures" means the acquisition costs for the Hwy 58 Property, and, with respect to the Development Work, those costs for which proceeds of the Loan may be disbursed, which shall include those hard costs, soft costs, financing costs and other costs listed on the approved Schedule of Values.

aaa. "Soft Costs" means Borrower's loan original and closing costs, general contractor fees, architect fees, governmental fees, overhead, general and administrative expenses, legal fees, marketing fees, management fees, archeological mitigation, property taxes and other "soft costs" incurred in the development, construction and marketing to the extent reflected in the Budget.

bbb. "Title Insurance Policy" means a title insurance policy covering the "Facility" in the form of an American Land Title Association Extended Coverage Loan Policy-1992 (without revision, modification or amendment, except, however, for endorsements thereto deleting the creditors rights exclusion and the arbitration provision) and all endorsements thereto required by Lender, as issued by Title Company and insuring the lien position of the Deed of Trust, all in form and substance satisfactory to Lender and which shall contain (a) full coverage against mechanic's liens (or an endorsement up to the full amount of the Note outstanding as of the current advance, (b) deletion of all standard exceptions, and (c) zoning endorsement, comprehensive endorsement, access endorsement, survey endorsement, location endorsement, tax parcel endorsement, non-imputation endorsement and pending disbursement endorsement. It is expected that the Title Insurance Policy will be will be recorded, no later than the First Capital Availability Date.

ccc. "Title Insurer" means a nationally recognized title insurance company to be named mutually by the Parties prior to the First Capital Availability Date.

**2.** AMOUNT, TERMS, AND SECURITY OF LOAN.

2.1 Terms.

(a) **Closing Costs:** Upon Closing and from the proceeds of the Loan, Borrower shall pay all due diligence costs, real and personal property taxes, credit reporting fees, assessments and special

assessments for the prior years, customary charges for escrow fees, recording fees, escrow expenses, title insurance premiums and the fees and costs of all title insurance policy endorsements, all of Lender's legal counsel fees and costs, and all other escrow fees, costs and charges whatsoever, whether to the Escrow Agent, the Title Insurer, or otherwise, it being understood and agreed that neither Lender, mortgage broker, nor Lender's agents, attorneys or employees shall pay any such recording taxes, fees, escrow fees, other fees, costs, premiums, charges or expenses ("Permitted Expenses"). Permitted Expenses shall not exceed $35,000, of which Borrower shall have advanced to Lender $10,000 upon the execution of this Agreement.

(b)   **Interest Rate**: Borrower and Lender have agreed to a fixed loan rate of six percent (6.0%) during the Initial Loan Term and a fixed loan rate of five and three quarters percent (5.75%) during the Permanent Loan Term. Interest shall not accrue on any amount hereunder until actually advanced to Borrower.

(c)   **Payments Due**: Loan payment shall be due and payable on the 1st day of each month.

(d)   **Principal and Interest (P&I)**: The P&I payments on this Loan will be based on a 20 year amortization and shall be calculated against the outstanding principal Loan balance using a fixed 5.75% interest rate at the end of the Initial Loan Term (24 months) and shall be payable monthly during the Permanent Loan Term.

(e)   **The Term**: The term of the Loan shall be ten (10) years consisting of a 24-month Initial Loan Term and a eight (8) year Permanent Loan Term.

(f)   **Interest Reserve Account**: The Parties have agreed that to aid the project in its ramp up period and stabilization, that an Interest Reserve Account will be established on the day of Closing and that an aggregate of $460,530 will be funded into the Interest Reserve Account. This account will be held in custody by the Loan Service Agent and such funds will be used to fund interest payments during this period.

2.2.   <u>Use of Proceeds</u>: The amounts set forth below are subject to the final Project Budget.

| | | |
|---|---|---|
| a) | $1,659,000 | Renovation of Facility and Purchase of Equipment |
| b) | $3,232,000 | Purchase "Hwy 58 Property" |
| c) | $    89,000 | Loan Fee |
| d) | $    35,000 | Legal, Due Diligence and Closing costs (this is an estimated number – not to Exceed $21,250) |
| e) | $   460,530 | To fund the Interest Reserve Account |
| f) | $    22,250 | Loan Servicing Fees |
| g) | $    52,220 | Project Contingency |
| h) | $ (550,000) | Less Equity Contribution by Borrower |
| | $5,000,000 | Total |

2.3   <u>Intentionally Left Blank</u>

2.4   <u>Intentionally Left Blank</u>

2.5   <u>Advances</u>. Lender agrees to make each Advance from the Loan proceeds in accordance with Section 2.6 hereunder upon satisfaction of the requirements set forth in this Section 2.5. Monies repaid to Lender

9

may not be re-advanced. Lender's obligation to fund each Advance is conditioned upon strict compliance by Borrower with each of the following requirements:

(i)   Advance Notice. Not later than ten (10) days prior to the applicable Advance Date, Borrower shall provide Lender with an Advance Notice, together with a Draw Request Certification setting forth, among other things, the line item from which the Advance is to be made, and, as applicable, (1) a schedule of payments, (2) a conditional progress lien release from the Contractor for amounts payable through the Advance Date, (3) an Unconditional Progress Lien Release, in statutory form from each subcontractor and supplier that has provided a preliminary 20-day lien notice for amounts payable through the immediately prior Advance Date, (4) a certification from Lender's inspector that the amounts requested have been evidenced by work completed and materials furnished to the Premises, and (5) copies of all change orders in progress or executed since the prior Advance Notice.

(ii)   No Event of Default. On the date of the Advance Notice and the funding of the Advance there is not then in existence an Event of Default under any Loan Document.

(iii)   Costs and Expenses. Borrower has paid or will pay from such Advance all costs, fees, and expenses of Lender incurred in connection with the Advance, including reasonable third party inspection fees.

(iv)   Title Insurance. If required by Lender, Borrower shall cause Lender to have received a commitment from Title Insurer for an endorsement to Lender's Title Insurance Policy insuring that the lien of the Deed of Trust continues to have at least the same priority as it did on the Closing Date as to the entire amount then advanced under the Loan. There shall be no unreleased intervening or other mechanic's liens recorded against all or any portion of the Premises; provided, however, that nothing contained in this Agreement will require Borrower to pay any claims for labor, materials or services that Borrower in good faith disputes and that Borrower, at its own expense, currently and diligently contests, provided that Borrower must, for each such case where a claim of lien in excess of Five Thousand Dollars ($5,000.00) has been filed, within thirty (30) days after actual receipt by Borrower of notice of filing of any such claim of lien, (i) record or cause to be recorded in the office of the recorder of the City of Chattanooga, a surety bond sufficient to release said claim of lien, or (ii) make or cause to be made a deposit of cash in the amount of one hundred fifty percent (150%) of the claim of lien with Lender, or (iii) deliver or cause to be delivered to Lender a specific endorsement to Lender's Title Insurance Policy that insures Lender against any loss by reason of such claim of lien, or (iv) deliver or cause to be delivered to Lender such other assurance as may be acceptable to Lender.

(v)   Conditions. All conditions to the funding of the Loan set forth in Article 3 continue to remain satisfied.

(vi)   Additional Items. Borrower has provided Lender with such other instruments, documents, agreements, certifications, and affirmations as it may reasonably require, including, without limitation, evidence of Borrower's continued satisfaction of all conditions to funding set forth in Article 3 below. Borrower's request for an Advance will be deemed to be a certification that there has been no change that has not been previously approved by Lender to the Plans, the Architect and Engineer Agreements (other than change orders), or the Construction Contract (other than change orders).Borrower agrees to notify Lender of any proposed change in any of the foregoing prior to such change if it will (i) impact any of Lender's rights if Lender shall become the owner of the Collateral, or (ii) materially adversely affect the value of Lender's Collateral.

2.6     Disbursement Procedure: Upon satisfaction of each of the requirements contained in this Agreement, Lender agrees to make available Advances of the Loan to Borrower. Advances to Borrower may not exceed the line item costs, plus ten percent (10%), as allocated in the Budget.

   2.6.1   Loan Funds Deployment - Following the date of the first funds to be made available to the Project Owners, funds will be made available each month thereafter subject to a Schedule of Values to be submitted by Project Owners. Monthly funding shall occur in accordance with the Schedule of Values until all funds have been deployed.

   2.6.2   Payment Priorities – Prior to any Loan Funds Deployment, advances shall be paid from the Loan amount in the following order of priority:

   (a) Paying all closing and start-up fees including the Loan Fee.

   (b) Paying any out of pocket expenses that may be outstanding at the time of closing.

   2.6.3   Lender will, subject to the terms and conditions of this Agreement make Advances to pay or reimburse Borrower for Qualified Expenditures and only to the extent that the preconditions to the Advance have been satisfied by the Advance Notice. Borrower may request an Advance from Lender once, and only once, each calendar month, except that the Advances made at the time of the funding of the Loan may precede the next Advance by a period of less than thirty (30) days. The funds of each Advance shall be utilized solely for the purpose specified in Section 2.2 above. Borrower agrees to execute such other documents as Lender may reasonably deem necessary in connection with each Advance and strict compliance with each of the foregoing conditions shall be required. No Advance made hereunder shall affect the liability or obligations of any Person for the payment of the Note or any other obligation under any of the Loan Documents, or the lien of the Deed of Trust upon the Premises for the full payment of any indebtedness then remaining unpaid or for any obligations unperformed under any of the Loan Document.

   2.6.4   Lender shall have the right to determine whether any item of cost, expense, or fee for which Borrower requests a disbursement constitutes a Qualified Expenditure and to which category such cost, expense, or fee it will be applied. The maximum amount that Lender shall be obligated to disburse for any Qualified Expenditure shall not exceed the amount designated for such category or line item on the Budget plus ten percent (10%). However, Lender shall not be obligated to disburse more than the original aggregate Loan Amount.

   2.6.5   In the event that all expenses for which any line item in the Budget is allocated are fully and finally paid and all work in connection therewith is fully and finally completed, the undisbursed sums in such line item shall be reallocated to the contingency line item in the Budget; provided (i) Borrower notified Lender of the amount of such undisbursed sums; (ii) Borrower provides such evidence as Lender may request that such expenses are fully and finally paid and work is fully and finally complete; and (iii) such requests shall be made no more frequently than once per month.

   2.6.6   All modifications to the Budget will be evidenced by a new Budget approved by Lender or as otherwise permitted by this Agreement.

   2.6.7   Provided that no Event of Default shall have occurred and is continuing, Borrower shall not be required to obtain Lender's consent to any individual change order unless (i) the individual change order would result in an increase to the Budget of Twenty-Five Thousand Dollars

11

($25,000.00) or more or (ii) the increase to the Budget resulting from such change order, when aggregated with the increase to the Budget resulting from all other change orders, is equal to or greater than One Hundred Thousand Dollars ($100,000.00) (the "Aggregate Limit").If a change order with the Aggregate Limit is subsequently approved in writing by Lender at the written request of Borrower, the Aggregate Limit shall be increased by the amount of such approved change.

2.6.8   The Company hereby agrees to adhere to the project's Approved Schedule of Values as set forth in Appendix "C," throughout the Funding Period. In the event the Lender reasonably determines that any material change in project costs or construction time periods, by more than thirty (30) days, has occurred, it may notify the Company in writing of such changes and demand that the Company prepare and submit to the Lender a Revised Schedule of Values for its approval. After receipt of notification from the Lender of the Event of Default, then: (a) the Company shall promptly acknowledge to the Lender in writing, within five (5) business days, that it is aware of material changes in project costs, and/or construction time periods, and agrees to cover any cost overrun or shortfall; and (b) within twenty (20) business days thereafter, either (i) provide additional collateral reasonably acceptable to the Lender; (ii) pay for such cost overrun or shortfall directly and provide proof thereof to the Lender; or (iii) at its sole discretion the Lender reserves the right to provide additional funding as necessary to complete the project, and to add such amount to the principal amount of indebtedness to be repaid by the Borrower in accordance with the Note. If the Event of Default is not cured by the Borrower, satisfactory to the Lender, the Lender shall have the right to make a draw on the Deposit, at its maturity date, as necessary to cover such cost overruns.

2.6.9   If the Company fails to meet any of its payment obligations as set forth in this Section 2.3 and/or Appendix "C," the Lender has the right to require the Company, by notice in writing, to bring all delinquent payments current within a period of time equal to fifteen (15) days. If the Company fails for any reason whatsoever to do so within such time, then the remedies set forth in Article 7 to this Agreement shall become available to Lender. In the event the Lender elects to terminate this Contract pursuant to this paragraph 2.6.9, then this Agreement and Promissory Note shall become immediately null and void.

2.7   <u>Purposes</u>. The purpose of the Loan is and Loan proceeds shall be utilized only for the purposes set forth in Recital A above.

2.8   <u>Net Payments</u>. All payments under this Agreement and the Note shall be made without set off or counterclaim by the Borrower.

2.9   <u>Security for the Loan</u>. The Loan is secured by the Loan Documents, including without limitation, the Deed of Trust, the Deposit, the Building Pledge Sinking Fund and the Existing Building Proceeds.

2.10   <u>Advertising</u>. Borrower acknowledges, agrees, and consents to Lender's advertising of the making of the Loan and the Loan amount in Lender's sole discretion, but Lender shall not disclose other material terms of the Loan. Borrower agrees that Lender shall have the right to issue press releases, advertisements, and other promotional material describing in general terms Lender's participation in such transaction.

2.11   <u>Use of City or Government Grants</u>. The Lender is granting Borrower the right to apply for and use any Grants and any tax bonds that may be available at any time to pay down or pay off the Loan after the first 24 months of the life of the Loan.

12

2.12 **Loan Prepayment.** With the exception of Loan Principal balance pay downs from the Building Pledge Sinking Fund and the Existing Building Proceeds, which shall provide for principal repayment without penalty, the Loan can be prepaid in whole or in part without penalty at any time after 24 months, with a minimum of 30 days written notice.

2.13 **Loan Fee.** A Loan Fee equal to One Point Eight Percent (1.8%) of each Loan Funding Amount shall be paid to Lender from each Loan Funding Amount placed into the Production Account.

2.14 **Loan Servicing Fee.** A Loan Servicing Fee in the amount of forty five one hundredths of one percent (0.45%) shall be paid to Lender from each Loan Funding Amount placed into the Production Account.

## 3.0   CONDITIONS PRECEDENT TO FUNDING LOAN

In addition to the other terms and conditions set forth in this Agreement, the obligation of Lender to fund the Loan, any Advance, and any other amount under the Loan Documents is subject to Lender's having received prior to or on the Closing Date or the date of funding of any Advance, in each case, in form and substance satisfactory to Lender, each of the following:

3.01 Execution and Delivery of Loan Documents. All Loan Documents duly executed and delivered to the Title Insurer or Escrow Agent, as applicable, in recordable form if appropriate.

3.02 **Deposit Established.** Borrower shall have wired the Deposit into the designated Production Account.

3.03 Authorizations. With respect to the funding of the Loan only, original certificates of resolution and certificates of incumbency executed by the appropriate members and/or managers of Borrower and containing specimen signatures of the same, authorizing Borrower to enter into all Loan Documents and other documents and agreements to be executed by Borrower in connection with this Agreement and the Loan and further authorizing and empowering the members and/or managers who will execute such documents and agreements with the authority and power to execute such documents and agreements on behalf of the Borrower.

3.04 Insurance. True and correct copies of the policies (or binders), together with original certificates and loss payable endorsements in favor of Lender, of insurance required by Section 5.3 hereof, accompanied by affidavits and certificates, paid bills or other documents evidencing that all premium payments are current. 3.3.1. Property Insurance coverage must be acceptable to the Lender prior to the closing. The key insurance policies include, but are not limited to, liability insurance, fire insurance, flood insurance and business interruption insurance.

3.05 Title Insurance Policy. A Title company identified at the Closing, prepared to work with Lender and Borrower during the course of construction of the Facility, that will result in the irrevocable agreement of the Title Insurer to issue the Title Insurance Policy, together with the required endorsements listed in the definition of Title Insurance Policy hereunder, to Lender in accordance with the Closing Instructions, and for additional Advances, such title endorsements as Lender may request.

3.06 Current Financial Statements. With respect to the funding of the Loan, if requested by Lender, financial statements provided to Lender, including, but not limited to, balance sheets and income statements of Borrower in such forms as are approved by Lender and dated not later than required by Lender.

3.07 Certain Statements. The representations and warranties contained in Article 4 hereof and in the Loan Documents are true and correct in all material respects, and no event has occurred and is continuing which

constitutes an Event of Default or would constitute an Event of Default but for the requirement that notice be given or time elapse, or both.

3.08  <u>Draw Request Certification</u>. Borrower shall have provided Lender with a Draw Request Certification for the Advance, which Draw Request Certification shall have received the prior approval of Lender.

3.09  <u>Required Acts and Conditions</u>. With the exception of the acquisition of the underlying land, which shall not need the following approvals, all acts and conditions (including, without limitation, the obtaining of any necessary regulatory or judicial approvals and the making of any required filings, recordings or registrations) required to be done and performed, and to have happened precedent to the execution, delivery and performance of this Agreement, the Deed of Trust and the Note or to constitute the same as legal, valid and binding obligations enforceable in accordance with their respective terms, shall have been done and performed.

3.10  <u>Additional Documents</u>. The execution and delivery of such additional documents, affidavits, certificates and opinions as Lender may reasonably require to insure compliance with the intent and purpose of this Agreement, including, without limitation, (i) purchase and sale agreement associated with the "Hwy 58 Property", (ii) an Assignment of and Security Agreement in Permits, Licenses, Plans, and Approvals; (iii) an Errors and Omissions Correction Agreement; and (iv) a Non-Foreign Persons Affidavit to be executed by Borrower.

3.11  <u>Additional Collateral</u>. In no event shall the Lender make a claim against the Additional Collateral unless upon a breach of a representation and warranty, an Event of Fraud or an uncured Event of Default under Section 7.

3.12  <u>Conditions for Sole Benefit of Lender</u>. All conditions precedent to the obligations of Lender to make the Loan or any advance or disbursement are imposed solely for the benefit of Lender, and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to make any disbursement or advance in the absence of strict compliance with such conditions precedent. All requirements of this Agreement may be waived by Lender, in whole or in part, at any time, and any such waiver shall not constitute a waiver of any other current, past, or future condition imposed upon Borrower hereunder. To the extent any conditions are not satisfied prior to the funding of the Loan, the parties agree to execute a separate agreement listing such items and Borrower covenants to satisfy such items within fifteen (15) days of such funding of the Loan unless otherwise stated.

3.012  **Pre-Development Bids, Valuations.** Borrower shall produce the following within 45 days of Closing:

    i.    Two project bids from reputable General Contractors with experience in Church Construction showing a minimum project of One Million Six Hundred Thousand Dollars( $1,600,000);

    ii.    One letter of valuation from the architect of record (Roe Messner & Associates) stating that the project to be constructed shall be valued at a minimum of Three Million Nine Hundred Thousand Dollars( $3,900,000);

    iii.    A full and complete MAI appraisal on the 13.87 acres of land located at 2800 N. Chamberlain Avenue, Chattanooga, TN 37406 showing a minimum value of at least Four Hundred and Fifty Thousand Dollars; ($450,000)and;

4    REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the Loan hereunder, Borrower makes the following representations and warranties which shall be deemed made as of the date hereof and as of the Closing Date, the funding of the Loan, and each Advance and including the representation that no event has occurred and is continuing which constitutes an Event of Default or would constitute an Event of Default but for the requirement that notice be given or time elapse, or both.

4.02 **Capacity.** Borrower and the individuals executing Loan Documents on behalf of Borrower have the full power, authority and legal right to execute and deliver, and to perform and observe the provisions of this Agreement, the Deed of Trust, the Note, the Other Loan Documents and any other document, agreement, certificate or instrument executed in connection with the Loan and to carry out the contemplated transactions.

4.03 **Authority and Enforceability.** The execution and delivery by the Borrower of this Agreement, the Deed of Trust, the Note, the Other Loan Documents and any other document, agreement, certificate or instrument executed in connection with the Loan have been duly authorized by all necessary company action and do not and will not require any registration with, consent or approval of, notice to, or any action by any Person or Governmental Authority that has not been satisfied or obtained. Borrower has obtained or will obtain in the ordinary course of the performance of the Development Work all necessary court and other approvals necessary for Borrower to comply with the terms and provisions of this Agreement, provided, however, if such approvals are not obtained in sufficient time to prevent the cessation of construction, it shall be a default of this Agreement. This Agreement, the Deed of Trust, the Note, the Other Loan Documents and any other document, agreement, certificate or instrument executed in connection with the Loan when executed and delivered by Borrower hereunder will constitute the legal, valid and binding obligations of Borrower enforceable in accordance with their respective terms.

4.04 **Compliance With Law.** The execution and delivery of this Agreement, the Deed of Trust, the Note and the Other Loan Documents, or any other document, agreement, certificate or instrument to which Borrower is bound in connection with the Loan do not conflict with, result in a breach or default under or create any lien or charge under any provision of any existing law, rule, regulation, order, writ, injunctionor decree of any court or Governmental Authority to which it is subject. The Premises complies in all material respects with all laws, ordinances, rules, regulations, covenants, and restrictions affecting the construction, occupancy, use, and operation thereof. All permits and approvals that are required for the construction, use, and occupancy of the Premises have been duly and validly issued by the governmental authorities or persons having jurisdiction or rights with respect thereto, are in full force and effect, and are not subject to any appeal, any applicable period for appealing such actions having expired, or Borrower will obtain such permits and approvals in the ordinary course of performing the Development Work.

4.05 **Material Adverse Events.** Since the date of the financial statements delivered to Lender pursuant to Section 3.6 hereof or any financial statements thereafter provided by Borrower to Lender, no Material Adverse Change has occurred.

4.06 **Litigation.** There are no actions, suits, investigations or proceedings pending, or to the knowledge of Borrower, threatened, after due inquiry and investigation, against or affecting Borrower at law or in equity, before or by any Person or Governmental Authority, which, if adversely determined, would have a Material Adverse Effect.

4.07 **No Untrue Statements.** Section 4.10 below with regard to financial statements, all statements, representations and warranties made by Borrower in this Agreement or any Other Loan Document and any other agreement, document, certificate or instrument previously furnished or to be furnished by Borrower to Lender under this Agreement, (i) are and shall be true, correct and complete in all material respects at the time they were made and on and as of the Closing Date, (ii) do not and shall not contain any untrue

15

statement of a material fact, and (iii) do not and shall not omit to state a material fact necessary in order to make the information contained herein or therein not misleading or incomplete in any material respect. Borrower understands that all such statements, representations and warranties shall be deemed to have been relied upon by Lender as a material inducement to make the Loan.

4.08 <u>Policies of Insurance</u>. Each of the copies of the policies of insurance relating to the Collateral delivered to Lender by Borrower (i) is a true correct and complete copy of the respective original thereof as in effect on the day hereof, and no amendments or modifications of said documents or instruments not included in such copies have been made, except as provided herein, and (ii) has not been terminated and is in full force and effect. Borrower is not in default in the observance or performance of its material obligations under said documents or instruments and Borrower has done all things required to be done as of the date of this Agreement to keep unimpaired their rights thereunder.

4.09 <u>Environmental Protection</u>. Except as disclosed in the Phase I Environmental Report, (i) Borrower has not used, generated, stored, released or disposed of on, or transported from, the Premises any Hazardous Substances in violation of any Environmental Laws; (ii) to Borrower's knowledge, no other Person has used, generated, stored, released or disposes of on, or transported from, the Premises any Hazardous Substances in violation of any Environmental Laws; (iii) Borrower has not received any currently effective notice from any Governmental Authority or private agency, person or entity concerning the presence of underground storage tanks or any Hazardous Substance on the Premises; (iv) to Borrower's knowledge, no underground storage tanks are, or at any time have been, located on or under the Premises; (v) no Hazardous Substances are to be used in the construction of the improvements to be located on the Premises other than in accordance with applicable Environmental Laws; (vi) only those portions of the Premises designated in writing by Borrower to Lender lie within an area which constitutes a "wetland" subject to the jurisdiction of the United States Army Corps of Engineers, the United States Environmental Protection Agency or any other federal, state or local governmental agency under the Clean Water Act, as amended, or under any similar Environmental Law; (vii) except as disclosed in writing by Borrower to Lender prior to the Closing Date, to Borrower's knowledge, no property adjoining the Premises is being used or has ever been used at any previous time for the disposal, storage, treatment, processing or other handling of Hazardous Substances nor is any such property contaminated by Hazardous Substances; and (viii) to Borrower's knowledge, no investigation, administrative order, consent order and agreement, litigation or settlement with respect to Hazardous Substances is proposed, threatened, anticipated or in existence with respect to the Premises, nor is the Premises currently, or has it ever been, on any federal or state "superfund" or "superlien" list.

4.10 <u>Financial Statements</u>. All historical financial statements furnished to the Lender present fairly, in all material respects, the financial condition of Borrower as of the dates stated subject to any typical yearend adjustments, and the results of operations and statements of cash flows of Borrower for the periods indicated, and all pro forma financial statements or projections are based on underlying assumptions which provide a reasonable basis for the projections contained herein and reflect Borrower's judgment based on present circumstances of the most likely set of conditions and course of action for the projected period.

4.10 <u>Taxes</u>. Borrower has filed or caused to be filed all tax returns which are required to be filed by it, pursuant to the laws, regulations or orders of each Person with taxing power over Borrower and Borrower has paid, or made provision for the payment of, all taxes, assessments, fees and other governmental charges which have or may have become due pursuant to said returns, or otherwise, or pursuant to any assessment received by Borrower except such taxes, if any, as are being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided.

16

4.11 <u>Title to Facility</u>. As of the Closing Date will be, there are no known liens, claims, changes or encumbrances that would apply to the Facility once constructed or during construction and there are no known impediments to free and clear title to the Facility once constructed or during construction, and Borrower has continued access to a public thoroughfare.

## 5    AFFIRMATIVE COVENANTS OF BORROWER

To induce Lender to enter into this Agreement and to make the Loan hereunder, Borrower agrees and covenants to Lender as follows.

5.01 <u>Performance of Development Work</u>. Borrower will diligently prosecute the construction of the Development Work upon the Premises to completion in a good and workmanlike manner and in substantial accordance with the Plans, all Legal Requirements, sound engineering and architectural principles, commonly accepted safety standards and the other terms of this Agreement, free and clear from all liens or claims for liens, other than the liens and security interests created by the Loan Documents and the Permitted Exceptions. In the event that an event of nature prevents the timely completion of the Development Work, the parties agree to discuss the possibility of an extension of the deadline.

5.02 <u>Additional Covenants Incidental to Construction</u>. At all times during construction Borrower will:(a) upon reasonable prior notice, and during normal business hours, permit Lender and its representatives at all reasonable times to enter and inspect the Premises, to inspect all materials to be used in the performance of the Development Work and to examine the Plans and shop drawings and use its reasonable efforts to cause Borrower's Architect and Engineers, Contractor(s), and the subcontractors and material men to cooperate with Lender during such inspections, including without limitation, respond to any reasonable inquiries of Lender (and Lender will use reasonable efforts not to interfere with the Development Work); (b) fully and timely comply with all Legal Requirements, and if required by Lender, record all notices of completion and similar notices permitted by Legal Requirements which have the effect of shortening periods within which mechanics' and material men's liens may be filed; (c) timely perform all its material obligations necessary to preserve its rights under the Principal Agreements and enforce and secure the performance of the other parties under the Principal Agreements in Borrower's reasonable business judgment; (d) from time to time and promptly after demand, deliver to Lender a current list of Contractors, subcontractors and material men performing work or services or providing equipment or materials with respect to the Development Work; (e) deliver to Lender or its representatives, promptly after demand, counterparts and/or conditional assignments of any and all Principal Agreements, bills of sale, statements, conveyances, receipted vouchers or agreements of any nature under which Borrower claims title to any materials used or to be used with respect to the Development Work; (f) after obtaining knowledge or receiving notice thereof, promptly correct any structural or material defect in the Development Work, any work or materials deviating from Legal Requirements or any material departure from the Plans not accepted by Lender; and (g) use Advances only for the purposes made and promptly pay, or cause to be paid, when due all bills, invoices and claims, whether for labor, services, materials or otherwise, which are submitted or made in connection with the completion of the Development Work.

5.03 <u>Insurance</u>. Borrower will maintain insurance, with companies or associations reasonably approved by Lender and authorized to issue the particular type of insurance in the State of Tennessee, in such amounts and covering such risks as may reasonably be required by Lender, including, without limitation, such insurance as is required under the Deed of Trust. The policies shall in no manner make Borrower or Lender a co-insurer prior to loss in excess of policy limits. All such insurance shall contain a loss payee endorsement in favor of Lender, shall provide that the insurer shall notify Lender in writing not less than ten (10) days prior to the cancellation of any such policy, shall contain endorsements that no act or negligence of the insured or any occupant and no occupancy or use of the applicable property for purposes

more hazardous than permitted by the terms of the policy, will affect the validity or enforceability of such insurance as against Lender.

5.04 Preservation of Collateral. Borrower will preserve and maintain the Collateral in good condition, and from time to time make all needed repairs, renewals and replacements thereto, so that the Premises, and other Collateral shall be usefully preserved, and will comply with all material applicable laws and regulations of any Person or governmental authority and the terms of any indenture, contract or other instrument to which they may be a party or under which they may be bound, if non-compliance will have a Material Adverse Effect, except where contested in good faith and by proper proceedings as to which adequate reserves (determined in accordance with GAAP) have been provided.

5.05 Advances. At any time during the Term of the Loan, if Borrower should fail (i) to perform or observe, or (ii) to cause to be performed or observed, any covenant or obligation of Borrower under this Agreement or any of the Other Loan Documents, then Lender, upon the giving of reasonable advance notice, may (but shall be under no obligation to) take such steps as are necessary to remedy any such nonperformance or non-observance and provide for payment thereof. All amounts advanced by Lender pursuant to this Section 5.05 shall become an additional obligation of Borrower to Lender secured by the Deed of Trust and Other Loan Documents

5.06 Financial Statements, Reports and Tax Returns. Borrower shall provide Lender with financial statements and reports pursuant to the definition of "Reporting Requirements", and will provide tax returns upon Lender's request.

    5.06.1 BORROWER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT THE FAILURE BY BORROWER TO TIMELY DELIVER THE FINANCIAL STATEMENTS, TAX RETURNS AND SCHEDULES REQUIRED PURSUANT TO THIS SECTION 5.06 WITHIN FIFTEEN (15) DAYS AFTER WRITTEN NOTICE THEREOF FROM LENDER TO BORROWER, SHALL CONSTITUTE AN EVENT OF DEFAULT, WHICH ALLOWS LENDER TO EXERCISE ALL REMEDIES SET FORTH HEREIN AND IN THE LOAN DOCUMENTS. IN ADDITION, AND WITHOUT LIMITING ANY OF THEFOREGOING, BORROWER ACKNOWLEDGES AND AGREES THAT IN THE EVENT BORROWER DEFAULTS UNDER THE PROVISIONS OF THIS SECTION 5.6, THE INTEREST RATE UNDER THE NOTE ON ALL AMOUNTS DUE THEREUNDER SHALL AUTOMATICALLY INCREASE TO THE DEFAULT RATE WITHOUT FURTHER NOTICE OR ACTION BY LENDER UNTIL SUCH TIME AS THE REQUIRED ITEMS ARE DELIVERED TO LENDER.

5.07 Taxes. Throughout the Term of the Loan, Borrower shall prepare and timely file all federal, state and local tax returns required to be filed by it, and Borrower shall promptly pay and discharge all taxes, assessments and other governmental charges or levies imposed in respect of the Premises and any of the Collateral except such taxes, if any, as are being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided.

5.08 Compliance With Other Loan Documents. Borrower shall comply in all material respects with each and every term, condition and agreement contained in the Loan Documents.

5.09 Suits or Actions Affecting Borrower. Throughout the Term of the Loan, Borrower shall promptly advise Lender in writing within ten (10) days of Borrower's knowledge thereof of (i) any claims, proceedings or disputes (whether or not purportedly on behalf of Borrower) against, or threatened or affecting Borrower which, if adversely determined, would have a Material Adverse Effect, or (ii) any proposal by any Governmental Authority to acquire any of the assets or business of Borrower.

18

5.10 <u>No Additional Extensions or Advances</u>. Borrower covenants, acknowledges and agrees that Lender has no duty or obligation, either expressed or implied, to make any extensions of the Loan or the Maturity Date or to make any further advances of funds under the Note other than as specifically set forth herein or therein. Borrower specifically covenants and agrees that the provisions of this Agreement and the making of the Loan hereunder in no way are intended to or create an obligation to make additional advances or further loans to Borrower. The Loan shall be fully due and payable on the Maturity Date.

5.11 <u>Compliance With Governmental Requirements</u>. Borrower shall timely comply with all Governmental Authority requirements and, upon Lender's request, deliver to Lender evidence thereof, to the extent such non-compliance would have a Material Adverse Change.

5.12 <u>Notices by Governmental Authority, Fire and Casualty Losses Etc.</u> Borrower shall timely comply with and promptly furnish to Lender true and complete copies of any official notice or claim by any Governmental Authority pertaining to the Premises or performance of the Development Work. Borrower shall promptly notify Lender of any fire or other casualty or any notice or taking of eminent domain action or proceeding affecting the <u>Premises</u>.

5.13 <u>Hazardous Substances</u>. Borrower shall not use, generate, manufacture, produce, store, release, discharge or dispose of any Hazardous Substances on, under or about the Premises, or transport to or from the Premises any Hazardous Substances, or knowingly allow any other person to do so, in violation of any Environmental Laws, and shall take all commercially reasonable efforts to assure that no Hazardous Substances are being used, generated, manufactured, produced, stored, released, discharged or disposed of on, under or about the Premises, except in each case in full compliance with all Environmental Laws.

5.14 <u>Indemnity</u>. Borrower unconditionally shall indemnify and defend Lender against, and shall hold Lender harmless from, any and all losses, damages (whether general, punitive or otherwise), liabilities, claims, causes of action (whether legal, equitable or administrative), judgments, court costs and legal or other expenses (including attorneys' fees) which Lender may suffer or incur as a direct or indirect consequence of: (i) Borrower's failure to perform any of Borrower's obligations as and when required by this Agreement or any of the Other Loan Documents, including, without limitation, any failure of any representation or warranty of Borrower to be true and correct when made and any failure by Borrower to satisfy any condition; (ii) any act or omission by Borrower, or any contractor, subcontractor or material supplier, engineer, architect or other person or entity acting on behalf of Borrower or its Contractor, except Lender, with respect to any of the Premises; (iii) any claim or cause of action of any kind by any person or entity which would have the effect of denying Lender the full benefit or protection of any provision of this Agreement or any of the Other Loan Documents; (iv) any claim that Lender is responsible for the payment of a fee, commission or other compensation to a broker, finder or packager in connection with the Loan or the performance of the Loan Documents based on such Person's relationship to Borrower; (v) the operation or maintenance of the Development Work; (vi) any other action or inaction by, or matter which is the responsibility of, Borrower, except for any such claim, injury, damage, loss or liability caused solely by the willful misconduct or gross negligence of Lender or their agents or employees; and (vii) the release or presence of any Hazardous Substance at the Premises, whether foreseeable or unforeseeable, regardless of the source of such release or when such release occurred or such presence is discovered. The indemnity provided under this Section shall include, without limitation, all costs in law or in equity of removal, remediation of every kind, and disposal of such Hazardous Substance, all costs of determining whether the Premises is in compliance and causing the Premises to be in compliance with all applicable Environmental Laws, all costs associated with claims for damages to person, property or natural resources, and Lender's attorneys' and consultants' fees and costs related thereto. Lender's right of indemnity shall not be directly or indirectly limited, prejudiced, impaired or eliminated in any way by any finding or allegation that Lender's conduct is active, passive or subject to any theory of any kind, character or nature for any act or omission by Borrower or any other person or

19

entity except Lender. Notwithstanding the foregoing, Borrower shall not be obligated to indemnify Lender with respect to any fraud, willful misconduct or intentional tort which Lender is personally determined by the judgment of a court of competent jurisdiction (sustained on appeal, if any) to have committed or the gross negligence or intentional acts of Lender after Lender takes possession of the Premises.

Borrower shall pay any indebtedness arising under said indemnity to Lender immediately upon demand by Lender. This indemnity shall survive the payment of all amounts payable pursuant to the Note and all Loan Documents. Payment by Lender shall not be a condition precedent to the obligations of Borrower under this indemnity.

5.13  **Lender's Action for Its Own Protection Only.** The authority herein conferred upon Lender, and any action taken by Lender, to inspect the Premises, procure waivers or sworn statements, approve contracts, subcontracts and purchase orders, and approve plans, will be exercised and taken by Lender for Lender's protection only and may not be relied upon by Borrower for any purposes whatever; and Lender shall not be deemed to have assumed any responsibility to Borrower with respect to any such action herein authorized or taken by Lender or with respect to the proper performance of the Development Work, performance of contracts, subcontracts or purchase orders by any contractor, subcontractor or material supplier, or prevention of mechanics' liens from being claimed or asserted against any of the Premises. Any review, investigation or inspection conducted by Lender or any architectural or engineering consultants retained by Lender to verify independently Borrower's satisfaction of any conditions precedent to Loan disbursements under this Agreement, Borrower's performance of any of the covenants, agreements and obligations of Borrower under this Agreement, or the validity, of any representations and warranties made by Borrower hereunder (regardless of whether, the party conducting such review, investigation or inspection shall have discovered that any of such condition precedent were not satisfied or that any such covenants, agreements or obligations were not performed or that any such representations or warranties were not true), shall not affect (or constitute a waiver by Lender of) (i) any of Borrower's representations and warranties under this Agreement or Lender's reliance thereon, or (ii)Lender's reliance upon any certifications of Borrower or the contractor required under this Agreement or any other facts, information or reports furnished to Lender by Borrower hereunder.

5.14  **Loan Participations.** Borrower acknowledges and agrees that Lender may, from time to time, sell or offer for sale participation interests in the Loan. Borrower authorizes Lender to disseminate any information it has pertaining to the Loan, including, without limitation, complete and current credit information of Borrower, to any purchaser of a participation interest in the Loan or any party offered to purchase a participation interest in the Loan, provided that such potential participant agrees to maintain the confidentiality of such information and use it only for its internal purposes in evaluating the purchase of a participation in the Loan.

5.15  **Declaration.** Borrower shall not record any declaration of covenants, conditions and restrictions (the "Declaration") against the Premises unless the Declaration has been approved in writing by Lender. Lender shall not unreasonably withhold, condition, or delay its consent of the Declaration, so long as the Declaration does not materially adversely impact the rights of Lender thereunder.

5.16  **Negotiations.** All negotiations related to this Contract and the transactions contemplated hereby have been carried on by Borrower in such a manner as to not give rise to any valid claim against the Lender (by reason of the Borrower's actions) for a brokerage commission, finder's fee or other like payment to any person other than those previously indicated.

20

## 6    FORCE MAJEURE

6.01 <u>Performance</u>. If either Party is unable, wholly or in part, to perform its obligations under this Agreement because of a Force Majeure event, that Party will be excused from whatever performance is affected by the Force Majeure event to the extent so affected from the inception and during the continuance of any such Force Majeure. The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure event.

6.02 <u>Notice</u>. The Parties hereto shall give each other notice, within no more than fifteen (15) days, of the beginning of and of the end of any event of Force Majeure. If this obligation is not met, then the Party in default shall lose its right to rely upon the event of Force Majeure. The occurrence of a Force Majeure event shall not relieve a Party's obligations to pay money.

6.03 <u>Obligations</u>. Should the Parties hereto be unable to carry out their obligations in accordance with the time schedule provided hereunder for a period of six (6) months or more as a result of an event of Force Majeure, then the Parties shall meet as soon as possible in order to examine the impact of such events on the terms of this Agreement, and they shall, within sixty (60) days, work in good faith to come to an agreement in regards to the terms and conditions for the continuance of their respective obligations.

## 7    EVENTS OF DEFAULT AND REMEDIES.

The occurrence of any of the following events shall constitute an Event of Default hereunder:

7.1 <u>Representations and Warranties</u>. Any representation, warranty or statement of Borrower pursuant to or in connection with this Agreement, the Note, the Deed of Trust, or any Other Loan Document or in any report, certificate or other writing furnished by or on behalf of Borrower in connection herewith shall prove to be false, incorrect, or misleading in any material respect when made or furnished, or any historical financial statement did not present fairly, in all material respects, the financial condition of Borrower as of the dates stated and the results of operations and statements of cash flows of Borrower for the periods indicated (subject to yearend adjustments);

7.2 <u>Payment of Note</u>. Borrower shall have defaulted in the payment of any installment of interest and/or principal when due under the Note;

7.3 <u>Other Charges</u>. Borrower shall have defaulted in the payment of any late charge or any other charge or amount owing to Lender under any Loan Document when such payment is due;

7.4 <u>Advances</u>. Borrower shall have failed to repay to Lender any Advances made by Lender, together with interest thereon, as set forth in this Agreement, and such failure continues for a period of more than ten (10) days after written notice by Lender of such required repayment;

7.5 <u>Other Covenants</u>. Borrower shall have failed to perform any obligation not involving the payment of money, or to comply with any other term or condition applicable to Borrower under this Agreement, the Note, the Deed of Trust or under any Other Loan Document and the expiration of thirty (30) days after written notice of such failure from Lender to Borrower; <u>provided, however</u>, if the nature of such failure is such that Borrower is unable to cure such failure within such thirty (30) day period, as determined by Lender in its reasonable discretion, Lender may (but shall not be obligated to do so) grant Borrower an additional period of time (to be determined by Lender in its sole and absolute discretion) to cure such failure.

21

7.6    Bankruptcy. The filing by Borrower (or against Borrower to which Borrower acquiesces or which is not dismissed within ninety (90) days after the filing thereof), of any proceeding under the federal bankruptcy laws now or hereafter existing or any other similar statute now or hereafter in effect; the entry of an order for relief under such laws with respect to Borrower; or the appointment of a receiver, trustee, custodian, or conservator of all or any part of the assets of Borrower.

7.7    Insolvency. The insolvency of Borrower, or the execution by Borrower of a general assignment for the benefit of creditors; or the convening by Borrower of a meeting of its creditors, or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; or if Borrower is generally not paying its debts as they mature.

7.8    Payment of Debts. Borrower makes an assignment for the benefit of its creditors, or admits in writing its inability to pay its debts generally as they become due;

7.9    Liens/Judgment. The existence or the filing of any lien, attachment, levy or encumbrance against the Premises or the entry of any judgment, order or decree, without Lender's prior written consent, that is not removed and released, satisfied, bonded over, or stayed by a surety or other security acceptable to Lender or otherwise disposed of to Lender's satisfaction, within ten (10) days after the filing of such lien, attachment, levy or encumbrance or the entry of such judgment, order or decree;

7.10   Priority. If after fifteen (15) days prior written notice from Lender (which notice shall specify the reasons for Lender's determination), the priority or security of the Deed of Trust or any other security for the payment of the Note, in the reasonable judgment of Lender, is in jeopardy.

7.11   Generally. Upon the occurrence and during the continuation of an Event of Default hereunder, Lender shall have all rights and remedies available to Lender under the law or at equity, hereunder or under the Note (including, but not limited to, the right to accelerate the Note without presentation, demand, notice, or notice of protest), the Deed of Trust or any of the Other Loan Documents. Without limiting the foregoing, Lender shall have the right to appointment of a trustee or receiver to perform any acts required of Borrower under this Agreement. In order to entitle Lender to exercise any remedy available hereunder, it shall not be necessary for Lender to give any notice, other than such notice as may be required by this Loan Agreement or any of the Other Loan Documents or such notice as may otherwise be required by law.

7.12   Right Not to Fund Loan or Advance. In the event and during the continuation of an Event of Default by Borrower prior to the funding of the Loan or any Advance, Lender shall, in addition to any other rights and remedies provided herein or by law, or at equity, not be required to fund the Loan and shall be excused from all further obligations and performance under this Agreement. In such event, Borrower shall continue to be responsible for payment of all costs, fees, and expenses.

7.13   Right to Draw Upon the Deposit. In the event and during the continuation of an Event of Default by Borrower, Lender may draw upon the Deposit, in whole or in part, and apply such proceeds in the manner set forth in the Note.

7.14   Right to Advance or Post Funds. Borrower agrees that Lender may, but shall not be required to, make any payment or perform any act herein required of Borrower in any form and manner deemed expedient after reasonable inquiry into the validity thereof and reasonable prior notice thereof to Borrower. By way of illustration and not in limitation of the foregoing, Lender may, but shall not be required to, (i) make full or partial payments of insurance premiums which are unpaid by Borrower, and of principal or interest to persons claiming prior liens or encumbrances, if any, (ii) purchase, discharge, compromise, settle or pay any tax lien or any other lien, encumbrance, suit, proceeding, title or claim thereof, including, but not limited to, liens for real and personal property taxes, or (iii) redeem all or any part of the Collateral from

22

any tax or assessment. All money paid for any of the purposes herein authorized and all other moneys advanced by Lender to protect the Collateral and/or the lien of the Deed of Trust or any Other Loan Document shall be additional liabilities secured and evidenced by the Loan Documents and shall become immediately due and payable without notice and shall bear interest thereon at the Default Rate until paid to Lender in full. In making any payment hereby authorized relating to taxes, assessments or prior liens or encumbrances, Lender shall be the sole judge of the legality, validity and priority thereof and of the amount necessary to be paid in satisfaction thereof.

7.15 <u>Remedies Are Cumulative</u>. All remedies of Lender provided for herein are cumulative and shall be in addition to any and all other rights and remedies provided in the Note, the Deed of Trust or any of the Other Loan Documents or by law or at equity. The exercise of any rights of Lender hereunder shall not in any way constitute a cure or waiver of a default hereunder or elsewhere, or invalidate any act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights hereunder or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Note, the Deed of Trust and the Other Loan Documents.

7.16 <u>Right of Contest</u>. Borrower shall have the right to contest in good faith any tax, claim, demand, levy, assessment or Legal Requirement by a third party, the assertion of which would constitute an Event of Default hereunder. Any such contest shall be prosecuted diligently and in a manner not prejudicial to Lender or the rights of Lender hereunder. Upon demand by Lender (which demand shall be reasonable under the circumstances), Borrower shall deposit funds with Lender or obtain and record a statutory bond sufficient to release such claim, demand, levy, or assessment as a lien against the Premises or Collateral. Borrower shall make such deposit or obtain and record such bond, as the case may be, within ten (10) days after demand therefore and, if made by payment of funds to Lender, the amount so deposited shall be disbursed in accordance with the resolution of the contest to Borrower or the adverse claimant.

7.17 <u>Subrogation Rights and Other Defenses</u>. Borrower waives the right to require Lender to proceed against Borrower, to foreclose any lien on any real or personal property in any particular order, or to exercise any right or remedy under the Loan Documents, to pursue any other right or remedy, or to enforce any other right. Borrower further acknowledges and agrees that nothing contained in the Loan Documents shall prevent Lender from exercising any rights available to it or under any of the Loan Documents, and that the exercise of any of the rights shall not constitute a legal or equitable discharge of Borrower. Borrower understands and acknowledges that the exercise by Lender of certain rights and remedies contained in the Loan Documents may affect or eliminate one or more of the Borrower's rights of subrogation against Lender and that Borrower may, therefore, succeed to a partially or totally non-reimbursable liability hereunder. Notwithstanding the foregoing, Borrower hereby authorizes and empowers Lender to exercise, at Lender's sole discretion, any rights and remedies, or any combination thereof, which may then be available, since it is the intent and purpose of Borrower that the obligations under the Loan Documents shall be absolute, independent, and unconditional under any and all circumstances.

7.18 <u>Cure Period</u>. Upon notice, Borrower shall be given thirty (30) days to cure the event of default to the satisfaction of the Lender in its sole and absolute discretion. The Lender may choose to extend this cure period, by its satisfaction that the Borrower is actively making its best efforts to cure, in its sole and absolute discretion.

7.19 <u>Agreement to Pay Attorneys' Fees and Expenses</u>. Upon the occurrence of an Event of Default, as a result of which Lender shall require and employ attorneys or incur other expenses for the collection of payments due or to become due under the Loan Documents or the enforcement or performance or observance of any obligation or agreement on the part of Borrower contained herein or in the Loan Documents, Borrower shall, on demand, pay to Lender the reasonable fee of such attorneys and such other

23

expenses so incurred by Lender, including, without limitation, expert witness fees, discovery costs, court costs, and other litigation-related expenses.

7.20  Exercise of Rights Subject to Applicable Law. All rights, remedies and powers provided by this Section 7 may be exercised only to the extent that the exercise thereof does not violate any applicable provision of the laws of the State of Tennessee and all of the provisions of this Section 7 are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they will not render this Agreement invalid or unenforceable.

7.21  Discontinuance of Proceedings. In case Lender shall have proceeded to enforce any right, power or remedy under this Agreement, the Note, the Deed of Trust or any Other Loan Document by foreclosure, entry, or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to Lender, then and in every such case Borrower and Lender shall be restored to their former positions and rights hereunder with respect to the Collateral, and all rights, remedies and power of Lender shall continue as if no such proceedings had been taken, subject to any binding rule by the applicable court or other tribunal in any such proceeding.

8  MISCELLANEOUS.

8.01  Entire Agreement. This Agreement with exhibits and Loan Documents embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. Neither this Agreement nor any provision herein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

8.02  Interpretation and Construction. In this Agreement, unless the context otherwise requires:(i) Sections mentioned by number only are the respective Sections of this Agreement as so numbered; (ii) words importing a particular gender mean and include every other gender, and words importing the singular number mean and include the plural number and vice versa; (iii) any headings preceding the texts of the several Sections of this Agreement, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect; (iv) the terms "herein," "hereunder," "hereby," "hereto," "hereof" and any similar terms as used in the Agreement refer to this Agreement; the term "heretofore" means before the date of the execution of this Agreement; and the term "hereafter" means after the date of the execution of this Agreement; (v) if any clause, provision or Section of this Agreement shall be determined to be apparently contrary to or conflicting with any other clause, provision or Section of this Agreement, then the clause, provision or Section containing the more specific provisions shall control and govern with respect to such apparent conflict; and (vi) all accounting terms used herein which are not otherwise specifically defined shall be used in accordance with GAAP. The parties hereto do agree that each has contributed to the drafting of this Agreement and all Loan Documents and that the provisions herein contained shall not be construed against either Borrower or Lender as having been the person or persons responsible for the preparation thereof.

8.03  Environmental. With respect to the Property, Borrower shall at all times comply in all respects with all applicable laws (whether statutory, common law or otherwise), rules, regulations, orders, permits, licenses, ordinances, judgments or decrees of all governmental authorities (whether federal, state, local or otherwise), including, without limitation, all laws regarding public health or welfare, environmental protection, water or air pollution, composition of products, underground storage tanks, toxic substances or chemicals, solid and special wastes, hazardous wastes, substances, material or chemicals, waste, used, or recycled oil, asbestos, occupational health and safety, nuisances, trespass, and negligence. Borrower agrees to indemnify and hold Lender harmless from and against any and all claims, liabilities, obligations,

24

losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, of any kind or nature whatsoever, including without limitation, attorneys' and experts' fees, which may be imposed on, incurred by or asserted against Lender in any way relating to or arising from the Obligations, the Deed of Trust, the other Loan Documents and/or the Property. All of Borrower's obligations under this section shall survive the foreclosure, release or other termination of any Deed of Trust and the satisfaction of the Obligations.

8.04 <u>Failure to Exercise Rights</u>. Nothing herein contained shall impose upon Lender or Borrower any obligation to enforce any terms, covenants or conditions contained herein. Failure of Lender or Borrower, in any one or more instances, to insist upon strict performance by Borrower or Lender of any terms, covenants or conditions of this Agreement or the Loan Documents, shall not be considered or taken as a waiver or relinquishment by Lender or Borrower of their right to insist upon and to enforce in the future, by injunction or other appropriate legal or equitable remedy, strict compliance by Borrower or Lender with all the terms, covenants and conditions of this Agreement and the Loan Documents. The consent of Lender or Borrower to any act or omission by Borrower or Lender shall not be construed to be a consent to any other or subsequent act or omission or to waive the requirement for Lender's or Borrower's consent to be obtained in any future or other instance.

8.05 <u>Notices</u>. All notices required or permitted to be given by law or by the terms of this Agreement shall be in writing and shall be considered given upon (i) personal service of a copy on the party to be served, (ii) the next Business Day following delivery to a reputable overnight carrier service, or (iii) three (3) business days after proper deposit of a copy of such notice in the United States Mail, by certified or registered mail, postage prepaid, receipt for delivery requested, addressed to the party to be served. The addresses of the parties are as set forth on the first page of this Agreement. Any change in the address of any party shall be given by the party having such change to the other parties in the manner provided above. Thereafter, all notices shall be given in accordance with the notice of change of address. Notices given before actual receipt of the notice of change of address shall not be invalidated by the change of address.

8.06 <u>Termination</u>. This Agreement shall terminate when all indebtedness and obligations of Borrower incurred hereunder and under each of the Loan Documents shall have been discharged in full or as otherwise provided herein.

8.07 <u>Severability of Provisions</u>. In the event any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

8.08 <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of Borrower, the Lender and its respective successors and permitted assigns; provided, however, that Borrower may not transfer its rights to borrow or any of its liabilities or obligations under this Agreement or any of the Other Loan Documents directly, indirectly or by operation of law without the prior written consent of Lender, in Lender's sole discretion.

8.09 <u>Governing Law, Venue</u>. Each of the Loan Documents shall be deemed to be a contract made under and governed by the laws of the State of Tennessee without regard to the laws of conflict of any jurisdiction) as to all matters, including without limitation, matters of validity, interpretation, construction, effect, performance and remedies. Borrower hereby irrevocably consents to the personal jurisdiction of the state and federal courts located in Hamilton County, State of Tennessee, or any other court having personal jurisdiction over Borrower or the Collateral in connection with any controversy related to this Loan Agreement and any other of the Loan Documents, waives any argument that venue in such forums is not

convenient, and agrees that any litigation in connection herewith or therewith shall be venue in such federal or state courts.

8.10 **Modification in Writing.** This Agreement, the Note and the Other Loan Documents constitute the entire agreement between the parties and supersedes all prior agreements whether written or oral with respect to the subject matter hereof, including, but not limited to, any term sheets furnished by Lender to Borrower. Neither this Agreement nor any provision herein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

8.11 **Incorporation of Terms.** Borrower agrees that the Note shall be made subject to all the terms, covenants, conditions, obligations, stipulations and agreements contained in this Agreement to the same extent and effect as if fully set forth in and made a part of the Note and Borrower and Lender agree that this Agreement is made subject to all the terms, covenants, conditions, obligations, stipulations and agreements contained in the Note to the same extent and effect as if fully set forth herein and made a part of this Agreement. Notwithstanding any of the foregoing, if any provisions in this Agreement or the Loan Documents are inconsistent with the Note, the Note shall control. If any provisions of the Deed of Trust or any of the Other Loan Documents are inconsistent with this Agreement, this Agreement shall control.

8.12 **Cumulative Nature of Covenants.** All covenants contained herein are cumulative and not exclusive of each other covenant. Any action allowed by any covenant shall be allowed only if such action is not prohibited by any other covenant.

8.13 **Continuing Representations.** All agreements, covenants, representations, and warranties made herein shall survive the execution and delivery of this Agreement, the making of the Loan hereunder, the execution and delivery of the Note, the payment and cancellation of the Note, and the foreclosure sale of the Collateral. All covenants, agreements, representations and warranties made in or pursuant to this Agreement shall be deemed continuing and made at and as of the date of this Agreement and at and as of the time of each Advance. All statements contained in any certificate, financial statement, legal opinion or other instrument delivered by or on behalf of Borrower pursuant to or in connection with any of the Loan Documents shall constitute additional representations and warranties made under this Agreement.

8.14 **Counterparts.** This Agreement may be executed by the parties hereto in any number of separate counterparts with the same effect as if the signatures hereto and hereby were upon the same instrument. All such counterparts shall together constitute but one and the same document.

8.15 **Costs to Prevailing Party.** If any action or proceeding is brought by any party against any other party under this Agreement, the prevailing party shall be entitled to recover such attorneys' fees, expert witness fees, litigation-related expenses, and court costs as the court in such action or proceeding may adjudge reasonable.

8.16 **Time.** Time is of the essence of this Agreement.

8.17 **No Third-Party Beneficiaries.** This Agreement is made and entered into for the sole benefit of Lender, it successors and assigns and Borrower and is not for the benefit of any third party. All conditions of the obligations of Lender to make advances hereunder are imposed solely and exclusively for the benefit of Lender and may be freely modified by Lender with the concurrence of Borrower or waived by Lender in whole or in part at any time if in Lender's sole discretion it deems it advisable to do so. No person other than Borrower shall have standing to require Lender to make any loan advances or to be a beneficiary of this Agreement or of any of the advances to be made hereunder.

8.18 <u>Form and Substance</u>. All documents, certificates, insurance policies and other items required under the Loan Documents to be executed or delivered to Lender shall be in a form and substance satisfactory to Lender.

8.19 <u>Assignment</u>. Lender may assign its rights and obligations hereunder, or grant participations in its interest in the Loan, from time to time and in whole or in part, and upon any such assignment, Lender shall be released from its obligations under this Agreement and the Loan Documents to the extent of any such assignment. No participant shall be deemed a partner or agent of Lender. Borrower irrevocably agrees that no claim shall be asserted by way of direct claim or offset against any participant and Borrower hereby irrevocably waives any right it otherwise may have, now or hereafter, to assert any such claim. Borrower acknowledges that the participants shall rely on the foregoing waiver and agreement.

8.20 <u>Waiver of Right to Offset</u>. No portion of the Loan funds at any time shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross claim, whether liquidated or unliquidated, which Borrower may have or claim to have against Lender.

8.21 <u>Joint and Several Liability</u>. Should this Agreement or any Other Loan Document be executed by more than one Person as Borrower, all obligations of Borrower herein or therein contained shall be deemed to be the joint and several obligations of each Person executing this Agreement or such Other Loan Document.

8.22 <u>Interpretation of Conflicts</u>. In the event of any conflict between the terms and provisions of this Loan Agreement and the terms and provisions of any Other Loan Document, the terms and provisions of this Loan Agreement shall govern and prevail.

8.23 <u>WAIVER OF JURY TRIAL</u>.BORROWER AND LENDER WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OR ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. BORROWER AND LENDER AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION IS TO BE TRIED BY A COURT TRIAL WITHOUT A JURY.WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING THAT SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.THIS WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

8.24 **Broker Fee.** Both parties acknowledge that there are no brokers or advisors entitled to a fee pursuant to this transaction. Each side shall indemnify the other for any claim that might arise in connection with any other broker or advisor fees hereunder.

8.25 **Legal Consultation; Mutual Drafting.** Each party recognizes that this is a legally binding contract and acknowledges and agrees that they have had the opportunity to consult with legal counsel of their choice. Each party has cooperated in the drafting, negotiation and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such language. Borrower agrees and acknowledges that he has read

27

and understands this Agreement completely, is entering into it freely and voluntarily, and has been advised
to seek counsel prior to entering into this Agreement and has had ample opportunity to do so.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Lender and Borrower have caused this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:

Mt. Canaan Baptist Church
A Tennessee Non-Profit Organization

By: _____
Name: Dr. Terrae T. Jordan
Its: Senior Pastor


LENDER:

JC FUNDING-6, LLC
a Missouri limited liability company


By:_____
Name: Jeff N. Crossland
Its: Member

EAGLE CAPITAL INVESTMENT PARTNERS LP
a Delaware limited liability company


By:_____
Name: Stephen C. Parente
Its: Managing Partner


STATE OF [          ]
                                    )   SS.
COUNTY OF _____   )

On this _13_ day of _Aug_, 2013 before me appeared _Terrae J. Gordan, Sr._ to me personally known, who being by me duly sworn did say that _he_ is the representative of _Mt. Canaan Baptist Church_ company and that said document was signed and sealed in behalf of said company by authority of its members, and he acknowledged said document to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the City and State aforesaid, the day and year first above written.

_____
Notary Public

My Commission Expires:

_5-4-2016_

29

IN WITNESS WHEREOF, Lender and Borrower have caused this Agreement to be duly executed and delivered as of the date first above written.

**BORROWER:**

**Mt. Canaan Baptist Church**
A Tennessee Non-Profit Organization

By:_____
Name: Dr. Ternae T. Jordan
Its: Senior Pastor

**LENDER:**

**JC FUNDING-6, LLC**
a Missouri limited liability company

By:_____
Name: Jeff N. Crossland
Its: Member

**EAGLE CAPITAL INVESTMENT PARTNERS LP**
a Delaware limited liability company

By:_____
Name: Stephen C. Parente
Its: Managing Partner

**STATE OF [CA ]**
                                )     **SS.**
**COUNTY OF Los Angeles )**

On this 14 day of Aug , 2013 before me appeared Jeff N. Crossland to me personally known, who being by me duly sworn did say that he is the representative of JC funding-6 a Missouri limited liability Company and that said document was signed and sealed in behalf of said company by authority of its members, and he acknowledged said document to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the City and State aforesaid, the day and year first above written.

_____
Notary Public

My Commission Expires:

Dec 1, 2016

ALEX SOTO
Commission # 1999635
Notary Public - California
Los Angeles County
My Comm. Expires Dec 1, 2016

IN WITNESS WHEREOF, Lender and Borrower have caused this Agreement to be duly executed and delivered as of the date first above written.

**BORROWER:**

**Mt. Canaan Baptist Church**
A Tennessee Non-Profit Organization

By:_____
Name: Dr. Ternae T. Jordan
Its: Senior Pastor

**LENDER:**

**JC FUNDING-6, LLC**
a Missouri limited liability company

By:_____
Name: Jeff N. Crossland
Its: Member

**EAGLE CAPITAL INVESTMENT PARTNERS LP**
a Delaware limited liability company

By: _____
Name: Stephen C. Parente
Its: Managing Partner

STATE OF [ _GA_ ]
                              )    SS.
COUNTY OF _Gwinnett_ )

On this _14th_ day of _August_ 2013 before me appeared _Stephen C Parente_ to me personally known, who being by me duly sworn did say that he is the representative of _Eagle Capital Ind Loan Service_ company and that said document was signed and sealed in behalf of said company by authority of its members, and he acknowledged said document to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the City and State aforesaid, the day and year first above written.

_____
Notary Public

My Commission Expires:

_4/29/15_

29

Exhibit "A"

## PREMISES LEGAL DESCRIPTION

Exhibit "B"

INITIAL BUDGET

**Mt. Canaan Batist Church**
Project Budget

| | | |
|---|---|---|
| Acquisition of Highway 58 Property | $ | 3,232,000 |
| Kitchen and Back Wall | $ | 106,000 |
| Renovation of Sanctuary/Facilities | $ | 1,474,000 |
| Architectural | $ | 79,000 |
| Project Hard/Soft Costs | $ | 4,891,000 |
| | | |
| Loan Fee | $ | 89,000 |
| Closing Costs | $ | 35,000 |
| Contingency | $ | 52,220 |
| Servicing Fee | $ | 22,250 |
| Interest Reserve | $ | 460,530 |
| Financial Transaction Costs | $ | 659,000 |
| | | |
| Total Project Budget | $ | 5,550,000 |

## Exhibit "C"

## APPROVED SCHEDULE OF VALUES

32

**Mt. Canaan Batist Church**
Schedule of Values

| | Project Capital Draw 1 | Project Capital Draw 2 | Project Capital Draw 3 | Project Capital Draw 4 | Project Capital Draw 5 | Project Capital Draw 6 | Project Capital Draw 7 | Project Capital Draw 8 | Project Capital Draw 9 | Project Capital Draw 10 | Accrued Interest Mos 11-24 | Project Capital Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Acquisition of Highway 58 Property | | | $ 3,232,000 | $ - | $ - | | | | | | | $ 3,232,000 |
| Renovation of Sanctuary/Facilities | | | | | $ 253,000 | $ 304,000 | $ 316,000 | $ 268,000 | $ 242,000 | $ 197,000 | | $ 1,580,000 |
| Architectural | | | | $ 79,000 | $ - | | | | | | | $ 79,000 |
| Project Hard/Soft Costs | $ - | $ - | $ 3,232,000 | $ 79,000 | $ 253,000 | $ 304,000 | $ 316,000 | $ 268,000 | $ 242,000 | $ 197,000 | | $ 4,891,000 |
| Loan Fee | | | $ 57,600 | $ 22,500 | $ 8,900 | $ - | $ - | $ - | $ - | $ - | | $ 89,000 |
| Closing Costs | | $ - | $ 35,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ 35,000 |
| Contingency | | | $ (13,750) | $ - | 0 | 0 | $ - | $ - | $ - | $ 65,970 | | $ 52,220 |
| Servicing Fee | | | $ 14,400 | $ 5,625 | $ 2,225 | $ - | $ - | $ - | $ - | $ - | | $ 22,250 |
| Interest Reserve Payments | $ - | | | $ 13,876 | $ 14,481 | $ 15,874 | $ 17,474 | $ 19,141 | $ 20,577 | $ 21,890 | $ 337,217 | $ 460,530 |
| Financial Transaction Costs | $ - | $ - | $ 93,250 | $ 42,001 | $ 25,606 | $ 15,874 | $ 17,474 | $ 19,141 | $ 20,577 | $ 87,860 | $ 337,217 | $ 659,000 |
| Total Project Costs | $ - | $ - | $ 3,325,250 | $ 121,001 | $ 278,606 | $ 319,874 | $ 333,474 | $ 287,141 | $ 262,577 | $ 284,860 | $ 337,217 | $ 5,550,000 |

17017811v2

## PROMISSORY NOTE

$5,000,000.00                                               August____, 2013

    For value received, the undersigned, **Mt. Canaan Baptist Church,** a Tennessee Non-profit organization (the "Borrower"), promises to pay to the order of JC Funding-6 LLC, a Missouri limited liability company and Eagle Capital Investment Partners LP (collectively, the "Lender") and in lawful money of the United States of America, the principal sum of **Five Million and 00/100 Dollars ($5,000,000.00)** or such lesser amount as may be disbursed hereunder, together with interest on each disbursement of the aforesaid principal sum, from the date of such disbursement, at the rate provided for herein.

    Prior to default during the Ramp-up Loan Period, interest hereunder shall accrue on the principal amount outstanding at the end of each day at a fixed rate per annum equal to six percent (6.00%) (the "Stated Rate"). All interest payable hereunder shall be computed for the actual number of days elapsed on the basis of a year consisting of three hundred sixty (360) days. After the Ramp-up Loan Period and until the Maturity Date (the "Permanent Loan Term"), interest hereunder shall accrue on the principal amount outstanding at the end of each day at a fixed rate per annum equal to five and three quarters percent (5.75%) (the "Post Ramp-up Rate").

    The Stated Rate shall be in effect for the first two (2) years of this loan. During the first 24 months there shall be interest only payments (the "Ramp-up Loan Period"), and such interest only payments shall be paid from the Interest Reserve Account established pursuant to the Loan Agreement. During Permanent Loan Term, installments of principal and interest (calculated using the Post Ramp-up Rate on the basis of a twenty (20) year amortization of principal and interest based on the outstanding principal balance hereunder as of the expiration of the Ramp-up Loan Period) shall be due and payable monthly.

    Upon or after the occurrence and during the continuation of any default or Event of Default hereunder, under the terms of the Deed of Trust (as hereinafter defined) or under the terms of any other Loan Document (as such term is defined in the Deed of Trust), the outstanding principal balance of this Note shall bear interest at an annual rate equal to 8.50%known as the "Default Rate".

    In no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof or otherwise, shall the amount paid or agreed to be paid to Lender for the use, forbearance or detention of money advanced hereunder exceed the highest lawful rate permissible under any law which a court of competent jurisdiction may deem applicable hereto.

1

EXHIBIT

**2**

An Interest Reserve equal to $526,500, representing 24 months of interest payments shall be established ratably during the Ramp-up Loan Period from which Lender will be paid interest costs.

This Note shall be secured by, among other things, a Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing executed and delivered as of the date hereof, encumbering certain real estate in the Hamilton County, Tennessee(hereinafter, as amended, restate or replaced from time to time, the "Deed"), which Deed secures future advances and future obligations.

The principal amount and accrued interest of this Note shall be due and payable on the dates and in the manner hereinafter set forth:

      (a) Accrued interest shall be payable in monthly installments on the 1st day of each calendar month for the first twenty four (24) months of this Loan, with the first such payment of interest commencing on the first day of the month following the first Advance, as set forth in the Loan Agreement provided that no Event of Default shall occur if Borrower makes payment within five (5) days of said due date. The interest shall be paid from the Interest Reserve Account as set forth in the Loan Agreement.

      (b) Principal and Interest payments shall be payable in monthly installments on the 1st day of each calendar month beginning in month twenty five (25) during the Permanent Loan Term as set forth above and in the Loan Agreement provided that no Event of Default shall occur if Borrower makes payment within five (5) days of said due date.

      (c) Principal shall be paid monthly from the Building Pledge Sinking Fund (as defined in the Loan Agreement) for as long as funds are available in the Building Pledge Sinking Fund.

      (d) Principal shall be paid when received from the proceeds of the sale of the Existing Building (as defined in the Loan Agreement) located at 2800 N. Chamberlain Avenue, Chattanooga, TN 37406.

      (e) The entire principal balance outstanding plus all accrued but unpaid interest shall become due and payable on July 31, 2023 (the "Maturity Date").

Payments of principal and interest shall be made to Lender by crediting before 12:00 noon, New York City, New York time, on the appropriate due date, at its offices located at 1123 Wilshire Blvd., #1012, Santa Monica, CA 90403; or in such other manner as Lender may elect from time to time. If any payment is due on a day other than a business day, such payment shall be due on the next succeeding business day. Failure to

make payments on this Note as required under the terms hereof shall constitute an Event of Default hereunder.  All payments due under this Note and not received within ten (10) days following the date due hereunder shall be subject to a late payment fee of five percent (5%) of the amount of said late payment.

Borrower may prepay this Note in whole or in part at any time after 24 months without penalty or premium. Amounts borrowed and prepaid may not be re-borrowed.

The occurrence of an Event of Default hereunder or under the Deed of Trust or any other Loan Document shall entitle Lender, at its option, to declare the then outstanding principal balance and accrued interest hereof to be, and the same shall thereupon become, immediately due and payable without notice to or demand upon Borrower, all of which Borrower hereby expressly waives.

Borrower agrees that Lender shall have the absolute right, without notice to Borrower, to cease making advances under this Note if Lender receives a notice purporting to terminate or limit the Deed of Trust in any manner.

Borrower shall also pay to Lender all amounts incurred by Lender in the collection of any obligations due from Borrower under this Note.  Such amounts include, subject to any limits under applicable law, Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Borrower agrees to submit to the jurisdiction of the courts of the Hamilton County, State of Tennessee. This Note shall be governed by and construed in accordance with the laws of the State of Tennessee.

Time is of the essence of this Note.  To the fullest extent permitted by applicable law, Borrower, for itself and its successors and assigns, expressly waives presentment, demand, protest, notice of dishonor,  demands and consents in connection with the delivery, acceptance, performance, default or enforcement of this Note, and hereby consents to any extensions of time, renewals, releases of any party to or guarantor of this Note, waivers and any other modifications that may be granted or consented to by Lender from time to time in respect of the time of payment or any other provision of this Note.

Wherever possible each provision of this Note shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Note. No delay or failure on the part of Lender in the exercise of any right or remedy hereunder shall operate as a waiver thereof, nor as acquiescence in any default, nor shall any single or partial exercise by Lender of any right or remedy preclude any other right or remedy.  Lender, at its option, may enforce its rights against any collateral securing this Note without enforcing its rights against Borrower, any guarantor of the indebtedness evidenced hereby or any other property or

indebtedness due or become due to Borrower. Borrower agrees that, without releasing or impairing Borrower's liability hereunder, Lender may at any time release, surrender, substitute or exchange any collateral securing this Note and may at any time release any party primarily or secondarily liable for the indebtedness evidenced by this Note.

Any notice, request, demand, consent, confirmation or other communication hereunder shall be in writing and delivered (a) in person, by messenger or overnight courier, (ii) by registered or certified mail, return receipt requested and postage prepaid, or (iii) by facsimile, to the applicable party at its address or facsimile number set forth below, or at such other address or facsimile number as such party hereafter may designate as its address for communications hereunder by notice so given. Such notices and communications shall be deemed delivered upon receipt (or refusal to accept delivery) provided that all notices and communications sent by facsimile shall also be evidenced by the facsimile machine's confirmation identifying the recipient's facsimile number and transmission and provided further that all notices or other communications sent by facsimile shall also delivered by another means permitted by under this section.

If to Borrower:        Mt. Canaan Baptist Church
                       2800 N. Chamberlain Avenue
                       Chattanooga, TN37406
                       Attention: Dr. Ternae T. Jordan Sr.
                       Facsimile No.: (   )

If to Lender           JC Funding-6, LLC
                       1223 Wilshire Blvd., #1012
                       Santa Monica, CA 90403
                       Attention: Jeff Crossland, Member
                       Facsimile No.: 310-496-2002

and also:              Eagle Capital Investment Partners LP
                       2700 Braselton Hwy, Ste #10-137
                       Dacula, GA 30019
                       Attention: Stephen C. Parente, Managing Partner
                       Facsimile No.: 770-271-7107

Borrower agrees to reimburse Lender as set forth in the Loan Agreement for the costs and expenses including attorneys' fees, incurred by Lender for the preparation of this Note, the Deed and any other necessary or incidental documents and costs.

**TO THE FULLEST EXTENT PERMITTED BY LAW, AND AS SEPARATELY BARGAINED FOR CONSIDERATION TO THE LENDER, BORROWER HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY (WHICH THE LENDER ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATING TO THIS NOTE, ANY OF**

4

THE LOAN DOCUMENTS OR THE LENDER'S CONDUCT IN RESPECT OF ANY OF THE FOREGOING. BORROWER HEREBY EXPRESSLY ACKNOWLEDGES THE INCLUSION OF THIS JURY TRIAL WAIVER.

ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT."

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]
[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered by its duly authorized representative as of the date first above written.

**MT. CANAAN BAPTIST CHURCH**

By: Ds.

Name: Dr. Ternae T. Jordan Sr.

Title:  Senior Pastor

**STATE OF**          )

                           )    SS.

**COUNTY OF** _Hamilton_ )

On this _13th_ day of _Aug_, 2013, before me appeared Dr. Ternae T. Jordan Sr., to me personally known, who being by me duly sworn did say that he is the Senior pastor of Mt. Canaan Baptist Church a State of Tennessee non-profit organization and that said instrument was signed and sealed in behalf of said company by authority of its members, and he acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the City and State aforesaid, the day and year first above written.

x Iris Brown

Notary Public

My Commission Expires:

_5 - 4 - 2016_

IRIS BROWN
STATE
OF
TENNESSEE
NOTARY
PUBLIC
HAMILTON COUNTY

17196531v2

6

# BUTLER|SNOW

June 2, 2014

***Via Federal Express***

JC Funding-6, LLC
1223 Wilshire Blvd., #1012
Santa Monica, CA 90403
Attention: Jeff Crossland, Member

Eagle Capital Investment Partners LP
2700 Braselton Hwy, Ste #10-137
Dacula, GA 30019
Attention: Stephen C. Parente, Managing Partner

     ***Re:***    **Mt. Canaan Baptist Church**

Dear Sirs:

     As you know, this law firm represents Mt. Canaan Baptist Church (hereinafter "Mt. Canaan"). In August 2013, Mt. Canaan entered into a Project Funding Loan Agreement (hereinafter the "Loan Agreement") with JC Funding-6, LLC and Eagle Capital Investment Partners LP (collectively hereinafter "Lender'). Pursuant to the terms of the Loan Agreement, Lender agreed to make available to Mt. Canaan certain project funding in the amount of Five Million and No/100 Dollars ($5,000,000.00). In addition, Mt. Canaan executed and delivered a Promissory Note to Lender dated August 2013 in the amount of Five Million and No/100 Dollars ($5,000,000.00) (hereinafter the "Note").

     The proceeds of the project funding were to be available to Mt. Canaan once Mt. Canaan met certain conditions and only upon a certain advance schedule. All of the conditions to the loan have been satisfied by Mt. Canaan; however, as of the date of this letter, Mt. Canaan has not received a single advance under the loan.

     Pursuant to Section 3.02 of the Loan Agreement, Mt. Canaan paid a deposit in the amount of Five Hundred Fifty Thousand and No/100 Dollars ($550,000.00) to Lender's Production Account (the "Deposit"). Mt. Canaan wired Four Hundred Fifty Thousand and No/100 Dollars ($450,000.00) of the Deposit on August 23, 2013 and the remaining One Hundred Thousand and No/100 Dollars ($100,000.00) of the Deposit on August 28, 2013. In addition, Mt. Canaan was required to pay the closing costs of the loan, and

*The Pinnacle at Symphony Place*
*150 3rd Avenue South, Suite 1600*
*Nashville, TN 37201*

C. PALMER PILLANS
615.651.6721
*palmer.pillans@butlersnow.com*

T 615.651.6700
F 615.651.6701
*www.butlersnow.com*

BUTLER SNOW LLP



EXHIBIT
3

pursuant to Section 2.1(a) of the Loan Agreement, Mt. Canaan prepaid Fifteen Thousand and No/100 Dollars ($15,000.00) (the "Closing Costs").

Mt. Canaan has been extremely patient during this process, but it has become exceedingly clear that Lender has no intention of funding the loan or complying with the terms of the Loan Agreement.  Lender's failure to fund the loan pursuant to the terms of the Loan Agreement is a clear breach of its obligations.

Mt. Canaan hereby demands the reimbursement of the Deposit and the Closing Costs.  Upon the reimbursement of the Deposit and the Closing Costs, neither party will have any further obligations to the other under the Loan Agreement or the Note.

We would like to offer you the opportunity to resolve this dispute without the necessity of legal recourse.  Please be advised that you have seven (7) days from receipt of this letter to refund the Deposit and the Closing Costs in the amount of Five Hundred Sixty-Five Thousand and No/100 Dollars ($565,000.00) by wiring such proceeds to Butler Snow LLP per the attached wiring instructions.  In the event that Lender fails to remit payment within the seven (7) day period, we have advised Mt. Canaan to proceed with a lawsuit to recover all of the damages it has incurred as a result of Lender's breach of its obligations under the Loan Agreement, including prejudgment interest, attorneys' fees, cost and expenses.

Should you have any questions, please do not hesitate to contact me.  Otherwise, we look forward to receiving payment in the amount of Five Hundred Sixty-Five Thousand and No/100 Dollars ($565,000.00) with the next seven (7) days.

Sincerely,

BUTLER SNOW LLP

C. Palmer Pillans

cc:     Pastor Ternae Jordan, Sr.
        Oliver Richmond

ButlerSnow 21365601 1

**Kevin Baltz**

| | |
|---|---|
| **From:** | jeff@crosscapp.com |
| **Sent:** | Monday, June 16, 2014 3:47 PM |
| **To:** | Palmer Pillans |
| **Subject:** | RE: Letter of 6-2-14 |

Palmer - We have several liquidity programs in motion right now on behalf of a host of Clients looking for Project capital infusions. We have been targeting any of these to generate sufficient capital to meet our obligation to return the original Deposit to Mt. Canaan, along with out-of-pocket monies the Church tells me they advanced to someone else.

Several of these programs are reaching maturity and I expect to have this mapped out to a timeline for repayment imminently, maybe as soon as tomorrow.

I have consistently stated to Pastor Jordan our absolute intent to repay the Deposit formally requested in writing. I have every expectation that promise will be fulfilled.

I will keep you apprised of timing developments on our side, particularly the near term transaction we expect to have more visibility on in the next 24 hours.

Jeff Crossland
Principal
Crossland Capital Partners LLC
1223 Wilshire Blvd. #1012
Santa Monica, CA 90403
(310) 477-5100 W
(310) 804-6662 C
email: jeff@crosscapp.com


-------- Original Message --------
Subject: RE: Letter of 6-2-14
From: Palmer Pillans <Palmer.Pillans@butlersnow.com>
Date: Fri, June 13, 2014 2:36 pm
To: "'jeff@crosscapp.com'" <jeff@crosscapp.com>

Mr. Crossland:
I will look forward to hearing from you on Monday.
Palmer Pillans

*C. Palmer Pillans*
Butler Snow LLP
Direct: (615) 651-6721
Fax: (615) 651-6701
Palmer.Pillans@butlersnow.com

BUTLER | SNOW

| About Butler Snow | Bio | V-Card |
|---|---|---|

Suite 1600
The Pinnacle at Symphony Place
150 3rd Avenue South
Nashville, TN 37201

1


EXHIBIT
4

**From:** jeff@crosscapp.com [mailto:jeff@crosscapp.com]
**Sent:** Friday, June 13, 2014 4:22 PM
**To:** Palmer Pillans
**Cc:** Ternae Sr
**Subject:** Letter of 6-2-14

Mr. Pillans - I am just now in receipt of your letter dated June 2, 2014 relating to Mt. Canaan Baptist Church. I would indulge you to allow me to respond to the letter on Monday.

Thank you.

Jeff Crossland
Principal
Crossland Capital Partners LLC
1223 Wilshire Blvd. #1012
Santa Monica, CA 90403
(310) 477-5100 W
(310) 804-6662 C
email: jeff@crosscapp.com

CONFIDENTIALITY NOTE: This e-mail and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by replying to the sender and deleting this copy and the reply from your system. Thank you for your cooperation.

CIRCULAR 230 DISCLOSURE: Pursuant to Treasury guidelines, any federal tax advice contained in this communication, or any attachment, does not constitute a formal tax opinion. Accordingly, any federal tax advice contained in this communication, or any attachment, is not intended or written to be used, and cannot be used, by you or any other recipient for the purpose of avoiding penalties that may be asserted by the Internal Revenue Service.